# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

**WILLIAM MCKISSACK**
12623 SAINT JOHN AVENUE
CLEVELAND, OHIO 44111

*Plaintiff*

Vs.

**RYAN JASINSKY / AS EMPLOYEE & AGENT
OF WESTLAKE POLICE DEPARTMENT / CITY OF WESTLAKE**
27300 HILLIARD BLVD.
WESTLAKE, OHIO 44145

AND

**RYAN JASINSKY, INDIVIDUALLY**
6888 BRADFORD CIRCLE
INDEPENDENCE, OHIO 44131

AND

**DENNIS M. CLOUGH / AS MAYOR OF WESTLAKE & INDIVIDUALLY**
27700 HILLIARD BLVD.
WESTLAKE, OHIO 44145

AND

**MICHAEL P. MALONEY / AS LAW DIRECTOR OF WESTLAKE & INDIVIDUALLY**
27700 HILLIARD BLVD.
WESTLAKE, OHIO 44145

AND

**CITY OF WESTLAKE, OHIO**
27700 HILLIARD BLVD.
WESTLAKE, OHIO 44145

*Defendants*

CASE NO. 1:23-cv-00984

**AMENDED COMPLAINT**
***WITH* JURY DEMAND**

JUDGE CHARLES ESQUE FLEMING

1

## COMPLAINT:

- **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS: IN TORT**
- **NEGLIGENCE: IN TORT**
- **FALSE ARREST: IN TORT**
- **MALICIOUS PROSECUTION: IN TORT**
- **EXCESSIVE FORCE: IN TORT**
- **ILLEGAL SEARCH & SEIZURE: IN VIOLATION OF U.S. CONSTITUTION 4TH AMENDMENT**
- **ILLEGAL EXCESSIVE FORCE: IN VIOLATION OF U.S. CONSTITUTION 4TH AND/OR 14TH AMENDMENTS**
- **ILLEGAL DENIAL OF INALIENABLE RIGHTS OF OHIO CONSTITUTION ARTICLE I, SECTION 1 & ORC 2921.45(A)**
- **ILLEGAL DENIAL OF RIGHT TO BE SECURE IN PERSON OF OHIO CONSTITUTION ARTICLE I, SECTION 14 & ORC 2921.45(A)**
- **FALSE POLICE REPORT: IN VIOLATION OF ORC 2921.13**
- **INTIMIDATION: IN VIOLATION OF ORC 2921.03**
- **DERELICTION OF DUTY: IN VIOLATION OF 2921.44**

## VENUE & JURISDICTION

1. Plaintiff at all times relevant herein was an adult resident of Cuyahoga County, Ohio and a citizen of the State of Ohio.

2. Defendant Ryan Jasinksy at all times relevant herein was an adult resident of Cuyahoga County, State of Ohio, and was acting in both his individual capacity and as an employee, officer and agent of the Westlake, Ohio police department, a municipal police power enforcement subsidiary/subdivision of the Defendant City of Westlake as authorized under ORC 715.05, and as an employee, officer and agent of the Defendant City of Westlake.

3. Defendant City of Westlake is an Ohio home rule municipal corporation of local self-government located in Cuyahoga County and operating under Sections 3, 7, 8 and 9 of Article 18 of the Ohio Constitution. In such capacity the City of Westlake can sue and be sued. City of Westlake was at all times relevant herein, through its subsidiary/subdivision

Westlake Police Department, the employer, supervisor, principal, and trainer of Defendant Jasinsky.

4. Defendant Dennis M. Clough was at all times relevant herein the Mayor of the City of Westlake, and an adult resident of Cuyahoga County, State of Ohio.

5. Defendant Michael P. Maloney was at all times relevant herein the Law Director of the City of Westlake, Ohio and an adult resident of Cuyahoga County, State of Ohio.

6. Venue is proper in this court based upon the residence in and contacts of all defendants with Cuyahoga County. The State of Ohio has jurisdiction over all causes of action, jurisdiction which is not preempted by 42 United States Code Section 1983, which states:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ."

The applicable preemption doctrine is known as "Complete Federal Preemption," which provides a basis for federal question jurisdiction when a federal statute is so broad that it wholly displaces any state-law claims relating to the same subject matter (*Aetna Health Inc. v. Davila,* 542 U.S. 200, 207 (2004). Under the complete preemption rule, a state-law claim will fall within the federal question jurisdiction of the federal courts if it is preempted by a federal statutory scheme that provides the exclusive cause of action for the harm alleged. A claim within the scope of the federal statute is therefore based on federal law, even if pleaded in state-law terms. When complete preemption applies, a defendant may remove the pre-empted state-law claims to federal court. (*Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003).

3

The US Supreme Court has held that complete preemption applies to state law claims relating to only three federal statutes:

- Section 301 of the Labor Management Relations Act.
- Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974.
- Sections 85 and 86 of the National Bank Act. (*Sullivan v. Am. Airlines*, 424 F.3d 267, 272 (2d Cir. 2005).)

Beyond Complete Federal preemption, the U.S. Supreme Court has identified two main types of preemption: express and implied, neither applicable in this matter.

Defendants will undoubtedly attempt to remove this case to Federal court under the complete preemption rule. However, 42 U.S.C. 1983 is not so broad that it wholly displaces state-law claims relating to the same subject matter. 42 U.S.C. 1983 provides a cause of action in this matter for unconstitutional excessive force and search and seizure only; it does not preclude Plaintiff's Ohio tort claims for intentional infliction of emotional distress, negligence, and malicious prosecution, nor his statutory claims, any of which are not "the same subject matter." A quick review of the Statement of Facts will show that Plaintiff's causes of action accrue in a sequence of events which took remarkable twists and turns. While the final act – the splitting of Plaintiff's skull - is necessarily one and the same thing, each sequential event is its own subject matter.

Similarly, 42 U.S.C. 1983 does not preempt Plaintiff's Ohio Constitutional Article I Bill of Rights claims of being deprived of the enjoyment and liberty of life, of being denied happiness and safety, of being denied security in his person, and of being protected against unreasonable searches and seizures. Ohio provides a statutory cause of action for violations of Ohio civil rights in ORC 2307.60, a statute which has been considered and interpreted numerous times by both Ohio and federal courts without a finding that it is

4

preempted by Section 1983. [See *Dancybey v. Dancy-Dunlap*, Court of Appeals of Ohio, Eighth Appellate District, 2022-Ohio-2772 (2022) where the court upheld 2307.60(A)(1) treble damage relief; *Harris v. Cunix*, Court of Appeals of Ohio, Tenth Appellate District, 2022-Ohio-839 (2022), holding 2307.60 (A)(1) is subject to a six-year statute of limitations; *Buddenberg v. Weisdack*, United States District Court for the Northern District of Ohio, Eastern Division, 2018 U.S. Dist. LEXIS 108333: "Recently, in Jacobson v. Kaforey, the Ohio Supreme Court held that ORC § 2307.60 independently authorizes a civil action for damages caused by criminal acts. 149 Ohio St. 3d 398, 2016-Ohio-8434, 75 N.E.3d 203, 204 (Ohio 2016). The Ohio Supreme Court determined that the language of ORC § 2307.60 is plain and unambiguous and found that ORC § 2307.60(A)(1) "specifically authorize[s] a civil action for damages based on the violation of any criminal statute. . . [I[n 2007, the Ohio General Assembly amended ORC § 2307.60 to create a presumption of civil liability when the defendant had been convicted of a criminal violation. Am. Sub. S.B. 117. Had the General Assembly wanted to make a criminal conviction a condition precedent to establishing an ORC § 2307.60 claim, they presumably could have done so." Also see *Conti v. Doe*, United States District Court for the Southern District of New York, 2019 U.S. Dist. LEXIS 31408 (2019), analyzing a conflict between ORC 2307.60(A)(1) and the law of Oregon without discussing 1983 preemption for either state's remedy law.]

There is no controlling law that holds that the Ohio Constitution is preempted by the U.S. Constitution when there is no conflict between the two. Indeed, the Ohio Supreme Court routinely recognizes that the Ohio Constitution provides broad protections for

individual rights, and that these protections are independent of the United States Constitution. See *Arnold v. Cleveland*, 67 Ohio St.3d 35, 42, 616 N.E.2d 163 (1993) ("The Ohio Constitution is a document of independent force."); *State v. Mole*, 149 Ohio St.3d 215, 2016-Ohio-5124, 74 N.E.3d 368, ¶ 21 ("Federal opinions do not control [the Court's] independent analyses in interpreting the Ohio Constitution, even when [it looks] to federal precedent for guidance.").

Because the Ohio Constitution "accord[s] greater civil liberties and protections to individuals and groups" than its federal counterpart, *Arnold* at 42, the Ohio Supreme Court has held in numerous contexts that the Ohio Constitution is more protective than the federal constitution, including: free exercise of religion, Humphrey v. Lane, 89 Ohio St.3d 62, 728 N.E.2d 1039 (2000); juveniles' right to counsel, State v. Bode, 144 Ohio St.3d 155, 2015-Ohio-1519, 41 N.E.3d 1156; government appropriation of private property, City of Norwood v. Horney, 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115; exclusion of physical evidence obtained due to unmirandized statements, *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985; and ***warrantless arrests for minor misdemeanors*** [emphasis added because it is a particularly salient issue in this case, see Statement of Facts, *infra*] *State v. Brown*, 99 Ohio St.3d 323, 2003-Ohio-3931, 792 N.E.2d 175.

The Ohio Supreme Court also has made clear that it may find the Ohio Constitution provides greater protections for individual rights, even if that means departing from its prior decisions, particularly when the United States Supreme Court has narrowed the scope of corresponding federal rights. See, e.g., *Humphrey*, 89 Ohio St.3d at 67, 728 N.E.2d 1039 (acknowledging the United States Supreme Court's decision in Employment Division,

6

Department of Human Resources of Oregon v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) prompted the Court to depart from prior decisions that "traditionally mirrored federal jurisprudence" and holding the Ohio Constitution's Free Exercise Clause 26 is broader than its federal counterpart); see also State v. Hackett, 164 Ohio St.3d 74, 2020-Ohio-6699, 172 N.E.3d 75, ¶ 26 (Fischer, J., concurring) (encouraging parties to "not presume that the rights afforded to a person under the United States Constitution are the only rights or are the same rights as those afforded to a person under the Ohio Constitution . . . even when this court has previously ruled that the state and federal Constitutions are coextensive"); Bode at ¶ 23-24.

Further, a state-law claim will only come within the federal question jurisdiction of the federal courts if the state claim is preempted by *a federal statutory scheme that provides the exclusive cause of action* for the harm alleged. While 42 U.S.C. 1983 provides *a* cause of action against government agencies, Ohio law provides many of its own. Ohio's political-subdivision potential immunity is only an affirmative defense, not an elimination of any cause of action. *Whitehall ex rel. Wolfe v. Civ. Right Comml*, Supreme Court of Ohio, 74 Ohio St.3d 120 (1995).

If the Defendants assert that it is in fact *Monell* that upholds 42 U.S.C. 1983 as the sole procedural cause of action for Plaintiff's search and seizure and excessive force claims then their argument fails even harder - *Monell* is a U.S. Supreme Court holding, and decidedly not part of a "federal statutory scheme." Ohio courts have and can apply the law of the U.S. Supreme Court, as the Supreme Court held over 200 years ago: "[T]he constitution not only contemplated but meant to provide for cases within the scope of the

7

judicial power of the United States, which might yet depend before state tribunals. It was foreseen that in the exercise of their ordinary jurisdiction, state courts would incidentally take cognizance of cases arising under the constitution, the laws, and treaties of the United States." *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 342 (1816).

Finally, this court needs only to look to itself for precedent that it can and should interpret a *Monell* claim for an Ohio citizen. *Meekins v. City of Oberlin*, Court of Appeals of Ohio, Eighth Appellate District, 2019-Ohio-2825 (Cuyahoga County 2019), applying the law of the United States Supreme Court in *Monell v. New York City Dept. of Social Services*, Supreme Court 436 U.S. 658 (1978).

## STATEMENT OF FACTS

### THE STOP

7. On October 18, 2021 Plaintiff, a young black male, was driving in Westlake with his girlfriend, enroute to a movie theater, when he was stopped by Defendant Jasinsky for alleged illegal tinted windows. Within 13 minutes of being racially profiled and stopped by Jasinsky, Plaintiff was on the street, the back of his head split open, an injury which would require multiple surgical staples to close and has caused Plaintiff continuing complications.

8. Jasinsky's dash cameras (State of Ohio Evidence marked as "tick178593123-tick178597768-video0.mp2 and [. . .] mp4", hereinafter "Dash-Cam") captured the pre-stop and post-stop behavior of Jasinsky, to the front, side and rear of Jasinsky's cruiser. Jasinsky's Dash-Cam video should be required viewing of all Ohio students for definition of what a "modern police state" looks like.

8

9.  Prior to the stop Jasinsky is shown on the Dash-Cam weaving in and out of traffic and passing vehicles in the turning lane, eventually pulling up next to and slightly behind Plaintiff's car at a traffic light, which afforded Jasinsky a long, unobstructed view into Plaintiff's side driver's window. When the light turns green Jasinsky cuts over from the turning lane in front of several vehicles to get behind Plaintiff's car. After calling in the Plaintiff's plate, just prior to sounding his siren, Jasinksy can be heard remarking on the Dash-Cam, "This should be interesting."

10. At this point all Jasinsky knows is that the car has tinted windows, and that it is being driven by a black male. What would make the stop "interesting?"

11. Upon stopping the Plaintiff's vehicle Jasinsky, along with a plain-clothed black male, approach the passenger side. Jasinsky asks Plaintiff and his passenger for identification. When the passenger asks Jasinsky why they are being stopped, Jasinsky coyly responds "I'll let you know."

12. Jasinsky then asks what Plaintiff's front window tint is; Plaintiff replies "35%." Jasinsky then states that Ohio law requires 50% light. In fact, Plaintiff believed that his front windshield tint was less than 50%; that it was 35%, admitting 65% light. Jasinsky says "since you admitted to the tint being illegal, I don't even need to check it." Jasinsky then says, "No big deal if that's all you've got going on right?" Jasinsky follows this up with immediately asking the Plaintiff if he can search his car. Why?

13. As inauspicious a start as this is, Jasinsky doubles down. Upon returning to his cruiser Jasinsky asks dispatch for a canine unit. Did Jasinsky smell weed? He hasn't commented that he did; nor has the plain-clothed black male who also apparently re-entered Jasinsky's

9

cruiser articulated a concern about drugs. While Jasinsky awaits an answer as to a canine unit he does suddenly remember that he did smell weed "off of the driver, when I approached the driver's side." (Dash-Cam at @ 6:10 minutes et seq.)

14. Unfortunately - for Officer Jasinsky and the City of Westlake - up until this point in the Dash-Cam video Jasinsky *has not* approached the driver's side of the vehicle. ***Nor will he ever.*** Fortunately for the civil rights of Ohioans, Jasinsky is live streaming his conscience.

15. Not yet happy with his pre-textual articulations, Jasinsky decides to triple down. He follows up his lie about marijuana odor by remarking that he also saw marijuana shake in the Plaintiff's console. No marijuana shake is ever recovered from the Plaintiff's console, nor noted in the police report, nor confirmed by the plain-clothed black male or by the second officer who arrives within a few minutes of the stop, and who also conducts a two-minute-prior-to-the-occurrence-of-excessive-force viewing of the interior of the Plaintiff's vehicle.

16. The illegal tint violation investigation has now been abandoned by Jasinsky. There are no marijuana indications that are true. Plaintiff has no warrants and possesses a valid driver's license and vehicle registration. Yet Jasinsky plows on.

17. What does Jasinsky say next as he awaits dispatch? "Strangest name. McKissack. I was not expecting that from a McKissack." Expecting what? What does the word "that" mean in this context? Is he surprised that the name is associated with a black male? Is Officer Jasinsky seeing the world through race-based eyes? Is Officer Jasinsky engaging in racial stereotyping, or racial profiling, at this point?

18. Next, 8:25 minutes into the stop, after being told by dispatch that no canines are available, Jasinsky states that both the Plaintiff and his passenger are "nervous", so he is "just going

10

to go ahead and get them out." Why? Nervousness is decidedly not a valid basis for an illegal seizure in Ohio.

19. Jasinsky proceeds back to the passenger side of Plaintiff's car and asks Plaintiff to exit. Jasinksy asserts "law" that he can order Plaintiff out of the vehicle. Plaintiff complies immediately. Jasinsky then walks Plaintiff back to his cruiser and asks for consent to a pat search for weapons, which Plaintiff provides willingly. Finding no weapons Jasinsky directs the Plaintiff to the side of his cruiser, off-camera, to get "some further information."

20. Ten minutes into the stop Jasinksy, a former Navy Seal and trained mixed martial arts fighter, has failed to find reasonable suspicion of a crime, has abandoned the basis for his police stop, has articulated lies as corroborated by the Dash-Cam video, has convinced Plaintiff to consent to a weapons pat down with no legal basis, and now has the Plaintiff trapped against his cruiser by his own body.

21. The stop continues. While off-camera Jasinsky can be heard on the audio track stating that the reason he asked the Plaintiff to step out of the car and come back to his cruiser to search him was because the Plaintiff was the "most nervous he's ever seen in thousands of traffic stops." Not weed shake, not weed odor, not illegal tints, but nervousness. During this entire sequence Jasinsky is essentially bullying the Plaintiff, mocking him, repeating "No doubt, no doubt" to every answer the Plaintiff tries to give to Jasinsky's barrage of questions, questions which amount to nothing more than thinly disguised inquires as to why the Plaintiff thought he was permitted to be in Westlake to begin with.

22. Jasinsky then tells the Plaintiff that he "understands [the Plaintiff's nervousness], I'm a scary dude." Jasinsky is both intimidating and inciting the Plaintiff.

11

23. Again, this stop is being prolonged after the Plaintiff's warrant, driver's license, and vehicle registration inquires have all come back clean, the tinted windows investigation has been abandoned, no canine dog is available, and is based upon Jasinsky's lies about weed and a ridiculous assertion of nervousness.

24. Next, and importantly, Jasinsky states, in response to Plaintiff's assertion that he isn't nervous, "You aren't now!" So, even the nervousness basis of the stop, by Jasinsky's own admission, has ended. Why is Jasinksy still pinning the Plaintiff against his cruiser?

25. With the Plaintiff trapped against the cruiser, a second officer arrives and slowly approaches the passenger side of Plaintiff's car and spends a few minutes looking into the windows. The passenger is then seen handing a small container out of the passenger window to the second officer. The second officer holds the container up, immediately turning and yelling to Jasinsky that the container has alcohol in it. The second officer doesn't smell the bottle or even check the seal. If it's sealed, it's not an open container.

26. We are now 12 minutes into the stop. Jasinsky promptly tells the Plaintiff that he now has probable cause to search Plaintiff's car, based upon "an open container." Jasinsky continues to pin the Plaintiff, instructing him to turn around to be handcuffed. It is unclear at this point if Jasinksy is effecting an arrest for an open container or is initiating a pre-arrest detention with cuffing for officer safety *because Jasinsky is in fear of an open container*.

27. Nonetheless, Plaintiff becomes upset, protesting that the container is old. Plaintiff then panics and attempts to get away from Jasinsky, who promptly catches the Plaintiff within a few steps, physically controls Plaintiff - as the other officer, running, closes within reach

of both Plaintiff and Jasinsky - and then inexplicably lifts the Plaintiff's body off the ground, tilts Plaintiff into a horizontal position, and then slams the Plaintiff headfirst onto the roadway, cracking the Plaintiff's head open.

28. An open container violation is a minor misdemeanor in Ohio and not an arrestable offense.

29. Jasinsky used deadly and/or excessive force against the Plaintiff.[1]

---

[1] **DEADLY & EXCESSIVE FORCE** The Supreme Court has held that use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").

In *Hanson v. Madison Cty. Det. Ctr.*, United States Court of Appeals for the Sixth Circuit, 736 Fed. Appx. 521 (2018) the court held:

> The Sixth Circuit has long adhered to the view that the Fourth Amendment prohibits excessive force under certain pre-trial circumstances. *See, e.g., McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir. 1988). Fourth Amendment protections do not vanish at the moment of arrest. *Aldini*, 609 F.3d at 865. Instead, Fourth Amendment protections, including those against excessive force, "continue during booking" and at all times "prior to a probable-cause hearing." *Id.* at 865, 867.

> Hanson's Fourth Amendment claims are governed by an objective reasonableness standard. *See id.* at 865. That is, [t]he officer's subjective intentions are irrelevant to the Fourth Amendment inquiry. *Phelps*, 286 F.3d at 299; *see Kingsley*, 135 S. Ct. at 2472-73. Thus, while Hanson points to 'several comments' captured on video that provided insight into the deputies' intent, beliefs, feelings, and expectations regarding their interactions with Hanson, these references, insofar as they are relevant to prove intent, are not relevant to our objective inquiry. Nevertheless, certain comments remain relevant as to whether excessive force in fact occurred.

> The objective reasonableness standard turns on the 'facts and circumstances of each particular case. *Kingsley*, 135 S. Ct. at 2473 (quoting *Graham*, 490 U.S. at 396). A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. *Id. See Phelps*, 286 F.3d at 299 (noting the standard requires deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case).

> Under this standard, courts assess the totality of the circumstances. *See Graham*, 490 U.S. at 397. The Supreme Court has recently detailed non-exclusive [c]onsiderations that may bear **[\*529]** on the reasonableness or unreasonableness of the force used in the pre-trial context: (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or to limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. *Kingsley*, 135 S. Ct. at 2473 (citing *Graham*, 490 U.S. at 396).

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

30. *Even though all criminal charges brought by the City of Westlake against Plaintiff were* dismissed by the State of Ohio after the criminal court found that Jasinsky's actions violated Plaintiff's constitutional rights (see attached Judgment Entry marked as Exhibit M and incorporated herein) the City of Westlake did not discipline Jasinksy for the injuries he caused Plaintiff.

**CITY OF WESTLAKE KNOWN CUSTOMS, POLICIES, PRACTICES, PROCEDURES & FAILURE TO TRAIN**

31. Attached as Exhibits and incorporated into all factual allegations and causes of action are the following known customs, policies, practices, procedures and training information of the City of Westlake[2] which establish its **_Monell_** **liability** (see discussion *infra* at page 25):

    A. Exhibit A "Make Westlake Safer Today" from Mayor Clough dated 3/19/2020 and signed by Westlake Police Chief Kevin Bielozer and Defendant Jasinsky. In Exhibit A Clough states that police officers will be provided with training to successfully perform *duties consistent with the values outlined in the document*, including in the area of "Policy, law, ethics, and Priority of Life", where Clough

---

which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.' *Ashcroft v. al-Kidd*, 563 U.S. 731, 743, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)).

Once the defendant raises a qualified-immunity defense, the burden shifts to the plaintiff to demonstrate both [1] that the challenged conduct violated a constitutional or statutory right, and [2] that the right was so clearly established at the time of the conduct 'that every reasonable official would have understood that what he [was] doing violate[d] that right.'" *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014) (third and fourth alterations in *T.S.*) (quoting *al-Kidd*, 563 U.S. at 741).

However, the Supreme Court continue[s] to stress that lower courts 'should think hard, and then think hard again,' before addressing both qualified immunity and the merits of an underlying constitutional claim. *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 n.7, 199 L. Ed. 2d 453 (2018) (quoting *Camreta v. Greene*, 563 U.S. 692, 707, 131 S. Ct. 2020, 179 L. Ed. 2d 1118 (2011)).

[2] Material from FOIA responses of the City of Westlake and public material.

writes that he "expects the officer to decide" and to "do what you believe is right, seek guidance when you need it." However, no duties are mentioned.

While Clough labels Exhibit A as "values", these statements by Clough actually reflect *Monell* actionable customs, policy, pattern and practices of the City of Westlake. What Clough has written in Exhibit A is woefully inadequate and a breach of his statutory duty in that it ***provides no policy, legal or ethical guidance whatsoever***. In fact, the policy established by Clough is a precise abrogation, and *dissimulato* attempt, to transfer responsibility from the City of Westlake to each individual police officer to not only acquire "legal and ethical knowledge", but to also develop, interpret, and implement techniques to apply this knowledge. And, most egregiously, to permit individual police officers to ***self-monitor*** exactly when they need to seek guidance.

B. Exhibit B "Training Task: Use of Force" outline for Jasinsky dated 4/28/2020 (during Jasinsky's probationary period). The document has the words "USC – Garner vs. Tennessee" artfully stamped in the heading, and outlines eight (8) categories, with no details, of use of force techniques. None of the categories are about what to do when a suspect flees. The last category is entitled "Deadly Force." (Tellingly, the Supervisor signature field is not signed.)

The City of Westlake appears to be engaging in duplicitous FOIA technique. While it has provided personnel files that show only 8 police officers as having attended Use of Force Training (see *infra*) (Jasinsky not being one) this probationary "Training Task" appears to be a Use of Force training session. Why is the City of Westlake not claiming these materials as Use of Force training? Why are there no details of the training? Who is the instructor for new cops in Use of Force?

Plaintiff avers that the City of Westlake is not claiming this training as Use of Force training because it is both woefully inadequate and not ORC or OAC compliant. Most significantly, it appears that Westlake's policy is to ***only*** require this probationary training task to be completed to commission an officer and set him loose on the Ohio citizens that happen into Westlake City.

C. Exhibit C "Probationary Officer Evaluation Report" for Jasinsky dated 5/8/2020. States that Jasinsky "excels in self-initiated traffic enforcement and criminal interdiction" and has "attained a solid grasp of search and seizure." Also states that Jasinsky "has exceptional instincts and behavior recognition when dealing with people."

15

The report provides no basis for these evaluations. The report goes on to state that due to Covid-19 Jasinsky "has had limited exposure to a variety of areas of basic investigation." The report also scores Jasinsky a "1.8/3.0" in the area of "Criminal laws/ordinances/prosecution", his second lowest score besides 1.7 in written communication. A score of 2 or less is "inadequate" *per the document*.

This report shows the practice of Westlake to not only make improper and reckless judgment analyses of a police officer's skills but is an admission that Jasinksy is failing in the most basic area of "criminal law." ***The document is a further admission that Westlake permits "inadequately" skilled police officers to roam its streets.***

Paradoxically, Jasinksy is praised in this report for his grasp of search and seizure, the very area which was seized upon by a Cuyahoga County Common Pleas Court to dismiss the criminal charges initiated by Jasinsky against Plaintiff because Jasinsky's behavior was in violation of 4th Amendment search and seizure law. Essentially one court has already determined that the City of Westlake doesn't know what it's doing when it comes to training and supervising its police officers in Constitutional issues. This document corroborates that determination.

D. Exhibit D "Training Record" for police officer Joshua Riley for years 1999-2014. In that time Officer Riley completed over one hundred training classes. Exactly one, in 2000, was on use of force.

A review of 50+ Personnel files provided by the City of Westlake for its police officers through 2022 show eight (8) attended a Use of Force training exercise. Jasinsky was not one of them.

Westlake police Captain Gerald Vogel, employed by Westlake since 1999, shows no completed Use of Force training in his entire career - through 2022 - as documented in his provided Personnel file.

E. Exhibit E, Page 1 "Notice of Discipline" from Mayor Clough to Officer Jeff Agoston, dated 11/5/2021. Shows that Clough is the ultimate supervisor of Westlake police officer behavior.

16

Agoston is disciplined for "failing to communicate with a subordinate officer" and "failure to ensure proper review" of the use of force incident that occurred on Agoston's shift in "October 2021." Assuming arguendo that this use of force incident was the head-splitting of the Plaintiff on October 18, 2021, and that **Agoston is Jasinsky's supervisor**, this document alarmingly shows that the City of Westlake disciplined Jasinksy's supervisor for *after-the-fact failures* (see Exhibit H *infra*), but not Jasinsky himself for the actual use of force; Jasinsky's Discipline sub-folder in his Personnel file is empty.

Page 2 of Exhibit E is the 3rd quarter 2021 "Evaluation Report" of Agoston prepared by Captain Vogel. The report states that Agoston's job performance was below standard in "successfully completes all tasks as defined within job description and policy, absent negative disciplinary action."

F.  Exhibit F "Westlake Police Department Policies & Procedures" certification page (page 1 of 59 pages provided) of Officer Jeff Agoston dated 12/18/2008, the date of Agoston's hire by Westlake. The entire provided Westlake Police Department Policies & Procedures document, dated in sub-parts 9/15/1987, 12/14/1987, 12/23/1987, 4/25/1997, shows *no* Use of Force policy in effect as of 12/18/2008.

A review of Agoston's Personnel file shows dozens of Training Tasks completed by Agoston at hire; *zero* are on the use of force. Agoston's Personnel file also shows 100+ Training classes completed through 2021; *zero* are in the use of force.

G.  Exhibit G "Evaluation Report" for Jasinsky, 3rd Quarter 2021, dated 9/17/2021. This report states that Jasinsky meets the standard of Measures 24 and 25 "with Distinction." The Measures are "24 . . . not having sustained Personnel Complaint regarding his conduct with members of the Community" and "25 . . . engaging in a preventive education effort with a member of the community."

There are no further Evaluation Reports provided by the City of Westlake for Jasinsky. Plaintiff's head was split open by Jasinksy in the 4th quarter, 2021. Per Westlake, Jasinsky has not had a performance evaluation since the head split. (Of course, if Defendant Maloney has directed that these evaluations be redacted from Jasinsky's file that not only adds weight to the dereliction of duty cause of action but portends other problems for Maloney.)

17

H. Exhibit H. Internet link for and screenshot of an article entitled "Controversial police training course being held in Westlake this week", dated 4/25/2022. The article describes a use of force training seminar for Westlake police officers that is a "national controversy" because the course focuses on *justifying use of force after the fact.*

That the City of Westlake is training and endorsing this approach to use of force by its officers speaks as loudly as any of the above materials to Westlake's culpable customs, policies, patterns and practices, and failure to train that led directly to Plaintiff's injuries. The article lists no other Cuyahoga County police departments, in fact no other Ohio PDs, utilizing this type of use of force training.     (https://www.ideastream.org/news/government-politics/2022-04-25/controversial-police-training-course-being-held-in-westlake-this-week.)

I. Exhibit I "Notice of Discipline" dated 12/8/2020 against Officer JP Toth for violation of Use of Force Policy 300. Westlake "disciplined" Toth by doing absolutely nothing. Toth is one of the only 8/50+ officers who completed Use of Force training, in 2015.

J. Exhibit J are two pages of records for Jasinsky from the "Policy Acknowledgement Report 2018-2022" provided by the City of Westlake. In Exhibit J Jasinsky 'acknowledges' several dozen policies; Jasinsky does not acknowledge any Use of Force Policy.

In fact, many of the Westlake police officers listed in the entire several hundred-page report have not acknowledged Use of Force.

K. Exhibit K are pages 53-60 for "Policy 300 Use of Force" of the 2022 Westlake Police Dept. Policy Manuel. The City of Westlake provided no Policy Manuel dated prior to 2022 other than the 1987-1997 Exhibit F; it appears that Exhibit F was the official Policy Manuel of the Westlake Police on the day that Plaintiff's head was split open in October 2021. Thus, there was no Use of Force Policy in place in 2021.

If "Policy 300" was actually in place in 2021 (see Exhibit I) and Westlake has simply responded with the latest 2022 version, Jasinksy still failed to acknowledge his knowledge of the policy, as well as violated it top to bottom - below are sub-parts 300.3.2(a)-(r) of the Policy entitled "Factors Used to

18

Determine the Reasonableness of Force" [with italic-bold comments added to the policy language]:

**i.** (a) Immediacy and severity of the threat to officers or others. ***Plaintiff posed none.***

**ii.** (b) The conduct of the individual being confronted, as reasonably perceived by the officer at the time. ***Plaintiff has taken 3 steps away from Jasinsky.***

**iii.** (c) Officer/subject factors (e.g.,age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of officers available vs. subjects). ***Jasinsky had size advantage, is an ex-Navy Seal and MMA fighter, was not exhausted or fatigued, and had another officer within arm's length.***

**iv.** (d) The effects of suspected drug or alcohol use. ***None.***

**v.** (e) The individual's mental state or capacity. ***Plaintiff was upset by Jasinsky's own conduct.***

**vi.** (f) The individual's ability to understand and comply with officer commands. ***No issuers re: understanding. Full compliance until the end.***

**vii.** (g) Proximity of weapons or dangerous improvised devices. ***None.***

**viii.** (h) The degree to which the individual has been effectively restrained and his/her ability to resist despite being restrained. ***Non-sensical.***

**ix.** (i) The availability of other reasonable and feasible options and their possible effectiveness. ***Jasinsky had the Plaintiff under control and then flipped him up and down on his head. Jasinsky had already employed "reasonable and feasible" and then chose to escalate.***

**x.** (j) Seriousness of the suspected offense or reason for contact with the individual. ***All misdemeanors not subject to arrest.***

**xi.** (k) Training and experience of the officer. ***Minimal or none.***

**xii.** (l) Potential for injury to officers, suspects, and others. ***Substantial to suspect; none to officers or others.***

**xiii.** (m) Whether the individual appears to be resisting, attempting to evade arrest by flight, or is attacking the officer. ***Once Jasinsky controlled the Plaintiff there was no resisting or attack upon Jasinsky.***

**xiv.** (n) The risk and reasonably foreseeable consequences of escape. ***None.***

**xv.** (o) The apparent need for immediate control of the individual or a prompt resolution of the situation. ***None.***

**xvi.** (p) Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others. ***Plaintiff never posed a threat.***

> > *xvii.* (q) Prior contacts with the individual or awareness of any propensity for violence. ***None.***
> > *xviii.* (r) Any other exigent circumstances. ***None.***

> L. Exhibit L "FSCC Certificate" for Westlake police officer Richard Lea, dated 5/2/2022. Purports to demonstrate that Lea completed a "Force Science Analyst" course. The certificate lists no hours attended and is violative of the standards of the Ohio Peace Officer Training Commission ("OPOTC") Continuing Professional Training standards.
>
> Westlake provided this document as responsive to its training of its police officers in Use of Force. The entirety of the response shows only eight (8) officers including Lea completing Use of Force training.

32. In addition to the above, the City of Westlake in its public records response provided "UoF" documentation for the years 2019-2022. Not until 2022 did Westlake train its police offices in "De-escalation"; for the years 2019-2021 the Use of Force training consisted only of Defensive Tactics, Taser and gun training.

33. Finally, upon information and belief, based upon a review of the thousands of pages of materials provided by the City of Westlake in its FOIA responses, many if not most of the training activities of the Westlake Police Department failed to conform to OPOTC standards, in *per se* violation of the Ohio Revised and Administrative Codes, in that the training lacked hours attended, is exclusively on-line, was not conducted by a properly credentialed instructor, was not performed per a written formal lesson plan, did not contain the required courses and/or did not meet the minimum hour requirements.

34. All the above facts collectively demonstrate actual customs, policies, patterns and practices of the City of Westlake relating to its police force, as well as a woeful failure to train its police officers, which amounts to deliberate indifference by the City of Westlake, sufficient to find the City of Westlake liable for Plaintiff's injuries under *Monell.*

### JASINSKY VIOLATED A "CLEARLY ESTABLISHED RIGHT"

35. Once the defendant raises a qualified-immunity defense, the burden shifts to the plaintiff to demonstrate both [1] that the challenged conduct violated a constitutional or statutory right, and [2] that the right was so clearly established at the time of the conduct 'that every reasonable official would have understood that what he [was] doing violate[d] that right.' *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014). The Cuyahoga County Common Pleas Court has already determined that Jasinsky violated Plaintiff's 4th Amendment constitutional rights during the Stop (see Journal Entry attached as Exhibit M and incorporated herein) regarding probable cause. Jasinsky's use of force also violated Plaintiff's 4th Amendment constitutional rights (and 14th Amendment if it is found that Plaintiff was under arrest at the time of the use of force) regarding excessive force, as defined under controlling federal case law.

36. In *Hanson v. Madison Cty. Det. Ctr.*, United States Court of Appeals for the Sixth Circuit, 736 Fed. Appx. 521*; 2018 FED App. 0246N (2018), the 6th Circuit discusses different types of force as being either *de minimis* or crossing "the *constitutional* line." *Hanson* at 530: "Not every push or shove . . . violates the Fourth Amendment." [Also discussed by *Hanson* as being *de minimis*: karate chop to side of neck; throwing plaintiff against van and kneeing him; forearm force to neck.]

37. In contrast, *Hanson* found a choke hold applied - after resisting had ceased - to have crossed the constitutional line: "In addition, assuming Hanson had 'stopped resisting', *Rudlaff v.*

21

*Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015), which a jury could conclude from the video, Deputy Whitaker was on sufficient notice that continuing to choke Hanson violated clearly established law. *See, e.g., Griffith v. Coburn*, 473 F.3d 650, 657, 660 (6th Cir. 2007) ([I]f the jury concludes that [the officer] used the neck restraint without an objectively reasonable belief that [the suspect] posed a threat of serious bodily injury, then it is obvious to us that 'no reasonable officer could believe that such [use of force] would not violate another's constitutional rights') (fourth alteration in *Griffith*) (quoting *Brandenburg v. Cureton*, 882 F.2d 211, 216 (6th Cir. 1989)); *Coley v. Lucas Cty.*, 799 F.3d 530, 540-41 (6th Cir. 2015) (citing *Valencia v. Wiggins*, 981 F.2d 1440, 1447 (5th Cir. 1993)) (The use of a chokehold on an unresisting—and even an initially resistant—detainee violates the **[\*533]** [Constitution].).)." *Hanson* at 531.

38. *Hanson* continues: "In light of the Supreme Court's calculation that 'the extent of the plaintiff's injury' is relevant to a court's assessment of whether a constitutional violation occurred, *see Kingsley*, 135 S. Ct. at 2473, we also note that Hanson has not suggested any of his injuries were caused during this segment—a split-second shove into the wall. It's true that in the Eighth Amendment context, the Supreme Court has affirmed the 'core judicial inquiry' is not 'the extent of the injury', but rather /the nature of the force—specifically, whether it was nontrivial and was applied . . . maliciously and sadistically to cause harm. *Wilkins*, 559 U.S. at 39-40 (internal citation and quotation marks omitted) (alteration in *Wilkins*). Nonetheless, [t]his is not to say that the absence of serious injury is irrelevant to the Eighth Amendment inquiry. *Id.* at 37 (quoting *Hudson*, 503 U.S. at 7). Indeed, 'the extent of the plaintiff's injury' clearly is one factor courts may consider when

22

determining whether the use of force was *objectively* reasonable under the Fourth or Fourteenth Amendments. *Kingsley.*"

39. In this case the Plaintiff ***never*** resisted. Certainly, a head-first slam to the pavement - an injury requiring surgical staples to close - of an unarmed, barely fleeing suspect who posed no risk to Jasinsky's safety is the equivalent of an unconstitutional chokehold.

40. Jasinsky was well aware that his actions in a head-first body slam of the Plaintiff without an objectively reasonable belief that Plaintiff posed a threat of serious bodily injury was an obvious breach of the standard that no reasonable officer could believe that such [use of force] would ***not*** violate another's constitutional rights.

## PLEADING STANDARD

41. *Hanson* goes on to discuss what type of pleading averments will fail summary judgment: finding that an averment of *respondeat superior* fails; averment of a lack of prior excessive force discipline fails; an averment of no use of force training for a period of time fails; an averment of bad judgment, not lack of training, fails, concluding: "Hanson has still not met his burden to show that a training program, or lack thereof, amounted to a policy of deliberate indifference. It does not suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *See City of Canton v. Harris*, 489 U.S. 378, 389-90, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989).

42. In this case the City of Westlake has produced no documentation that it had any training in place on use of force for the two decades prior to this incident, specifically use of force on a fleeing suspect or de-escalation policies. The only use of force training certifications - if

23

even legally compliant - provided by Westlake for its police officers prior to 2022 focused on weapons, self-defense, and tasers. In addition, even assuming *arguendo* that Westlake had a Use of Force Policy in place prior to the provided 2022 Policy Manuel many of the Westlake police officers failed to acknowledge the policy, let alone were trained in it.

43. In summary:

    A. Only 8 out of 50+ Westlake police officers completed a Use of Force training course through the end of 2022.
    B. Much if not all the training that was completed by the 8 officers does not meet OPOTC training standards and is in violation of Ohio law.
    C. Many Westlake officers failed to even acknowledge the Use of Force policy.
    D. Westlake did not begin teaching De-escalation procedures until 2022. Prior to 2022 Westlake taught Defensive Tactics which included training only in Weapons, Tasers, and self-defense.
    E. Westlake conducted no training of any officer on Use of Force on a fleeing suspect.
    F. Westlake conducted no training on the Use of Deadly Force.

44. Clearly, Westlake has – failingly - met the 6th Circuit *Hanson* standard of operating under "a policy of deliberate indifference" in its police officer training regime.

## CAUSES OF ACTION

Plaintiff incorporates by reference all the above factual allegations and all the attached Exhibits and asserts the following causes of action against Defendants individually and/or as employee, jointly and/or severally, and/or exclusively, as delineated within each cause of action and Claim Prayer.

## 1. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS IN TORT

Defendant Jasinsky by his actions towards the Plaintiff intentionally inflicted emotional distress upon the Plaintiff. As a direct and proximate result of Jasinsky's actions Plaintiff suffered and continues to suffer serious physical harm as well psychological issues, lost wages, loss of future earnings, emotional distress and/or trauma, loss of enjoyment of life, medical and/or hospital

bills, future medical expense, scarring on his body, damage to his clothes, and protracted pain and suffering.

The City of Westlake should be denied immunity protection because its customs, policies, pattern and practices, as well as its failure to train - in that such failure to train does reflect a deliberate and/or conscious choice by Westlake to disregard the risk to citizens who encounter its police force – violate the law as edified in *Meekins v. City of Oberlin*, Court of Appeals of Ohio, Eighth Appellate District, 2019-Ohio-2825 (Cuyahoga County 2019), applying the law of the United States Supreme Court in *Monell v. New York City Dept. of Social Services*, Supreme Court 436 U.S. 658 (1978). ("***Monell* liability**.")

The *Meekins* court held:

For purposes of municipal liability under Section 1983, a plaintiff may establish the existence of a municipal policy or custom through evidence of (1) an official policy or enactment; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision or (4) a custom of tolerance of or acquiescence in federal rights violations. Sutton, 183 Ohio App. 3d 616, 2009-Ohio-4033, 918 N.E.2d 181, at ¶ 21, citing Pembaur, 475 U.S. at 480, 106 S.Ct. 1292, 89 L.Ed.2d 452, and Thomas v. Chattanooga, 398 F.3d 426, 429 (6th Cir.2005).

[*P53] Meekins does not contend that an express, written policy or procedure was the "moving force" behind the deprivation of his constitutional rights. Rather, he asserts that the city's "inaction," i.e., its failure to provide adequate staffing, training and supervision, amounted to an "official [municipal] policy" that "led to [his] constitutional harm."

[*P54] Inadequacy of police training or supervision may serve as the basis for Section 1983 liability only where the failure to train or supervise amounts to "deliberate indifference to the rights of persons with whom the police come into contact." Canton at 387 ("Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.").

[*P55] Thus, to succeed on a Section 1983 claim against a municipality based on inadequate police training or supervision, a plaintiff must show that: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; (3) the inadequacy was closely related to or actually caused the

25

plaintiff's injury and (4) the violated right is clearly established. Brown, 814 F.3d at 463; Arrington-Bey, 858 F.3d at 994-995.

[*P56] "[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Cty. Commrs. of Bryan Cty. v. Brown, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); Shadrick v. Hopkins Cty., 805 F.3d 724, 737 (6th Cir.2015) (observing that the Supreme Court has described "deliberate indifference" as "'lying somewhere between the poles of negligence at one end and purpose or knowledge at the other'" and that it is "'routinely equated * * * with recklessness'"), quoting Farmer v. Brennan, 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

[*P57] Although a "pattern" of similar constitutional violations is "ordinarily necessary" to demonstrate deliberate indifference, "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." Bryan Cty. at 409; see also Shadrick, 805 F.3d at 738-739. "'[O]bvious potential for such a violation' has two elements: It must be obvious that the failure * * * will lead to certain conduct, and it must be obvious (i.e., clearly established) that the conduct will violate constitutional rights." Arrington-Bey at 995. Thus, single-incident liability exists "in a narrow range of circumstances" where a federal rights violation "'may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" Bryan Cty. at 409. "The high degree of predictability may also support an inference of causation — that the municipality's indifference led directly to the very consequence that was so predictable." Bryan Cty. at 409-410.

[*P58] In support of his claim that the city's "policy" of inadequate staffing, training or supervision was the "moving force" behind the violation of his constitutional rights, Meekins points to Officer Sustarsic's testimony that (1) because he was the only patrol officer on duty on March 23, 2016 — as was the case the majority of the time he worked — he was unable to speak with Meekins before requesting an arrest warrant and (2) this "lack of staffing" caused Officer Sustarsic to "cut short" his investigation and prevented him from substantiating George's allegations before seeking a warrant for Meekins' arrest. With respect to the city's alleged inadequate training of officers, Meekins presented evidence that the city lacked specific policies, procedures or training — beyond any field training upon hire — on issues such as: how to take a police report from an individual, how to investigate a criminal complaint, how to handle a domestic violence complaint, how and when to interview potential defendants prior to arrest, "spoofing" or electronic evidence, what to do after taking a criminal complaint and what should be included with a warrant request. Meekins also presented evidence that the city had no policies or procedures with respect to the supervision and oversight of patrol officers when deciding to seek an arrest warrant. Meekins contends that the "appalling lack of [employee] training" that the city "systematically tolerated" made "it all but certain harms would arise" to individuals such as Meekins, and led to the violation of Meekins' Fourth Amendment rights.

26

[*P59] Although "[a] Monell claim that survives summary judgment is exceedingly rare, and rightly so," Hanson v. Madison Cty. Detention Ctr., 736 Fed.Appx. 521, 542 (6th Cir.2018), we believe that this is such a case.

[*P60] Following a thorough review of the record and construing the evidence in the light most favorable to Meekins, we find that triable issues of fact exist as to (1) whether Officer Sustarsic recklessly made misleading statements or omitted material information when requesting a warrant for Meekins' arrest and (2) whether the municipal court judge would have issued the arrest warrant in the absence of the alleged misleading statements or omissions. We further find, based on the evidence before us, that reasonable jurors could disagree as to whether the alleged inadequacy of the city's staffing, policies, training or supervision was obvious and so likely to result in the violation of the constitutional rights of potential defendants that the city could be found to be deliberately indifferent. We further find that reasonable jurors could disagree as to whether the city was a "moving force" behind the alleged violation of Meekins' constitutional rights, i.e., whether but for the city's alleged "policy or custom" of inadequate staffing, training or supervision, Meekins' constitutional rights would not have been violated.

Given that the standard contained in *Monell* is "deliberate indifference" - which as applied to the City of Westlake in this matter amounts to *disregard of the risk to citizens who encounter its police force* - a good faith basis exists for the expansion of municipality liability to include torts that sound in intent, or "deliberate indifference of the municipality." Deliberate and intentional are after all synonyms.

Thus, the City of Westlake under expanded municipal liability is liable to Plaintiff for the injuries and other losses caused Plaintiff by the City's deliberate indifferent disregard of the risk to citizens of inadequately informed, ill-trained, and unsupervised police officers roaming the streets of Westlake, and thus is liable to Plaintiff for the foreseeable and intentional infliction of emotional distress upon Plaintiff by its employees.

2. **NEGLIGENCE IN TORT**

Defendant Jasinsky negligently stopped, detained, and injured Plaintiff and is liable to Plaintiff in tort for Plaintiff's injury and other losses.

27

Defendant Clough is liable in negligence to Plaintiff for Plaintiff's injuries and other losses by Clough's negligent actions in the form of his failed supervision of the Westlake Police Department and its training of Westlake Police officers including Jasinsky in the law of reasonable suspicion, probable cause, legal detainment, legal arrest, and the use of force including deadly force against unarmed fleeing suspects.

### 3.  INTIMIDATION IN VIOLATION OF ORC 2921.03

Defendant Jasinsky by his actions towards the Plaintiff intimidated Plaintiff knowingly and by force, as well as by filing a materially false writing to intimidate, both criminal violations of Ohio Revised Code Section 2921.03, and is liable to Plaintiff for the injury and other losses caused to Plaintiff as a direct result of Jasinsky's actions. While 2921.03 does not provide a private right to a cause of action and remedy, ORC 2307.60 does. Thus, Jasinsky is liable to Plaintiff for the injury and other losses caused to Plaintiff as a direct result of Jasinsky's actions per 2307.60, in that Jasinsky injured the Plaintiff in Jasinsky's commission of a criminal act.

### 4.  FALSE ARREST IN TORT; ILLEGAL SEARCH & SEIZURE/ARREST IN VIOLATION OF U.S. CONSTITUTION 4TH AMENDMENT

Defendant Jasinsky by his actions towards the Plaintiff violated Ohio tort law of false arrest and the United States Constitution 4th Amendment search and seizure clause, both of which protect the Plaintiff's right to be free from unreasonable search and seizure/arrest and is liable to Plaintiff for all injury and other losses caused to Plaintiff as a direct result of Jasinsky's actions. 42 U.S.C. § 1983 provides a procedural basis for an individual to sue State or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution." The Ohio legislature codified immunity from liability in certain situations for employer/governmental

28

agencies in Ohio Revised Code Section 2744 *et seq*. However, in *Monell v. Department of Social Services of the City of New York,* Supreme Court, 436 U.S. 658 (1978), see fuller discussion *supra,* the Supreme Court held that municipalities will not be immune and will be liable for 1983 claims in certain situations.

Defendant City of Westlake is liable to Plaintiff for injuries and losses per its ***Monell* liability** for Jasinsky's constitutional violations towards Plaintiff. If the court expands municipal liability to foreseeable intentional torts of its employees that emanate from a deliberate indifference of a municipality of the risk to citizens of inadequately informed, ill-trained, and unsupervised police officers roaming the streets, Westlake is also liable to Plaintiff for the foreseeable and intentional false arrest tort upon Plaintiff by Jasinsky.

### 5. EXCESSIVE FORCE IN TORT; ILLEGAL EXCESSIVE FORCE IN VIOLATION OF U.S. CONSTITUTION 4TH AND/OR 14TH AMENDMENTS

Defendant Jasinsky by his actions towards the Plaintiff violated Ohio tort law and the United States Constitution 4th and/or 14th Amendments protecting the Plaintiff's right to be free from excessive force and is liable to Plaintiff for the injury and other losses caused to Plaintiff as a direct result of Jasinsky's actions. 42 U.S.C. § 1983 provides a procedural basis for an individual to sue State or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution."

A question of fact is unresolved as to whether or not Plaintiff was under arrest at the time of the injuries inflicted by Jasinsky. In *City of Sacramento v. Lewis*, 523 U.S. 833, 842–43 (1998) the Supreme Court has applied substantive due process analysis to excessive force claims brought prior to an arrest and to claims brought by pretrial detainees, who have yet to be convicted of any crime. See *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015) (claim brought by pretrial detainee).

In *Lewis,* the Court reiterated that "in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Lewis, 523 U.S. at 847, n.8. In *Kingsley*, however, the Court held that, at least in the pretrial detainee context, "to prove an excessive force claim [under substantive due process analysis], a pretrial detainee must show… only that the officers' use of that force was *objectively* unreasonable." *Kingsley,* 135 S. Ct. at 2470.

Thus, Jasinsky's excessive force against Plaintiff is a violation of both the 4th and 14th Amendments of the U.S. Constitution.

Defendant City of Westlake is liable to Plaintiff for injuries and losses per its *Monell* liability for Jasinsky's constitutional violations towards Plaintiff. If the court expands municipal liability to foreseeable intentional torts of its employees that emanate from a deliberate indifference of a municipality of the risk to citizens of inadequately informed, ill-trained, and unsupervised police officers roaming the streets, Westlake is liable to Plaintiff for the foreseeable and intentional excessive force used upon Plaintiff by Jasinsky.

## 6. ILLEGAL DENIAL OF INALIENABLE RIGHTS IN VIOLATION OF OHIO CONSTITUTION ARTICLE I, SECTION 1 & ORC 2921.45(A)

Defendant Jasinsky by his actions towards the Plaintiff violated Plaintiff's Ohio Constitutional rights contained in Article I, Section 1 by depriving Plaintiff of the enjoyment and liberty of life and by denying Plaintiff happiness and safety, all of which are also in violation of Ohio Revised Code 2921.45(A), which provides that "[n]o public servant, under color of the public servant's office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right." While neither the Ohio Constitution nor 2921.45(A) provide a private right cause of action or remedy, ORC 2307.60 does. Thus, Jasinsky is liable to

Plaintiff for the injury and other losses caused to Plaintiff as a direct result of Jasinsky's actions, including reasonable attorney fees, court costs and other expenses incurred, in violating Plaintiff's Ohio civil rights, per 2307.60, in that Jasinsky injured the Plaintiff in the commission of criminal acts.

Defendant City of Westlake is liable to Plaintiff for injuries and losses per its ***Monell* liability**. While liability under *Monell* presently only attaches to violations of the U.S. Constitution under 42 U.S.C. 1983, a good faith basis exists for this court to expand municipal liability to violations of the Ohio Constitution, which will make an Ohio municipality - the City of Westlake - liable to Plaintiff for injuries caused by its employees' actions in violating the Ohio civil rights of Ohio citizens.

### 7. ILLEGAL DENIAL OF RIGHT TO BE SECURE IN PERSON IN VIOLATION OF OHIO CONSTITUTION ARTICLE I, SECTION 14 & ORC 2921.45(A)

Defendant Jasinsky by his actions towards the Plaintiff violated Plaintiff's Ohio Constitutional rights contained in Article I, Section 14 by depriving Plaintiff of security in his person and by failing to protect Plaintiff against unreasonable searches and seizures, all of which are also in violation of ORC 2921.45. While neither the Ohio Constitution nor 2921.45(A) present a private right to a cause of action and remedy, ORC 2307.60 does. Thus, Jasinsky is liable to Plaintiff for the injury and other losses caused to Plaintiff as a direct result of Jasinsky's actions, including reasonable attorney fees, court costs and other expenses incurred, in violating Plaintiff's Ohio civil rights, per 2307.60, in that Jasinsky injured the Plaintiff in the commission of criminal acts.

Defendant City of Westlake is liable to Plaintiff for injuries and losses per its ***Monell* liability**. While this liability only attaches to violations of the U.S. Constitution under 42 U.S.C. 1983, this court should expand *Monell* liability to violations of the Ohio Constitution, which will make the

City of Westlake liable to Plaintiff for injuries caused by its employees' actions in violating the Ohio civil rights of Ohio citizens.

### 8. FALSE POLICE REPORT IN VIOLATION OF ORC 2921.13

Defendant Jasinsky by his actions caused a false statement to be made against Plaintiff in violation of Ohio Revised Code Section 2921.13 for use in an official proceeding. As a result of Jasinsky's actions Plaintiff suffered and continues to suffer damages. While 2921.13 does not present a private right to a cause of action and remedy, ORC 2307.60 does. Thus, Jasinsky is liable to Plaintiff for the injury and other losses caused to Plaintiff as a direct result of Jasinsky's actions, including reasonable attorney fees, court costs and other expenses incurred, per 2307.60, in that Jasinsky injured the Plaintiff in the commission of a criminal act.

Defendant Michael P. Maloney participated in causing a false police report to be made against the Plaintiff, a violation of 2921.13, and is liable per 2307.60 for Plaintiff's injuries and other losses in that Plaintiff was injured by Maloney's commission of a criminal act.

### 9. MALICIOUS PROSECUTION IN TORT

Defendant Jasinsky by his malicious actions in profiling and arresting Plaintiff - an arrest found by the criminal court to be lacking in probable cause and thus terminated in favor of the Plaintiff - caused a malicious prosecution to be initiated by the State of Ohio against Plaintiff. As a result of Jasinsky's actions including influence and participation in the decision to criminally prosecute the Plaintiff without probable cause the Plaintiff was deprived of liberty, including being subjected to false arrest, illegal seizure, excessive force, and intentional infliction of emotional distress.

There is no question that the City of Westlake intentionally prosecuted the Plaintiff with deliberate indifference. It knew, or should have known, that there was no basis for criminal

32

charges. One viewing of Jasinsky's Dash-Cam by a Westlake Police supervisor or law staff clearly shows a pretextual stop, abandonment of the stop's pretext, falsified additional "reasonable" suspicion, unwarranted ordering of the Plaintiff out of his vehicle, an unjustified weapons pat down, illegal detainment/imprisonment/arrest of Plaintiff for a non-arrestable offense, lack of probable cause in any of the foregoing, and unnecessary use of force against an unarmed fleeing suspect. This court must send a message that this type of malicious prosecution will not be tolerated.

Defendant Michael P. Maloney maliciously participated in the criminal prosecution of the Plaintiff and is liable in tort for Plaintiff's injuries and other losses.

Given that the standard contained in *Monell* is "deliberate indifference" - which as applied to the City of Westlake in this matter amounts to *disregard of the risk to citizens who encounter its police force and its prosecuting employees* - a good faith basis exists for the expansion of municipality liability to include torts that sound in intent, or "deliberate indifference of the municipality", which makes the City of Westlake liable to Plaintiff for injuries caused by the malicious prosecution by its employees against Plaintiff.

### 10. DERELICTION OF DUTY IN VIOLATION OF 2921.44

Defendant Jasinsky by his actions violated Ohio Revised Code Sections 2921.44:

> (B) No law enforcement, ministerial, or judicial officer shall negligently fail to perform a lawful duty in a criminal case or proceeding.

> and

> (E) No public servant shall recklessly fail to perform a duty expressly imposed by law with respect to the public servant's office, or recklessly do any act expressly forbidden by law with respect to the public servant's office.

33

Jasinsky negligently failed to perform his lawful duty as a law enforcement officer in a criminal proceeding per 2921.44(B) to *not* violate the Plaintiff's U.S. and Ohio Constitutional rights, to *not* intimidate the Plaintiff, to *not* file a false police report against the Plaintiff, and to *not* further malicious prosecution against the Plaintiff. As a direct result of Jasinsky's failure to perform these lawful law enforcement duties Plaintiff suffered and continues to suffer injuries and other losses.

Additionally, Jasinksy was a public servant who recklessly failed to perform numerous other duties expressly imposed by law per 2921.44(E), as described in detail below. Tellingly, the City of Westlake as of the date of this lawsuit does not publish a police officer code of ethics nor enumerate the duties of a Westlake police officer on its website or on any internet job board. (The City of Westlake does, however, warn its citizens that it must take on personal responsibility for "making Westlake safer." Nowhere does the City of Westlake warn its citizens that driving with tinted windows will result in racial profiling, false allegations, illegal arrest, bullying, and use of deadly force if a citizen runs.  https://www.cityofwestlake.org/250/Personal-Safety-Crime-Prevention.)

While 2921.44 does not present a private right to a cause of action and remedy, ORC 2307.60 does. Thus, Jasinsky is liable to Plaintiff for the injury and other losses caused to Plaintiff as a direct result of Jasinsky's actions per 2307.60, in that Jasinsky injured the Plaintiff in the commission of a criminal act.

Fortunately, while the City of Westlake purposely fails to expressly state the duties and responsibilities of its police force, other Ohio municipalities do expressly impose legal duties on their police officers. For example, Yellow Springs, Ohio, a community with one-tenth the population of Westlake, states:

34

**Primary Responsibilities of a Police Officer**

A police officer acts as an official representative of government who is required and trusted to work within the law. The officer's powers and duties are conferred by statute. The fundamental duties of a police officer include serving the community; safeguarding lives and property; protecting the innocent; keeping the peace; and ensuring the rights of all to liberty, equality and justice.

**Performance of the Duties of a Police Officer**

A police officer shall perform all duties impartially, without favor of affection or ill will and without regard to status, sex, religion, political belief or aspiration. All citizens will be treated equally with consideration and dignity. Officers will never allow personal feelings, animosities or friendships to influence official conduct. Laws will be enforced appropriately and courteously and, in carrying out their responsibilities, officers will strive to obtain maximum cooperation from the public. They will conduct themselves in appearance and deportment in such a manner as to inspire confidence and respect for the position of public trust they hold.

**Discretion**

A police officer will use responsibly the discretion vested in the position and exercise it within the law. The principle of reasonableness will guide the officer's determinations and the officer will consider all surrounding circumstances in determining whether any legal action shall be taken.

Consistent and wise use of discretion, based on professional policing competence, will do much more to preserve good relationships and retain the confidence of the public. There can be difficulty in choosing between conflicting courses of action. It is important to remember than a timely word of advice, rather than arrest, may be a more effective means of achieving a desired end.

**Use of Force**

A police officer will never employ unnecessary force or violence, and will, in all circumstances, use only such force in the discharge of duty as is reasonable.

Transposing a Yellow Springs Police Officer's duties to a Westlake police officer renders

Jasinsky in breach of failing to perform his duties as related to:

       (i)     safeguarding lives
       (ii)    protecting the innocent
       (iii)   treating all citizens with consideration and dignity
       (iv)   principles of reasonableness
       (v)    never employing unnecessary force or violence

35

Defendant Dennis M. Clough has committed a crime under ORC 2921.44 (E) as the result of Clough's reckless failing to perform a public servant duty as follows: the Westlake policy established by Clough in Exhibit A is a breach of his statutory duty in that it ***provides no policy, legal or ethical guidance whatsoever***. In fact, the policy established by Clough is a precise abrogation, and *dissimulato* attempt, to transfer responsibility from the City of Westlake to each individual police officer to not only acquire "legal and ethical knowledge", but to also develop, interpret, and implement techniques to apply this knowledge. And, most egregiously, to permit individual police officers to ***self-monitor*** exactly when they need to seek guidance.

Exhibit A is a reckless choice by Clough to disregard the risk to citizens of inadequately informed, trained, and supervised police officers roaming the streets of Westlake. While 2921.44 does not provide a private right to a cause of action and remedy, ORC 2307.60 does. Thus, Clough is liable to Plaintiff for the injury and other losses caused to Plaintiff as a direct result of Clough's actions per 2307.60, in that Clough injured the Plaintiff in the commission of criminal acts.

Defendant Michael P. Maloney is a public official, not protected by prosecutorial immunity, who was derelict in his duties towards the Plaintiff, in that he recklessly failed to determine if there was legal basis for criminal prosecution of the Plaintiff, a violation of 2921.44, and is liable per 2307.60 for Plaintiff's injuries and other losses sustained by Maloney's criminal act.

### PRAYER FOR RELIEF

1. **CLAIM 1 - TORT CAUSES OF ACTION**: Plaintiff prays for relief against Defendants Jasinsky, Clough, and Maloney, individually, jointly and/or severally, and if the court extends municipal liability for the intentional torts of its employees, against the City of Westlake as well, for judgment in tort for damages for:

   A. psychological issues
   B. lost wages
   C. loss of future earnings

    D. emotional distress and/or trauma
    E. loss of enjoyment of life
    F. medical and/or hospital bills and future medical expenses
    G. scarring on his body
    H. damage to his clothes
    I. immediate and protracted pain and suffering

In the amount of:

1. Compensatory damages in an amount in excess of **Twenty-Five Thousand Dollars ($25,000.00)** the exact amount to be determined at trial.
2. Punitive damages in the amount of **Five Million Dollars ($5,000,000.00)**, trebled as allowed.
3. Attorney fees and costs.

2. **CLAIM 2 - 42 U.S.C. CAUSES OF ACTION:** Plaintiff prays for relief against all Defendants individually, jointly and/or severally for judgment in violation of 42 U.S.C. § 1983 for damages for:

    A. psychological issues
    B. lost wages
    C. loss of future earnings
    D. emotional distress and/or trauma
    E. loss of enjoyment of life
    F. medical and/or hospital bills and future medical expenses
    G. scarring on his body
    H. damage to his clothes
    I. immediate and protracted pain and suffering

In the amount of:

- Compensatory damages in an amount in excess of **Twenty-Five Thousand Dollars ($25,000.00)** the exact amount to be determined at trial.
- Punitive damages in the amount of **Five Million Dollars ($5,000,000.00)**, trebled as allowed.
- Attorney fees and costs.

3. **CLAIM 3 - OHIO REVISED CODE CAUSES OF ACTION**: Plaintiff prays for relief against Defendants Jasinsky, Clough, and Maloney, individually, jointly and/or severally for judgment in violation of the Ohio Revised Code sections as averred for damages for:

    A. psychological issues
    B. lost wages
    C. loss of future earnings

37

    D.  emotional distress and/or trauma
    E.  loss of enjoyment of life
    F.  medical and/or hospital bills and future medical expenses
    G.  scarring on his body
    H.  damage to his clothes
    I.  immediate and protracted pain and suffering

In the amount of:

- Compensatory damages in an amount in excess of **Twenty-Five Thousand Dollars ($25,000.00)** the exact amount to be determined at trial.
- Punitive damages in the amount of **Five Million Dollars ($5,000,000.00)**, trebled as allowed.
- Attorney fees and costs.

**4.** Referral of Jasinksy, Clough, and Maloney to the FBI for criminal prosecution.

**5.** Referral of Maloney to the Ohio Supreme Court Office of Disciplinary Counsel.

**6.** A jury trial on all appropriate issues.

**7.** An award of attorney fees, costs and expenses against all Defendants.

**8.** Any and all other relief this Court may deem appropriate.


Respectfully submitted,

**s/JAMES SIDNEY JONES (64099)**

_____

**JAMES SIDNEY JONES, LPA**
3901 AQUA MARINE BLVD.
AVON LAKE, OHIO 44012
attorneyjamessidneyjones@gmail.com
(216) 797-9520

38

EXHIBIT A



The City of *Westlake* Ohio

DENNIS M. CLOUGH, MAYOR



www.cityofwestlake.org

**POLICE DEPARTMENT**

27300 Hilliard Blvd.      Phone 440.871.3311
Westlake, OH 44145       Fax    440.835.6444

**Mission**:  Make Westlake Safer Today

**Vision**:    Effective Leadership in all positions.

**Goals**: Preserve Life and Restore Peace Within the City of Westlake
Reduce Crime in the City of Westlake
Improve Professionalism of Police Service Provided
Create a Sense of Safety for Those who Live, Work and Visit the City of Westlake

**Performance:**  Performance is a function of ability, opportunity, and attitude.  All three must be present for effective performance to occur.

*As a patrol officer in the Westlake Police Department, your training will provide you with the ability to successfully perform your duties.  You will be given the opportunity to perform successfully each day you work.  You alone have the ability to control your attitude and dictate your performance outcome.*

**Attitude:**  Attitude is your tendency to evaluate, act or react to things in a certain way. Your attitude provides a guide for how you will approach family/work/life etc.  Your attitude is used to express your values and beliefs.  If you value integrity, effort, gratitude, optimism, and vision, you will be recognized as having a positive attitude.  If you align a positive attitude with the Mission, Vision, and Goals of the Westlake Police Department you will be able to reliably perform your duties.

Your attitude is necessary for you to perform your role effectively.  It sets the tone for the performance of your people.  Your attitude will influence others.  Attitude is most influential when:  Your attitudes are the result of your experiences, when you are an expert on the subject, when you expect a favorable outcome, when they are repeatedly expressed, and when you stand to win or lose something due to the issue at hand.

Do you want to lead?

**What I expect of you:**
1. I expect you to make mistakes – *Nobody is perfect.  Make decisions for the right reasons and learn from your mistakes.  Gratefully accept guidance and correction.*
2. I expect you to outwork everyone – *Be a great team player, go to every call and every traffic stop that you possibly can.  You will be constantly evaluated.  Give your best effort, help your team, and attend work reliably*

3. I expect you to decide – *Policy, law, ethics, and Priority of Life decision making will guide you to make your decisions…do what you believe is right, seek guidance when you need it*
4. I expect you to teach – *They will look to you as a mentor and for your guidance; you need to develop them into the best they can be for this organization.*
5. I expect you to set an example – *your integrity, your work ethic and your commitment to treat others with honor and dignity will make a tremendous impact on their attitudes.*
6. I expect you to encourage others– *look for great efforts throughout the organization and recognize those efforts regularly, both personally and in writing. Enable them to achieve even more. Build a team environment.*
7. I expect you to be a great communicator- *words matter. Be precise, encourage open communications, and ensure that messages and intent are in fact communicated effectively.*
8. I expect you to learn – *about your teammates, how to connect with them, and how to always improve yourself as a leader. Learn the Mission, Vision, and Goals.*
9. I expect you to sacrifice – *struggle, work hard, risk failure, have difficult conversations, provide counsel when necessary. You may not be liked, but you must be respected. Participate in advancing the organization, and be loyal to organizational objectives even when they conflict with your opinion.*
10. I expect you to never be compromised – *they will try to weaken you in order to justify their own failures. Instead, envision a better tomorrow for your team and lead them to it. Help the weak get stronger.*
11. I expect you to be you – *Always improving, but still you at the core. Develop greater trust by staying true to your morals and values. They will see right through you if your actions do not match your beliefs.*
12. I expect you to be responsible –*Keep them safe. Trust them to make mistakes, but don't let them fail. Their work product is a reflection upon you.*

I expect you to have a great attitude.

**What you can expect from me:**
1. Expect my trust – you have earned it, and need to rely upon it in your new role. I am responsible for your mistakes, so do your best.
2. Expect me to fail -- It won't be for the wrong reason. When I do, I will need you to help me learn and move on.
3. Expect me to communicate – I will let you know exactly how you are performing in your new role. We may have uncomfortable conversations someday; these are good things in the long run.
4. Expect me to have a positive attitude – I owe it to you. You are taking on a tremendous responsibility. I will make time to work with you and your chain of command.

If you do not believe in the Mission, Vision, and Goals of this Organization you cannot possibly succeed in your role. Your attitude is limited by your beliefs.

The below signed have met personally and discussed this document as foundation for the role of patrol officer in the Westlake Police Department.

| | | |
|---|---|---|
| Ryan Jasinsky | 3/19/2020 Date | Chief Kevin Bielozer    3·19·20 Date |

**PHASE 1**
**TASK 15**

# Training Task: Use of Force

**USC - Garner vs. Tennessee**
**Lexipol Policy: 300 – Use of Force, 304 – Conducted Energy Device**

    A.      Officer Presence

    B.      Verbal Warning

    C.      Soft Hand Techniques
        1.    Come-a-longs
        2.    Balance displacement
        3.    Pain compliance techniques

    D.      Chemical Spray
        1.    How to spray/where to spray
        2.    Decontamination

    E.      Empty Hand Strikes

    F.      Baton Strikes
        1.    Non-lethal areas
        2.    Less lethal areas
        3.    Lethal areas

    G.      Conducted Energy Device (Taser)
        1. Justifications
        2. Restrictions
        3. Method of Carry
        4. After care
        5. Documentation

    H.      Deadly Force

*I certify that I have been trained and demonstrated proficiency in the above training task.*

Probationary Officer: Ptl. Jasinsky          Date: 4/28/2020

Field Training Officer: Ptl. Dudas          Date: 4/28/2020

Supervisor:_____ Date:_____

30

EXHIBIT C

# WESTLAKE POLICE DEPARTMENT

### Probationary Officer - Evaluation Report

Instructions: Complete this report during the closing weeks of Steps I-III and during any extension of training, as directed by your FTO/OIC. Please honestly and realistically consider the progress of the probationary officer to date and respond to the areas noted below. You may continue on the backside of this report if necessary.

Probationary Officer: R. Jasinsky #79          Date: 5-28-20

Assigned FTO: J. Sirl #39

Step: 2     Week: _____     Extension?:  Yes ☐   No ☑

1. The areas of most significant performance competence are:
   Ptl. Jasinsky has continued to excel in self initiated traffic enforcement and criminal interdiction. He has attained a solid grasp of search and seizure but still requires a minimal amount of guidance and oversight in this area. His report writing continues to improve, however, he still requires oversight regarding content and attention to detail. He has demonstrated competence in evidence handling and processing, requiring little or no oversight. Ptl. Jasinsky has exceptional instincts and behavior recognition when dealing with people. He maintains a calm and professional demeanor and also asserts authority appropriately when necessary. Ptl. Jasinsky had demonstrated competence in O.V.I. enforcement and field sobriety testing, but additional work in this area would serve him well. He has demonstrated ability to identify and navigate through criminal law, but additional work is needed in this area.

2. The areas of my performance most in need of improvement are:
   Due to the Covid-19 pandemic, Ptl. Jasinsky has had limited exposure to a variety of areas of basic investigation. He has only investigated one MVA, and assisted on another to this point, so additional training in this area is needed. Ptl. Jasinsky has not yet achieved an acceptable level of geographical familiarity within the city, so additional focus is needed in this area as well. A concerted effort should be made to gain exposure to basic areas of investigation, geography, and MVA investigation. Time management for completion of administrative functions and report writing still needs oversight, which should help to minimize minor reporting errors. Ptl. Jasinsky is also an aggressive driver, which requires oversight and guidance at times.

I believe that I am currently (check one)

☑ Satisfactorily completing the Field Training and Evaluation Process.

☐ Experiencing difficulty in completing the Field Training Process.

| | |
|---|---|
| Ptl. J. Sirl #39 | 5-28-20 |
| Probationary Officer | Date |

71

# WESTLAKE POLICE DEPARTMENT

**Phase Transition Report**

Probationary Officer: R. Jasinsky #79

FTO: J. Sirl #39

Phase 2

Performance assessment for categories 1-10

| Week | 1 | 2 | 3 | 4 | Extension (1) | (2) | Total |
|---|---|---|---|---|---|---|---|
| 1.  Motor vehicle operation | 2.6 | 2.7 | 2.7 | | | | 2.7 |
| 2.  Orientation/jurisdictional geography | 1.7 | 1.7 | 2.0 | | | | 1.8 |
| 3.  Written communication | 1.7 | 1.7 | 1.7 | | | | 1.7 |
| 4.  Field performance: cognitive abilities | 2.1 | 2.7 | 2.5 | | | | 2.4 |
| SIFA% | | | | | | | |
| 5.  Patrol/Investigative: tactical-procedural | 2.0 | 2.0 | 2.0 | | | | 2.0 |
| 6.  Telecommunication skills | 2.1 | 2.7 | 2.2 | | | | 2.3 |
| 7.  Criminal laws/ordinance/prosecution | 1.8 | 2.0 | 1.7 | | | | 1.8 |
| 8.  Department policy and procedure | 2.0 | 2.0 | 2.0 | | | | 2.0 |
| 9.  Traffic enforcement/accident investigation | 2.4 | 2.5 | 2.5 | | | | 2.5 |
| 10.  Interpersonal relationships | 2.6 | 2.7 | 3.0 | | | | 2.8 |

Accurately describe any chronic NRT and what PIP (performance improvement plan) was developed:

72

EXHIBIT D

# North Ridgeville Police Department
## Training Record

Name: Joshua A. Riley  DOE: ███

SS#: ███  DOB: ███

| Promotions: | Sergeant: | Lieutenant: | Captain: | Chief: |
|---|---|---|---|---|

## SCHOOLS/SEMINARS/IN SERVICE

| Date | Description/Location | Hours 1545.75 |
|---|---|---|
| | **1998** | |
| 9/3/98 | Univ of Akron Basic Police School | 552 |
| 9/3/98 | Strategies and Tactics of Patrol Stops | 20 |
| 9/3/98 | Edged Weapon Self Defense | 4 |
| 9/3/98 | Community Oriented Policing and Problem Solving | 8 |
| 9/3/98 | PR -24 Baton | 12 |
| 9/3/98 | Oleoresin Capsicum Spray | 8 |
| 9/3/98 | ASP Baton | 8 |
| 7/29/98 | CPR Training | 8 |
| | **1999** | |
| 7/20/99 | Jailer Training, Parma Hts PD | 8 |
| 8-20-99 | Administering Oaths, NRPD | 1 |
| 9/15/99 | Employee Assistance Program, NRPD | 0.75 |
| 9/24/99 | Regional Traffic Crash Investigation, OSP | 40 |
| 10-5-99 | Felony Vehicle Stops, NRPD | 2.5 |
| 10-5-99 | Defensive Driving, NRPD | 4 |
| | **2000** | |
| 1/23/00 | Verbal Judo/Avon Lake | 16 |
| 3/2/00 | Traffic Laser/N. Ridgeville PD | 4 |
| 4/30/00 | Regional ADAP/OSHP | 32 |
| 5/30/00 | Ohio Traffic Crash Report/Local Traffic Crash Report, N.Ridgeville PD | 3 |
| 10/12/00 | Deadly Force/OC Spray, N. Ridgeville PD | 1 |
| | **2001** | |
| 5/15/01 | Use and Deployment of Stop Sticks/N.Ridgeville PD | 1.5 |
| 7/12/02 | Rapid Deployment Response Training/LCCLEA | 8 |
| 8/27/01 | Emergency Vehicle Operation and Control /NRPD In-service | 8 |
| 9/4/01 | Reid Technique Interview and Interrogation/OPOTA | 24 |
| | **2002** | |
| 3/21/02 | Use and Application of Handcuffs/In Service NRPD | 0.5 |
| 6/17/02 | Urban Police Mountain Bicycle Techniques/Tri-C | 40 |
| 8/13/02 | BAC Data Master/OPOTA | 16 |
| 9/12/02 | Highway Interdiction/DEA | 8 |
| | **2003** | |
| 7/1/03 | Driver's Training/NRPD | 8 |
| | **2004** | |
| 5/11/04 | Street Survival/Tactical Edge Seminar | 16 |
| 6/2/04 | Clandestine Laboratory Enforcement | 8 |
| 9/27/04 | FTO Programs (Modified Coaching Model)/OPOTA | 40 |
| 10/25/04 | Defensive Tactics Instructor/OPOTA | 40 |
| | **2005** | |
| 6/21/05 | Stop Stick Deployment and High Risk Stops/N. Ridgeville P.D. | 2 |

| | | |
|---|---|---|
| 7/26/05 | Northern Ohio Violent Fugitive Task Force Training | 24 |
| 8/28/05 | National Incident Management System an Introduction | 3 |
| 10/28/05 | Lorain County Domestic Violence Conference | 8 |

### 2006

| | | |
|---|---|---|
| 2/10/06 | Homicide Investigation/NRPD/CCPO | 3.5 |
| 2/25/06 | Taser/NRPD | 4 |
| 4/10/06 | Shaken Baby Syndrome/LCPO/LCCC | 3.5 |
| 4/21/06 | Rapid Deployment/NRPD | 2 |
| 8/4/06 | Intro to the Incident Command System/FEMA | 3 |
| 9/15/06 | Emergency Restraint Chair/NRPD/Lt. Freeman | 2 |
| 9/16/06 | Stop Stick Deployment and High Risk Stops/NRPD | 2 |
| 11/9/06 | Critical Incident Stress Management/UMBC | 14 |
| 12/9/06 | Rapid Deployment/NRPD/Lt. Hilty | 2 |

### 2007

| | | |
|---|---|---|
| 3/8/07 | Interview & Interrogation/OPOTA | 24 |
| 3/20/07 | STRMS Instructor/OPOTA | 16 |
| 4/5/07 | Driving Simulator/Pursuit Policy Review/ Sgt. Lee | 2 |
| 5/4/07 | Police Instructor Certification/Northcoast Polytech | 40 |
| 6/5/07 | Medical Training on Pre Lock-up Survey/NRPD/#64 | 0.5 |
| 7/17/07 | Driver's Training/NRPD/Lt. Garrow | 7 |
| 8/4/07 | Glock Transition Training/NRPD/Sgt. Koglman | 7 |
| 10/27/07 | Stop Stick Deployment & High Risk Stops/NRPD/Sgt. Lee | 2 |
| 12/5/07 | Victims of Crime and Search & Seizure Updates | 8 |

### 2008

| | | |
|---|---|---|
| 3/6/08 | A.E.D. Familiarization/NRPD/Ptlm. Dancy | 0.5 |
| 3/6/08 | Medical Training on Pre Lock-up Survey/NRPD/#64 | 0.5 |
| 7/15/08 | SLASHES-Edged Weapon Instructor/OPOTA | 16 |
| 8/21/08 | Close Quarter Gunfight Survival Tactics/Instructor Enhancement Program/OPOTA | 24 |
| 8/29/08 | Physical Fitness Specialist/OPOTA | 40 |
| 9/12/08 | Victims of Crime / North Coast Polytech | 2 |
| 9/12/08 | Confessions & Interrogations / North Coast Polytech | 3 |
| 9/12/08 | Civil Liability / North Coast Polytech | 3 |
| 11/6/08 | Submission Counter & Escape School/OPOTA | 24 |

### 2009

| | | |
|---|---|---|
| 4/7/09 | 14 Hour Instructor Update / N.R.P.D. / Ptlm. Moore | 14 |
| 6/18/09 | Drivers Training / Lorain Cty. Airport / Sgt. Lee | 8 |
| 12/1/09 | TASER Instructor Certification/TASER | 24 |

### 2010

| | | |
|---|---|---|
| Jan., 2010 | Taser Update / Refresher / Ptlm. Riley | 1 |
| 8/31/10 | Bulletproof Mind / OPOTA | 8 |
| 11/14/10 | Financial Exploitation of Seniors / Ohio A.G. online | 1 |

### 2011

| | | |
|---|---|---|
| 2/22-24/2011 | The Reid Technique of Interviewing & Interrogation / Cleveland | 24 |
| 2/25/11 | Advanced Course on Reid Technique of Interviewing & Interrogation | 8 |
| 4/13/11 | 6th Annual Child Abuse Awareness & Prevention Conference / LCCC | 8 |
| April, 2011 | Mobile Ident II Fingerprint Scanner / shift Sgt. | 0.5 |
| 6/29/11 | CODIS Arrestee & Convicted Offender DNA Collections / eOPOTA | 1 |
| 7/8/11 | Multi-Disciplinary Team Forensic Interviewer Training / LCCC Nord Center | 6 |
| July, 2011 | Roll Call Training: Photography / Sgt. Dietz | 0.5 |
| August, 2011 | Child Abuse Investigations Online training / OJJDP | 20 |

| | | |
|---|---|---|
| 8/29/11 | Investigative Resources / OPOTC | 8 |
| 9/2/11 | TASER X2 & TASER X26 ECD Instructor Certification | 12 |
| 9/20/11 | TASER Technician Certification | 1 |

## 2012

| | | |
|---|---|---|
| 2/12/12 | Sudden Assault Response System (SARS) & Ground Combatives / OTPD | 8 |
| Feb. 2012 | Roll Call Training: CCW Update Training / Sgt. Dietz | 0.5 |
| 4/18/12 | 7th Annual Child Abuse Awareness & Prevention Conference/LCCC | 8 |
| 5/16-17/12 | Ultimate Survival Instincts / LifeLine Training Inc. | 16 |
| 5/23/12 | Fire Horse Combatives Departmental Instructor Certificate | 24 |
| 5/29/12 | Individual Chemical Aerosol Instructor/OPOTA | 8 |
| 06/25-26/12 | Evidence Room Management / OPOTA | 16 |
| 06/28-29/12 | Subject Control Instructor Update / OPOTA | 16 |
| July, 2012 | Roll Call Training: Body Cavity & Strip Searches Update / Sgt. Dietz | 0.5 |
| 8/1/12 | LEADS: Inquiry Test | 0 |
| 12/24/12 | Responding to Human Trafficking / AG Online | 1 |
| 12/24/12 | Awareness of Human Trafficking / AG Online | 1 |

## 2013

| | | |
|---|---|---|
| Jan. 2013 | Roll Call Training: Vehicle Pursuit Policy / Sgt. Dietz | 0.5 |
| 2/19/13 | Unit Instructor Renewal BAS21698 / OPOTC | 0 |
| 4/4-5/13 | Total Officer Survival / Modern Combative Systems LLC | 16 |
| 6/13/13 | Indoor Marijuana Grow / INIA | 8 |
| 10/23-24/13 | ISR Matrix 101 for LE: Subject Control End-User Course | 16 |
| 10/10/13 | Project DAWN Naloxone / Narcan Training / Dr. Stephen Evans | 1 |
| 12/2/13 | Unit Instructor Ohio Peace Officer Basic Training Program / OPOTC | 0 |

## 2014

| | | |
|---|---|---|
| 1/28/14 | Judgement Firearms simulator / OPOTA/NRPD | 1 |
| 2/6/14 | TASER X26, X2 & X26P CEW Instructor Certification / TASER | 8 |
| Feb., 2014 | Roll Call Training: Photo Spreads/Line-ups / Sgt. Gorski | 0.5 |
| March, 2014 | SFST Refresher/Update / Ptlm. Roth | 1 |
| 5/12/14 | CPT DV-1, S&S-4, LoA-2, / NCPI | 7 |

## 2015

# The City of Westlake Ohio

**DENNIS M. CLOUGH, MAYOR**

**www.cityofwestlake.org**

**POLICE DEPARTMENT**

27300 Hilliard Blvd.      Phone 440.871.3311
Westlake, OH 44145       Fax    440.835.6444

<u>NOTICE OF DISCIPLINE</u>

To: **Lt. Jeff Agoston**
Date: **November 5, 2021**

Article 30 of the Collective Bargaining Agreement between the City of Westlake and The Ohio Patrolmen's Benevolent Association (OPBA) provides for the disciplinary procedure to be followed with non-probationary employees of the Police Department. Pursuant to said Article, you are hereby on notice that discipline is being imposed against you for a violation of the following: Westlake Police Department Policy 209 Job Descriptions, Policy 300 Use of Force, Policy 320 Standards of Conduct, and Policy 431 Watch Commander. This conduct occurred during October 2021, when you failed to communicate effectively with a subordinate officer and failed to ensure proper review and documentation of Use of Force incidents that occurred on your shift. On November 5, 2021, you waived your right to have a representative present and participated in an informal meeting with me in a good faith effort to settle this matter. I proposed a punitive measure intended to serve as a performance improvement guide. This measure is your willing participation in the PXT Select Assessment administered by the Westlake Police Department Psychologist. You agreed to this proposal. The following discipline will be imposed against you for the above-described conduct:

**Completion of the PXT Select Assessment administered by Westlake Police Department Psychologist Dr. Kurt Jensen by December 01, 2021.**

**Further failure to follow the Polices, General Orders and/or Rules and Regulations of the City of Westlake Police Department will subject you to further disciplinary action which may include your termination from employment.**

The below signed parties agree hereby agree to this imposition of discipline as settlement of this issue.

_____   11/5/21        _____   11·05·21
Lt. Jeff Agoston          Date           Kevin Bielozer, Chief of Police   Date

**THIS FORMAL NOTICE OF DISCIPLINE WAS SENT VIA REGISTERED MAIL, RETURN RECEIPT REQUESTED OR PERSONALLY SERVED ON THE EMPLOYEE.**

<span style="color:red">EXHIBIT E - PAGE 2</span>

**Evaluation Report**

Lieutenant: _Agoston_     Captain: _Vogel_     Rating Quarter: _3rd_ 20_21_

Evaluation Measures

1.  The Lieutenant successfully completes all tasks as defined within job description and policy, absent negative disciplinary action, during the evaluation period.
    Below Standard____XX____     Meets Standard_____

    **Meets standard with Distinction**, as evidenced by no documented counseling during the evaluation period. _____

2.  The Lieutenant recognizes a police matter that needs to be addressed (crime pattern/spree/problem, quality of life issue such as noise complaints, opportunity to increase police presence/develop community relationships; equipment or facility issue, training opportunity, etc.) and develops/implements a plan of action to address the matter, and documents the goal/plan/results in an email memo to the Captain, at least once during the evaluation period.

    Below Standard_____ Meets Standard_____XX_____

3.  The Lieutenant leads each immediate subordinate to achieve at least one quarterly rating of "Meets Standard with Distinction".

    **Meets standard with Distinction**. __N/A ATT__

    Note: This standard can only be met with distinction-failure to achieve is not measured against the lieutenant's performance.

4.  The Lieutenant establishes and achieves a SMART goal to advance the culture of the Westlake Police Department.

    Agreed Upon Goal:
    _N/A this quarter_
    _____
    _____

5.  The Lieutenant establishes and achieves a SMART goal to advance leadership development in the Westlake Police Department.

    Agreed Upon Goal:

    _N/A this quarter_
    _____
    _____

# WESTLAKE POLICE DEPARTMENT

POLICIES & PROCEDURES

| | | Probationer | FTO |
|---|---|---|---|
| Policy 1430 | Juvenile Operations | _____ | _____ |
| Policy 2200 | Performance Evaluations | _____ | _____ |
| Policy 4401 | Temporary Light Duty | _____ | _____ |
| Policy 5103 | Citizen Complaints | _____ | _____ |
| Policy 5108 | Harassment in the Workplace | _____ | _____ |
| Policy 6036 | Stalking Policy | _____ | _____ |
| Policy 7000 | Agency Jurisdiction and Mutual Aid | _____ | _____ |

*I certify that I have read and understand the above policy and procedures.*

Probationary Officer: _____  Date: __12/18/08__

Field Training Officer: _____  Date: _____

Supervisor: _____  Date: _____



# City of Westlake

27216 Hilliard Boulevard, Westlake, Ohio 44145 • (216) 871-3300

# POLICE DEPARTMENT
## general orders

| SUBJECT: JUVENILE OPERATIONS | NUMBER 1430 |
|---|---|
| RULE/REFERENCE: ORC/Chapter 173 C.O. | EFFECTIVE DATE: Sept. 15, 1987 REVIEW DATE: |
| DISTRIBUTION CODE: A,B,C,D,E,F | APPROVED: *Chief David L. Ely* | No of PAGES 1 of 11 |

I. PURPOSE

In accordance with the special legal status afforded juveniles, the WPD has adopted procedures in line with both the requirements of Juvenile Court and the intent of Ohio Statutes.

II. PREVENTION AND CONTROL OF JUVENILE DELINQUENCY

In addition to our enforcement and crime prevention efforts in the adult community, it is also the policy of the WPD to develop and perpetuate programs designed to combat juvenile delinquency. All Department divisions and personnel share the responsibility for participating in and supporting the juvenile operations function. All sworn personnel of this Department are responsible for maintaining a working knowledge of the Ohio Revised Code as it pertains to juveniles and shall familiarize themselves with various support programs utilized by Cuyahoga County Juvenile Court.

The numberous programs currently in operation within the Juvenile Court System cover a wide spectrum of services ranging from residential treatment centers to community service programs and our Youth Diversion Program. When available, all officers of the WPD will be supplied a list and related summary of these programs. Familiarization with and support of these programs is the responsibility of all personnel.

III  JUVENILE OPERATIONS FUNCTION

Currently within the WPD there are three components that directly handle juvenile functions.

A.  Uniform Patrol Section

B.  Investigations Section

C.  Community Education Officers

The WPD now establishes a juvenile operations component within the Investigations Section. The Investigations Section shall maintain a position defined as the "Juvenile Officer". The responsibility of the "Juvenile Officer" shall be the follow-up investigation of juvenile felony crimes. Additionally, the "Juvenile Officer" will receive, review and coordinate the investigation of misdemeanor juvenile offenses associated with other components within the WPD

The Juvenile Officer position will include the following functions:

A.  Involvement with Cuyahoga County Juvenile Court in designing and implementing programs intended to prevent and control delinquent and criminal behavior by youths.

B.  Serving as counsel or resource person to other components within the WPD on the follow-up and coordination of misdemeanor juvenile offenses.

C.  Follow-up processing of youth arrests as related to both felony and misdemeanor juvenile arrests.

D.  Serving as central coordinator of juvenile offenses, thereby making sure that preparations of court cases are complete and within requirements of the Cuyahoga County Juvenile Court System.

E.  By being familiar with the City of Westlake Youth Diversion Program, diverting juvenile offenders out of the justice system as criteria applies.

F.  Being trained sufficiently in Ohio Juvenile Law and other areas of specialization and knowledgeable in:

    1.  Lawful detention and arrest of juveniles

2. Questioning and taking statements as applicable in juvenile arrests.

3. Application of all rights afforded juveniles under law

4. Being familiar with and able to give advice as to the alternatives of arrest and referral of juveniles to social service agencies within Cuyahoga County, as they are utilized by Cuyahoga County Juvenile Court.

G. Acting in a liaison capacity between the Department and other components of the juvenile justice system to ensure that the WPD policies and procedures for juveniles are consistent with those of other juvenile justice agencies in Cuyahoga County.

H. As part of the juvenile operations function, the Community Education Officers shall annually review and evaluate the juvenile crime prevention programs; the Juvenile Officer shall annually review and evaluate all juvenile enforcement programs. It shall be the responsibility of the Operations Division Commander to notify the appropriate personnel as to the time and location of any meeting for such a review of programs

IV  JUVENILE COURT POLICY REVIEW

It shall be the policy of the WPD to have all policy and procedure relating to juvenile matters reviewed by the Presiding Judge of the Juvenile Court. The Juvenile Officer will work in cooperation with the Court Administrator to make sure all policy revisions are provided to the court for review.

Once this material has been reviewed by the Court, any comments pertaining to the policy and procedure will be directed to the Office of the Chief for consideration.

V  ALTERNATIVE ENFORCEMENT METHODS

When dealing with juvenile offenders, the WPD employees shall use he least coercive among reasonable alternatives. These alternatives shall be consistent with preserving public safety, order and individual liberties. The authority in dealing with juvenile offenders is conferred on the court system by the State of Ohio, under Title 21

of the Ohio Revised Code. Section 2151.01 through 2151.99 inclusive, as well as the ordinances of the City of Westlake and the various "Rules of Juvenile Procedure".

The Cuyahoga County Juvenile Court, under the authority of Juvenile Rule #9 of "Rules of Juvenile Procedure", specifies "in all appropriate cases formal court action should be avoided and other community resources utilized to improve situations brought to the attention of the Court."

A.   Officers of the WPD are given the discretion to evaluate those situations involving juvenile offenders. As the situation arises, juvenile offenders may be released with no further action.

VI   JUVENILE YOUTH DIVERSION PROGRAM

The State of Ohio confers upon the court system authority for administering formal diversion programs for juvenile offenders. Under the authority of Rule #9 (B) of "Rules of Juvenile Procedure", information pertaining to a child within the court's area of jurisdiction may be informally screened prior to the filing of a complaint. As such, a determination can be made as to whether the filing of a complaint is in the best interest of the child and the public.

Effective 07/10/87, the Cuyahoga County Juvenile Court adopted the Youth Diversion Program (YDP)of the City of Westlake. This program establishes criteria to be considered in diversion decisions.

Officers of the WPD shall observe the guidelines of this program and confer as needed with either the Juvenile Officer or the Cuyahoga County Juvenile Court.

In situations involving minor violations of the law, or where no prosecution is desired, personnel are encourage to utilize alternatives such as informal referrals, simple warnings and consultation with parents to initiate corrective action if appropriate.

VII   JUVENILE INTAKE REFERRALS

Juvenile intake referrals will be made in all status offenses as well as criminal offenses where the complainant wishes to prosecute.

However, referral of alleged juvenile offenders to formal legal proceedings should be restricted to those cases involving serious criminal conduct or repeated criminal violations. In general, delinquent acts requiring referral to the juvenile justice system should include:

A. All acts that, if committed by an adult, would be felonies.

B. All acts involving weapons.

C. All serious gang related acts.

D. All acts involving aggravated assaults.

E. All acts committed by juveniles under probation or parole, or with a pending case already before the court.

F. All repeated delinquent acts.

G. Cases where parental supervision is not effective.

H. Cases where a juvenile refuses to participate in a diversion program

I. Cases involved the use of drugs.

VIII  ORDER-IN IN LIEU OF CUSTODY

In keeping with the philosophy established in Section V of this Directive, personnel shall attempt to utilize an order-in filing for juveniles, should circumstances warrant, versus a custody situation. Criteria to consider in making such a decision should be items such as the offender's past record, whether the youth is under the influence of alcohol or drugs and type of offense.

After it has been determined that an order-in filing is appropriate, personnel should forward a copy of both the offense and arrest report via records, to Juvenile Court. Upon receipt, the court will notify both the parents and the youth when and where to appear.

IX  JUVENILE CUSTODY

Juveniles charged with alleged delinquencies by reason of acts contrary to the statutes below, will be considered non-probationary offenders by the Cuyahoga County Juvenile Court, and it shall be the policy of the Juvenile Court as

well as the WPD, to detain juveniles who have allegedly committed these acts.

The ORC offenses are listed as follows:

A. 2903.01 Aggravated Murder
B. 2903.02 Murder
C. 2903.03 Voluntary Manslaughter (by means of a firearm)
D. 2903.04(A ) Involuntary Manslaughter
E. 2903.11 Felonious Assault (by means of firearm)
F. 2907.02 Rape
G. 2911.02 Robbery (involving actual use of force)
H. 2911.11 Aggravated Burglary

There may be from time to time, extenuating circumstances in which it is not in the best interest of the child to have the juvenile detained. In these cases, contact shall be made with the Admissions Officer of Juvenile Detention Home and the matter then discussed and a ruling made by the Admissions Officer .

In any case, the Admissions Officer will be contacted prior to any juvenile being taken to the detention facility.

Pertaining to criminal offenses other than those outlined above, it shall be the responsibility of the arresting officer to determine whether the situation necessitates the juvenile being detained or whether the juvenile can be released to a parent, guardian, or other custodian, feeling confident that the juvenile will be properly cared for and that the parent, guardian, or custodian will have the child appear in court once notification of an appearance date has been made.

Should there be some concern as to not detaining the juvenile, contact should be made with the Juvenile Admissions Officer and the matter discussed. The final decision for detention lies with the Juvenile Admissions Officer at the Detention Home.

In situations pertaining to children that are incorrigible, referrals may be made by the Juvenile Admissions Office to an outside agency, where shelter care can be provided

The officer dealing with runaways, where no warrants are on file or no problems other than the fact that the child has run away exists, shall contact the parents of the

child in an attempt to have the parents either call for the child or make the necessary arrangements. If contact cannot be made with the parent, the officer shall contact the Juvenile Admissions Officer for advice regarding detainment.

In any case, prior to a juvenile's being taken to the Juvenile Detention Home, contact shall be made with the Admission Officer for prior approval.

In regards to situations where juveniles are taken into custody for their care or safety, contact will be made with the Cuyahoga County Department of Human Services - Child Welfare, located at 2925 Euclid Ave. A 24-hour number, 696-KIDS is available where arrangements will be made by the operator on duty to notify a case worker to assist in possible placement of the child

The Cuyahoga County Department of Human Services - Child Welfare Office will also be contacted in those cases where it is alleged that the juvenile has been harmed or is in danger of being harmed.

Should there be any questions pertaining to the care of juveniles contact can be made with Cuyahoga County Child Welfare or the Juvenile Court Admissions Office 24-hours a day.

It shall be the policy of WPD that once a juvenile is taken into custody for any criminal offense, the juvenile will immediately be advised of his/her Constitutional rights.

Officers should take into account the totality of circumstances as they exist at that point in time (i.e., the juveniles age, parental presence, support personnel, and severity of crime). These factors will determine the location and duration of the interrogation.

Juveniles taken into custody, once it has been determined that they will be detained, will be taken to the Juvenile Detention Home or whatever location has been designated by the Juvenile Admissions Officer, without unnecessary delay.

Juveniles in need of emergency medical treatment will be treated prior to being taken to any of the detention facilities.

Once a juvenile has been taken into custody, notification of the juvenile's parents, guardians, or custodians will be made and they will be advised of that fact as soon as possible.

Detention of juveniles will coincide with the guidelines that have been established in this Directive.

X    JUVENILE LIAISON PROGRAM

As a method of juvenile education and delinquency prevention, the WPD provides a school liaison program. This program is administered by the Community Education Officers, and is updated on a regular basis.

Community Education Officers provide a wide variety of services to the local school district, which include, but are by no means limited to the following areas:

A.    Acting as resources with respect to delinquency prevention.

B.    Providing guidance on ethical issues in a classroom setting.

C.    Provide classroom instruction on safety topics.

D.    Explaining the law enforcement role in society as well as providing information on a wide variety of police and other community related material.

E.    Providing individual counseling to students upon request.

XI   JUVENILE FINGERPRINTS AND PHOTOGRAPHS

Under State of Ohio law, juvenile proceedings are not criminal in nature. For this reason there are special considerations when dealing with photographs and fingerprints of juvenile suspects. The following rules will be followed by officers of this Department in order to assure compliance with the law:

A.    Collection

No child shall be fingerprinted or photographed in the investigation of a crime without the consent of the court, with the following exception.

1.    Fingerprints and/or photographs of a child may be taken by officers investigating the commission of an act which would be a felony if committed by an adult, and if there is probable cause to believe that the child may have been involved in the felonious act being investigated.

Officers who take fingerprints or photographs of a child shall immediately inform the Juvenile Court that the fingerprints or photographs were taken, and shall provide the court with the identity of the child, the number of fingerprints and photographs taken and the name and address of each person who has custody and control of the fingerprints or copies. A form has been provided by the Cuyahoga County Juvenile Court, entitled "FINGERPRINT-PHOTOGRAPH NOTICE". This form will be used by all officers whenever a juvenile is fingerprinted or photographed in connection with a criminal investigation.

Unless otherwise ordered by the court, originals and copies of such fingerprints and photographs shall be delivered to the Juvenile Court after use for their original purpose, for such further use and disposition as the court directs.

B.    RETENTION AND DISPOSITION

Fingerprints and photographs of a child obtained or taken, and any records of the arrest or custody that was the basis for the taking of the fingerprints or photographs, may be retained initially only 30 days after the date taken, except that the court may limit the initial retention of fingerprints and photographs to a shorter length of time.

If, within the 30 day period, no complaint is pending against the child, no complaint is filed or one if filed and dismissed and no other complaint is filed, the fingerprints and photographs, and all copies and all records of the arrest and custody shall be removed from files and then delivered to the Juvenile Court.

If, at the end of 30 days, a complaint is pending, or the juvenile has been found delinquent or has plead guilty, or been convicted of a crime, the finger-prints, photographs, copies and records of arrest and custody may further be retained for 2 years after the

date on which the fingerprints and photographs were taken, or until the child turns 18 years of age, whichever occurs first.

All juvenile case files/records shall be segregated from adult case files.

C.   USE OF JUVENILE FINGERPRINTS AND PHOTOGRAPHS

Until they are delivered to the Juvenile Court, the original and all copies of fingerprints and photographs, and the records of arrest or custody, shall be used or transferred only as follows:

1.   For the investigation of the act for which they were originally obtained.

2.   For transfer only to a court that would have jurisdiction of the child's case.

3.   For transfer to state or local officers, upon proper notification to Juvenile Court of the name and address of the officer or agency to whom they will be transferred by use of the Court's FINGERPRINT-PHOTOGRAPH NOTICE, with the WPD "borrow slip" also being signed and filed.

XII   JUVENILE RECORDS

A.   Collection

Whenever a juvenile is picked up and placed in detention or released to the custody of parents or a guardian, an arrest booking slip shall be completed. Information from this slip will be data captured into the computer system by the Records Section personnel. On missing and runaway juveniles a Missing Person Report and computer entry will be required

XIII   DISSEMINATION

The computerized criminal records system is programmed so that juvenile records are protected by an access code, and thus kept separated from the adult records. The only persons to have access to juvenile records which are maintained in the computer system are the Records Section personnel, Investigations Section and Watch Commanders.

Once accessed by proper personnel, the juvenile arrest information will be provided only to a WPD officer who requires such information in the performance of his/her duties. All other agencies requesting such information shall be referred to the Cuyahoga County Juvenile Court. This control applies to all juvenile records, even though the individual may have reached the age of majority. Offense reports concerning juvenile offenders will be maintained in the Records Section and will be subjected to the same dissemination requirements as the arrest records.

XIV .RETENTION

The offense reports will be reduced to Microfiche for filing as soon as practical. The original report will be maintained in secured storage for a period of two (2) years from the date of writing before it is destroyed.

XV EXPUNGEMENT

When the Cuyahoga County Juvenile Court orders the expungement of a juvenile record, that record and other associated documents will be removed from the file and sealed in an envelope. The outside of the envelope will contain the name of the individual, the name of the court, the case number, and the date of the expungement. Expunged records will be maintained in a secured file in the Records Section. Expunged records will not be opened or reviewed for any purpose without an order from the Cuyahoga County Juvenile Court.



# City of Westlake

27216 Hilliard Boulevard, Westlake, Ohio 44145 • (216) 871-3300

# POLICE DEPARTMENT
## general orders

| SUBJECT: PERFORMANCE EVALUATIONS | | NUMBER 2200 |
|---|---|---|
| RULE/REFERENCE: CIVIL SERVICE | EFFECTIVE DATE: December 14, 1987 REVIEW DATE: | |
| DISTRIBUTION CODE: A,B,C,D,E,F | APPROVED: *Chief David J. Bly* | No of PAGES 1 of 15 |

I  PURPOSE

Basically, the purpose of performance evaluation is to improve employee performance. In addition, one of the major sources of job satisfaction for an employee is for him to know the work he does is considered worthwhile and essential -- to know his efforts to do the job are appreciated and accepted as an important part of the progress of the department's work objectives; and above all, to know whether or not his is performing his job correctly. The purpose of this general order is to outline and organize the evaluation process.

II  POLICY

The development of an adequate employee evaluation plan that provides for the rating of both sworn personnel and civilians, including supervisors with the rank of captain or below, semi-annually. The system for sworn personnel is an adaptation of a procedure published by the Public Personnel Association, and one that is recommended by the IACP, which takes into account trends in the field of employee evaluation:

1.  Only one definite objective in mind -- to inform the employee of his standing, with intent to improve his performance or to sustain performance which is already superior.

2.  Summary or numerical ratings have been eliminated. It will not be possible with the use of this form to categorize an employee as "Excellent", "Above Average", "Average", and so forth.

3.    Factors are designed to help form opinions about performance, rather than intangible qualities.

4.    Ample provision is made for explanatory comments.

5.    The employee interview is a major feature.

## III OBJECTIVES

In order to measure the on-the-job performance of its employees, the WPD has established a performance evaluation system. The objectives of this system are numerous and seek to upgrade the performance standards across the entire scope of the department.

The performance evaluation system provides an invaluable method of acquiring information for both administration and line level personnel. This information at the administrative level takes the form of identifying both immediate and long term training needs, a format for decisions regarding probationary personnel, and a means for recognition and measurement of individual performance. Personnel, at the line level, should view the system as a method to better understand what level of performance is expected from them. It is designed as a guide for self improvement.

Through attainment of these objectives, the performance evaluation system will enable the WPD to best utilize its human resources.

## IV JOB PERFORMANCE STANDARDS

Few police departments have developed job performance standards in written form. However, most supervisors have a great many unwritten standards in mind, often without knowing it. If the supervisor did not have such standards he would have no basis for drawing the conclusion that an officer's work was well done, or it was not properly done.

In police work the establishment of written standards for all conceivable tasks is not warranted because of the complex nature and wide variety of tasks performed. However, supervisors' concepts of standard performance for many factors will tend to become uniform and adequate with greater experience in rating subordinates and close review by their reviewing superiors.

Job performance standards are descriptions of how well an employee must do the specific tasks of his position under existing working conditions, if he is to do his job in a manner satisfactory to management.

The foundation on which performance standards are based is that each employee is entitled to know, and must know if he is expected to do his best work, what he is expected to do and what constitutes a job well done.

V  FACTOR DEFINITIONS AND GUIDES FOR USE

Job performance standards are simply yardsticks for measuring performance. The following "factor definitions" are intended to assist raters in establishing uniform job performance standards.

Performance factors listed in Section A of the Performance Evaluation Report form are defined below, and guideline questions for each factor provided.

NOTE:  On the first five factors in Section A, Column 4 (Exceeds Standards) has been blocked out. These factors are considered absolutes – an employee either meets required standards or he does not. Column 5 (Does Not Apply) has been blocked out on the first five factors. All five factors apply to all employees, and therefore no option is provided.

1.  OBSERVANCE OF WORK HOURS: Refers to punctuality in reporting to or leaving a duty station in accordance with the prescribed schedule of working hours, breaks, or leaves of absence. Can the employee be relied upon to be working when and where he is supposed to be?

2.  ATTENDANCE: Reflects absences from duty for any reason. This factor introduces the opportunity for necessary or desirable counseling of an employee regarding his improper or excessive use of leave privileges, especially if his attendance have become unreliable. If sick leave use has been greater than the norm, should the employee seek medical care? Is there a Friday-Monday or holiday pattern of sick leave use? Have continued absences been costly to the department or harmful to the morale of co-workers who may have been required to carry extra loads?

3.  GROOMING AND DRESS: An appropriate type of dress and standard of good grooming is required in every position. Does the employee meet the standards of dress commensurate with the degree of public or employee contacts he makes? Is his uniform consistently clean, neat and in good order?

4.  COMPLIANCE WITH RULES: Members of the department are subject to rules and regulations. Failure to observe reasonable directions and regulations is listed as a

reason for disciplinary action. Does the employee consistently comply with rules and regulations applicable to him and his job?

5. SAFETY PRACTICES: Nearly all employees, even those who do not work under physically hazardous circumstances, must comply with reasonable safety practices, particularly in situations involving the public. These practices may reflect specific supervisory directives, or simply forethought for potentially dangerous conditions and the use of good common sense. Does the employee endanger his own safety or the safety of others by his actions? Does he help to prevent accidents by practicing good safety procedures?

6. PUBLIC CONTACTS: Refers to all public contact made through personal or telephone conversation, correspondence, and day-to-day appearances before the public. Does the employee's exposure to the public eye and ear reflect credit on the department and promote a good public image? Is the employee courteous and discreet in his public contacts and behavior? Is he aware of the necessity to present a consistently good appearance on the public?

7. SUSPECT CONTACTS: As with public contacts, this factor may not apply to some employees and yet may be extremely significant in the cases of other employees. Is the employee too harsh or too timid with suspects or prisoners? Is his attitude or behavior toward suspects or prisoners detrimental to security, a good image, or investigative efficiency?

8. EMPLOYEE CONTACTS: Reflects only those contacts which either improve or reduce the effectiveness of the employees involved. It does not apply to an employee's personal popularity or lack of it. Does he mind his own business, but at the same time have a proper concern for the problems of other employees whose jobs touch his? Is he a disruptive influence? Does he bother or embarrass others with his personal problems? Is he a positive influence on the morale of others?

9. KNOWLEDGE OF WORK: This factor should not be confused with, or restricted to, the technical knowledge an employee is required to bring to a specialized job class (Job Skill Level, factor 12). It is much broader and includes particularly the range of pertinent policies, regulations, and procedures relating to his assignment. Has the probationary employee acquired an acceptable working level of job knowledge?

10. WORK JUDGEMENTS: Every employee makes decisions depending upon the degree of responsibility assigned in his position. Does the employee make a minimum of poor judgements in the course of his work? Is he consistent and reliable in his judgements? What effect do his judgments have on the quantity and quality of work produced by himself and by others?

11. PLANNING AND ORGANIZING: Measure the manner and method in which an employee approaches his assigned duties, and how successful his planning and organizing is in achieving desired results. Does the employee take time to plan the sequence of steps required in carrying out his task? Or does he attack the job thoughtlessly or with such blind enthusiasm that waste and mistakes result or work deadlines are missed? Does he make allowances in organizing the job so that all foreseeable circumstances are properly taken into account? Does lack of planning or poor organizing indicate reasons for low production or poor quality of work?

12. JOB SKILL LEVEL: This factor relates particularly to the mental and/or manual skills required in a given position. Does the employee consistently demonstrate at a proper level the skills of his job class? Has he taken advantage of related in-service training opportunities? Does he read technical publications related to his work?

13. QUALITY OF WORK: The degree of excellence of the work performance over the entire rating period is measured here. In rating this factor, attention should be paid to the consequences of poor quality work. Is the employee's work effective, accurate, thorough, and acceptable? Must the work be redone, thus reducing the potential volume of acceptable work which could have been produced? Do errors in the employee's work affect the efforts of others? Does poor work too often reflect upon the department? Are reports clear, concise, accurate and complete?

14. VOLUME OF ACCEPTABLE WORK: Refers to the amount of work required to meet job standards. Does the employee consistently accomplish a day's work for a day's pay. Does he produce enough work so that he is clearly a net asset to the department? Supervisors should not make undue allowances for such reasons as the employee's poor health, home problems, age, or length of service. While short-term exceptions to the volume standard can sometimes be made, care should be exercised to see that proper warnings are issued when indicated.

15. MEETING DEADLINES: If work schedules are important enough to set reasonable deadlines, were these deadlines met? If the employee could not meet deadlines, did he give advance notice? Did he show an honest attempt to meet deadlines?

16. ACCEPTS RESPONSIBILITY: Refers to the degree of willingness an employee exhibits when given responsibility and the manner in which the responsibility is carried out. Does the employee readily accept responsibility or does he avoid it? Does he deny his responsibility when things go wrong? Or is he quick to own up to his failures? Does he consistently act in a responsible manner?

17. ACCEPTS DIRECTION: The word "direction" as used here is synonymous with such words as supervision, training, and instruction. Does the employee demonstrate that he has accepted the direction by carrying out the direction to the best of his ability? Does he chronically challenge supervision, instruction, or orders? Does he meekly or passively accepted directions he thinks may be faulty? Does he blindly or maliciously carry out such directions? Is he resentful of direction or supervision? Does he accept direction, but complain about it to fellow employees?

18. ACCEPTS CHANGE: Use this factor to evaluate the traits of adaptability and flexibility. Does the employee accept change willingly? Does he slow down progress or cause inefficiencies by resistance to change? Does he adapt satisfactorily to new work surroundings, new equipment, new procedures, new ideas, new supervisors?

19. EFFECTIVENESS UNDER STRESS: There are some positions where pace, pressure, and tempo are consistently demanding. Is the employee capable of meeting the demand? Can he produce an acceptable volume and quality of work in an emergency? Is his work generally organized well enough to meet unforeseen contingencies? Before marking this factor, consider whether stress is inherent in the position or results from the employee's failure to properly plan and organize his work.

20. ATTITUDE: Does the attitude of the employee contribute to a desirable work atmosphere or a proper public image? In the many situations the employee is confronted with, is his/her attitude satisfactory or disruptive?

21. OPERATION AND CARE OF EQUIPMENT: Reflects the employee's concern for safe, responsible, and reasonable operation or use of equipment. Is the employee concerned with conservation of equipment? Does he request appropriate maintenance and repair of equipment when necessary?

22. INITIATIVE: Refers to initiation of action by the employee. While initiative shows up in the form of suggestions and constructive criticism, it is most obvious when the employee originates investigations or acts to produce more efficient, productive or economical methods and procedures. Does he take opportunities to exercise initiative or must he be prodded into action? Is he alert to operating efficiency and cost-cutting? Is he inventive? Does he offer practical constructive criticism?

24. Spaces 24-25 have been left blank for additional factors the rater may consider necessary in achieving a view of the employee's total job effectiveness.

## SUPERVISORY FACTORS

26. PLANNING AND ORGANIZING: Knowledge, talent, and mental effort are required in planning and organizing the work of subordinates. How well does he analyze and then put into effect improved and more efficient work processes? Does he plan improvements or changes and effect them in a logical and systematic manner?

27. SCHEDULING AND COORDINATING: This is the next logical step and is a critical phase of the supervisor's function. Does the supervisor effect the necessary scheduling or rescheduling or work? Does he provide the necessary personal coordination of the work, not only among his subordinates, but, more importantly, between other sections and divisions? Does he anticipate schedule problems, or is he surprised and "caught short" when these occur? Does he keep his supervisor informed of problems and delays, or does he wait until these may be discovered, or until it is too late for planning adjustments?

28. TRAINING AND INSTRUCTION: Refers generally to orientation of new employees or to the demonstration and exploration of technical methods, procedures and rules in which the new employee cannot be expected to be competent. It also refers to introducing permanent employees to changing methods, procedures, and techniques, as well as improving basic qualifying skills to their highest potential level. Refers also to instructions given in day-to-day or periodic observation and supervision of employee performance.

It may be an occasional word or it may be a planned periodic meeting of a small group of employees in which effective methods, techniques, and standard procedures are explained, demonstrated, and reviewed. Does the supervisor plan and carry out a program of orientation and training for new employees? Does he provide for the correction of any technical skill deficiencies in new employees? Does he provide training for permanent employees in new methods and procedures? Does he assist employees in self-development programs?

29. EFFECTIVENESS: This factor is designed to measure the results achieved by the supervisor and his subordinates. Do his subordinates prevent crime, apprehend violators, or provide services to the desired degree? Are assigned functions accomplished? Completely? On time? Is the quality of work produced by the supervisor and his staff up to standard?

30. EVALUATING SUBORDINATES: Measures the accuracy and manner in which the supervisor approaches and completes the formal evaluation of his subordinates. Does the supervisor exhibit a good balance of constructive criticism and praise in evaluating employees? Does he indicate how an employee's work may be improved, when improvement is needed? Are his evaluations positive contributions to employee development? Are his evaluations consistently objective, fair, and accurate?

31. JUDGEMENTS AND DECISIONS: Refers to the practical exercise of authority and responsibility by the supervisor. Does the supervisor exhibit firmness and fairness in judgments affecting employees? Is he accurate in making judgments affecting functional goals? Does he cause a resentment or other adverse reactions to his decisions because of poor timing or the manner in which he states them? Are his judgments always in accord with the best interests of the department? Does he balance employee and department interests when these are not fully compatible?

32. LEADERSHIP: Does the supervisor spur subordinates to their best efforts through example rather than by relying on the authority of his position? Does he mold them into a group or team whose cooperative endeavors surpass their individual performance collectively? Does his intelligent exercise of leadership create an atmosphere in which employee attitudes are optimistic and positive?

33. SUPERVISORY CONTROL: Refers to the maintenance of order in all areas of supervisory jurisdiction. Do the supervisor's employees perform their duties and functions in an orderly and disciplined manner which promotes work objectives? Do the employees have a clear understanding of behavior and performance standards which are expected? Does the supervisor enforce these standards consistently? Is the supervisor "accepted" by his subordinates and in full control at all times? Is the discipline and control too oppressive?

34. Spaces 34-35 have been left blank for any additional supervisory factors the rater feels should be included as determinants of supervisory effectiveness necessary to the position of the employee being evaluated.

VI  SYSTEM DEFINITION AND OUTLINE

A. The evaluation system utilizes two separate forms to include civilian and sworn personnel.

B. All supervisors involved in the rating process will be required to attend in-service training on the system prior to the actual evaluation process.

C. Semi-annual evaluation required.

1. All non-probationary personnel shall be evaluated on a semi-annual basis, or more frequently as deemed necessary by a Division Commander.

2. Sworn probationary personnel shall be evaluated on a quarterly basis or (4) times annually.

D. Written evaluation required.

1. The WPD requires that personnel evaluations be documented and written on the forms provided.

2. These forms have been approved, and are on file with the Clerk of the Westlake Civil Service Commission.

E. Specific rating period.

1. An employee's evaluation will be based entirely on the measurable performance demonstrated within the specified rating period.

2. The first evaluation rating period will cover April 1st through September 31st. The second rating period will be from October 1st through March 31st.

   a) The first Performance Evaluation Report will commence October 1st and is to be completed by November 1st.

   b) The second Performance Evaluation Report will be started April 1st and is to be completed by May 1st.

3. The first two weeks of the evaluation month will allow the supervisor to complete the Performance Evaluation Report form and review it with the subordinate. The last two weeks will allow for review of appeals.

F. Criteria used for evaluation specific to the position.

   1. Personnel are evaluated on specific criteria which is provided in their individual job descriptions.

   2. Rating categories also have commentary for purposes of clarity and uniformity.

G. Evaluation reviewed and signed by raters supervisor.

   1. All employee Performance Evaluation Reports will be reviewed and signed by the rater's supervisor, or an assigned reviewing officer, in order to assure fairness and objectivity of the ratings given.

H. Performance Evaluation Report signed by employee.

   1. Each employee is required to sign his/her evaluation after it is reviewed with the rater.

   2. This signature does not indicate approval or disapproval of the rating provided, solely that the employee reviewed the evaluation.

VII PROCEDURE

A. Rating will be provided by employee's immediate supervisor

   1. An employee will be evaluated only by the supervisor who was in direct command of the employee during the rating period involved.

2. This responsibility will not be delegated.

3. At the end of each "review period", the Watch Commander will be responsible for generating the performance review and summary reports for all men under his command.

B. Performance Evaluation Reports are to be typewritten and prepared in triplicate.

1. The original will be placed in the Performance Evaluation File.

2. A copy will be presented to the individual employee.

3. A copy will be retained by the employee's Watch Commander.

C. Upon completion of the Performance Evaluation Report, the rating officer will schedule and conduct a performance review interview with the individual employee.

1. Performance of the past review period will be discussed.

2. Plans will be developed for specific improvement in any area where improved performance is required to meet departmental standards.

D. At the completion of the performance interview the employee may exercise his option to comment in writing in the space so provided on the evaluation form.

E. The individual employee shall sign and date his/her evaluation form on the lines so indicated.

1. Officer's signature does not effect his/her right to appeal to a superior officer

F. APPEAL: If an officer has a complaint resulting from a performance report or the accompanying interview, the appeal process will be:

1. Initiated in writing, through the supervisor issuing the report in question, within five (5) working days, excluding Saturdays, Sundays, and all paid holidays.

2. Referred to the rating officer's immediate superior.

3. If appeal warrants special consideration, the results of the subsequent review by the immediate supervisor will be filed as a supplement to the appealed evaluation report.

4. If special consideration is justified, and a supplemental appeal report is filed by the superior officer, the appeal report will become a permanent record and is to be filed with the original evaluation report. NO EVALUATION PERFORMANCE REPORT MAY BE ALTERED OR DESTROYED AS A RESULT OF AN APPEAL.

   a) The supplemental appeal report filed by the superior officer shall outline all those facts and circumstances that support an appeal.

   b) The appeal report shall be reviewed by the Chief of Police and either sustained or disallowed, and so noted in writing by the Chief on the supplemental appeal report.

G. Rater evaluation by the reviewing officer.

1. At the conclusion of the semi-annual evaluation process, reviewing officers will evaluate the raters as to their fairness and impartiality, their participation in counseling and guidance for employees, and their ability to apply ratings uniformly

VIII PERFORMANCE EVALUATION UTILIZATION

A. The WPD utilizes evaluations for the following purposes:

1. To identify and deal promptly with personnel problems and attempt to motivate improvement.

2. To assist the employee with career development.

3. To facilitate proper decisions regarding probationary employees.

4. To identify training needs.

5. To establish suitability for individual assignment.

B. Performance Expectations

1. At least once during the first two months of the rating period, the rater will discuss with each employee they are rating, specific duties and responsibilities of the position, what level of performance is expected of the employee and the criteria that will be used to evaluate the individual

C. Notification of Unsatisfactory Performance

1. Should an employee's performance be deemed unsatisfactory, that employee is to be advised in writing immediately where practical, or as soon as possible.

2. The employee will also be provided with recommendations to improve his/her performance.

3. Should the unsatisfactory performance continue, those courses of action defined by the rater shall be included in the evaluation.

   a) Further unsatisfactory performance will result in a special evaluation schedule for more frequent review, at the direction of the Division Command and the Chief.

4. Suspension, reduction in rank or removal may result from inefficient service in preceding six (6) months, as determined by the Civil Service Commission (Rule XVIII).

D. A "Performance Improvement File" will be established for the collection of job performance documentation.

E. Individual files will be available only to command personnel of higher rank.

1. The performance improvement file will contain active evaluations and summaries.

2. At the discretion of the Watch Commander or the Division Commander, the performance improvement file may contain other documented evidence relative to the individual's performance.

   a) Inspection reports

   b) Letters of commendation

   c) Letters of complaint

   d) Activity summaries

             e)    Other pertinent documents

F.    Evaluation Retention Schedule

    1.    It shall be the policy of the WPD, that all Performance Evaluation Reports will be kept on file for a minimum of two (2) years.

**PERFORMANCE EVALUATION REPORT**

| Use Blue or Black Ink For Final Markings |

**WESTLAKE POLICE DEPARTMENT**

| EMPLOYEE NAME (Last) (First) (Init) | EMPLOYEE NO. | STATUS: ☐ FULL TIME ☐ PART TIME |
| --- | --- | --- |
| CLASS: TITLE/RANK | ASSIGNMENT | DUE DATE |

| SECTION A | 1 | 2 | 3 | 4 | FACTOR CHECKLIST | 5 |
| --- | --- | --- | --- | --- | --- | --- |
| | NOT SATISFACTORY | SOME IMPROVEMENT NEEDED | MEETS STANDARDS | EXCEEDS STANDARDS | IMMEDIATE SUPERVISOR MUST CHECK EACH FACTOR IN THE APPROPRIATE COLUMN | DOES NOT APPLY |

**SECTION B** — Record job Strengths, Superior Performance Incidents, Progress Achieved, or Checks in Column 4.

| | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | ///// | 1 Observance of Work Hours | ///// |
| | | | ///// | | 2 Attendance | ///// |
| | | | ///// | | 3 Grooming & Dress | ///// |
| | | | ///// | | 4 Compliance w/rules | ///// |
| | | | ///// | | 5 Safety Practices | ///// |
| | | | | | 6 Public Contacts | |
| | | | | | 7 Suspect Contacts | |
| | | | | | 8 Employee Contacts | |
| | | | | | 9 Knowledge of Work | |
| | | | | | 10 Work Judgments | |
| | | | | | 11 Planning and Organizing | |
| | | | | | 12 Job Skill Level | |
| | | | | | 13 Quality of Work | |
| | | | | | 14 Volume of Acceptable Work | |
| | | | | | 15 Meeting Deadlines | |
| | | | | | 16 Accepts Responsibility | |
| | | | | | 17 Accepts Direction | |
| | | | | | 18 Accepts Change | |
| | | | | | 19 Effectiveness Under Stress | |
| | | | | | 20 Attitude | |
| | | | | | 21 Operation & Care of Equipment | |
| | | | | | 22 Initiative | |
| | | | | | 23 (Additional Factors) | |
| | | | | | 24 | |
| | | | | | 25 | |

**SECTION C** — Record specific Goals or IMPROVEMENT PROGRAMS to undertaken during next evaluation period.

**SECTION D** — Describe STANDARD Performance, (optional for most factors checked in Col. 3), MANDATORY for some factors - see instructions

**SECTION E** — Record specific work performance DEFICIENCIES or Job behavior requiring improvement or correction (Explain checks in Cols. 1 and 2).

**For Employees Who Supervise Others**

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| | | | | 26 Planning and Organizing | |
| | | | | 27 Scheduling and Coordinating | |
| | | | | 28 Training and Instructing | |
| | | | | 29 Effectiveness | |
| | | | | 30 Evaluating Subordinates | |
| | | | | 31 Judgments and Decisions | |
| | | | | 32 Leadership | |
| | | | | 33 Supervisory Control | |
| | | | | 34 (Additional Factors) | |
| | | | | 35 | |

Checks in Cols. 1 and 2 must be explained in Section E.

RATER: I certify this report represents my best judgement.
[ ] I recommend   [ ] I do not recommend this employee be granted permanent stat (For final Probationary reports only)
(Rater's signature)     (Title)     (Date)

REVIEWER: (If none, so indicate)
(Reviewer's signature)     (Title)     (Date)

EMPLOYEE: I certify this report has been discussed with me. I understand my signature does not necessarily indicate agreement.  ☐ I wish to discuss this report with the reviewer.

(Comments):

(Employee's signature)     (Date)

········ SEE INSTRUCTIONS ON THE REVERSE SIDE··········

# WESTLAKE POLICE DEPARTMENT

| Effective Date:<br>February 17, 1999 | | Number: 4401 |
|---|---|---|
| Subject:<br>Temporary Light Duty | | |
| Reference: ADA, FMLA, Pregnancy Discrimination Act | | Approved:<br>*Richard A. Walling*<br>Chief of Police |
| Distribution:<br><br>A,B,C,D,E,F | Reevaluation Date:<br>Annual | No. Pages<br>1 of 6 |

## I.    Purpose

It is the purpose of this policy to establish the authority for temporary light-duty assignments and procedures for granting temporary light duty to eligible officers and civilian personnel within this agency.

## II.    Policy

Temporary light-duty assignments, when available, are for officers and other eligible personnel in this agency who, because of injury, illness or disability, are temporarily unable to perform their regular assignments but who are capable of performing alternative duty assignments. Use of temporary light duty can provide employees with an opportunity to remain productive while convalescing, as well as provide a work option for employees who may otherwise risk their health and safety or the safety of others by remaining on duty when unable to fulfill physically or mentally their regular assignment. Therefore, it is the policy of this agency that eligible personnel be given a reasonable opportunity to work in temporary light-duty assignments where available and consistent with this policy. The determination to allow a light duty assignment will be made on a case-by-case basis, with the best interests of the productivity and efficiency of the department, the other departmental personnel, the public and the injured employee taken into account.

## III.    Definitions

*Eligible Personnel*: For purposes of this policy, any full-time sworn or civilian member of this law enforcement agency suffering from medically certified illness, injury or disability requiring treatment of a licensed health-care provider and who, because of injury,

illness or disability, is <u>temporarily</u> unable to perform the regular assignment, but is capable of performing alternative assignments.

*Family and Medical Leave Act (FMLA)*: Federal law providing for up to 12 weeks of annual leave for workers (in addition to leave provided by this agency) due to illness, injury or certain other family conditions/situations.

*Full Duty*: A job status indicating that an employee is capable of performing the essential job tasks required of their respective position.

*Temporary Light Duty*: A limited term duty status indicating that a full time employee is temporarily not able to perform some essential job tasks, but is able to perform useful law enforcement-related work and is medically approved to be assigned to an existing administrative or support position within the Department.

## IV. PROCEDURES

A. **General Provisions**
1. Temporary light-duty positions are limited in number and variety. Therefore:
   a. personnel injured or otherwise disabled in the line of duty shall be given preference in initial assignment to light duty; and
   b. assignments may be changed at any time by the Chief of Police or his designee, upon the approval of the treating physician, if deemed in the best interest of the employee or the agency.
2. This policy in no way affects the privileges of employees under provisions of the Family and Medical Leave Act, Fair Labor Standards Act, Americans with Disabilities Act, or other federal or state law.
3. Assignment to temporary light duty shall not affect an eligible employee's pay classification, pay increases, promotions, retirement benefits or other benefits.
4. No specific position within this agency shall be established for use as a temporary light-duty assignment, nor shall any existing position be designated or utilized exclusively for personnel on temporary light duty.
5. Light-duty assignments are strictly temporary and normally should not exceed one month in duration. After one month, personnel on temporary light duty who are not capable of returning to their original duty assignment shall
   a. present a request for extension of temporary light duty, with supporting documentation, to the Chief of Police or his designee; or
   b. pursue other leave options as provided by employment provisions of this agency or federal or state law, or through disability or service retirement.

2

6. Officers on temporary light duty are prohibited from engaging in any outside or off duty employment.

    a. Overtime assignments should be stopped or strictly controlled for personnel on light-duty assignment.

7. Depending upon the nature and extent of the disability, an officer on temporary light duty may be prohibited or restricted from wearing the departmental uniform, carrying the service weapon, operating a marked police cruiser or otherwise limited in employing police powers as determined by the Chief of Police on a case by case basis.

8. Light-duty assignments shall not be made or denied for disciplinary purposes.

9. Officers may not refuse temporary light-duty assignments that are supported by and consistent with the recommendations of an attending physician or certified health-care provider.

B. **Reporting Requirements**

1. All **on duty injuries** shall be reported immediately to the OIC.

    a. A detailed report shall be submitted by the injured employee as soon as is practical.

    b. The OIC shall immediately investigate the injury or accident. A detailed report and investigation is needed, along with photographs, statements, and collection of physical evidence if applicable.

    c. The first report of injury form shall be completed and submitted to the Chief's office within 24 hours of the injury.

2. **Workmen's Compensation**

    a. Any employee needing medical attention who goes to a doctor or hospital due to an on-duty injury will advise the doctor or hospital that the injury is to be processed as a Workmen's Compensation claim and not processed under the employee's hospitalization plan.

3. All **off duty injuries**, illnesses, or disabilities shall be reported to the current on duty OIC if said injury, illness, or disability has caused any restriction in the ability of the affected employee to perform all essential job tasks.

    a. The OIC shall immediately inquire into the details so that a detailed report(s) can be submitted to the Chief's office.

    b. A log entry shall be completed, schedule noted and checked, and compliance with shift minimums adhered to and adjusted if applicable.

C. **Temporary Light-Duty Assignments**

1. Temporary light-duty assignments may be drawn from a range of technical and administrative areas that include but are not limited to the following:

    a. administrative functions (e.g. report review, special projects),

3

      b.     clerical functions (e.g. filing, data entry, typing),

      c.     desk assignments (e.g. report writing, phone call follow-up, prisoner monitoring ),

      d.     report taking (e.g. telephone reporting, reports on station), or

      e.     communications (e.g. dispatching, receiving complaints).

2. This agency's Administrative Captain will maintain an inventory of available job assignments that may be used for temporary light duty.

3. The City of Westlake is not required to create a new job position, a light duty position, or a new permanent position for any disabled employee.

4. In addition to considerations included in IV-A-1 of this policy, decisions on temporary light-duty assignments shall be made based upon the availability of an appropriate assignment, given the applicant's knowledge, skills and abilities; availability of light-duty assignments; and the physical limitations imposed on the officer on a case by case basis.

4. Every effort shall be made to assign officers to positions consistent with their rank and pay classification. However, where deemed appropriate, personnel may be assigned to positions designated for personnel of lower rank or pay classification.  Officers thus assigned shall

      a.     retain the privileges of their rank but shall answer to the supervisory officer of the unit to which they are assigned with regard to work responsibilities and performance; and

      b.     retain the pay classification and related benefits of the position held prior to their assignment to temporary light duty.

D. **Requests for and Assignment to Temporary Light Duty**

1. Requests for temporary light-duty assignments shall be submitted to the officer's/employee's immediate supervisor. Requests must be accompanied by a statement of medical certification to support a requested reassignment, which must be signed either by the treating physician or other licensed health-care provider. The certificate must include an assessment of the nature and probable duration of the disability, prognosis for recovery, nature of work restrictions and an acknowledgment by the health-care provider of familiarity with the light-duty assignment and the fact that the employee can physically assume the duties involved.

4

2.  The request for temporary light duty and the physician's statement shall be forwarded to this agency's designated personnel authority, the Administrative Captain, who shall make a recommendation regarding the assignment to the Chief of Police or his designate.

   a.  This agency may require the employee to submit to an independent medical examination by a health provider of the agency's choosing.  In the event the opinion of this second health provider differs from the foregoing health provider, the employee may request a third opinion at the employer's expense.

   b.  The employee and representatives of this agency shall cooperate and act in good faith in selecting any third health-care provider, and both parties shall be bound by that medical decision.

   c.  Refusal to submit to an examination will be considered insubordination and will be dealt with accordingly.

3.  An employee who has not requested temporary light duty may be recommended for such assignment by submission of a request from the officer's immediate supervisor or unit commander.  Such a request must be accompanied by an evaluation of the employee conducted by a competent medical authority expressing the need for temporary light duty or by a request/order for a medical or psychological fitness-for-duty examination.

   a.  Notice shall be provided to the employee of the proposed temporary light-duty assignment together with justification for the recommendation.

   b.  The employee may challenge the proposed reassignment using established agency grievance procedures.

   c.  Pending results of a grievance procedure, an employee may be reassigned if, in the opinion of the Chief of Police, failure to reassign may jeopardize the safety of the officer, other employees, or the public.

4.  As a condition of continued assignment to temporary light duty, officers shall be required to submit to periodic medical or psychological assessments of their condition as specified by the Administrative Captain or Chief of Police.

E.  **Pregnant Officers**

1.  Pregnant officers are eligible for temporary light-duty assignments as available and as appropriate to their physical capabilities and well-being.

2.  Where appropriate temporary light-duty assignments are unavailable, pregnant officers may request a leave of absence, sick leave, vacation leave, or pursue other forms of medical leave such as Family and Medical Leave (FMLA) as provided by this agency and state or federal law.

   a.  Article XXIII, subsection 23.07 of the current collective bargaining contract allows members of the bargaining unit, at their option, utilize the twelve (12) weeks of unpaid Family and Medical Leave in lieu of using their accumulated sick time or vacation time for the purpose of maternity leave.

5

3. On a monthly basis, pregnant officers shall submit physician's medical certificates that document
   a. the officer's physical ability to perform the present assigned duties,
   b. the physician's appraisal that the type of work being performed will not injure the officer or her expected child, and
   c. any recommended duty restrictions or modifications including temporary light duty.
4. Pregnant officers shall be permitted to continue working on regular duty or temporary light-duty assignments as long as they present monthly physician certificates or until such time as a physician recommends that work be curtailed.

F. **Return to Duty**
1. The temporary light duty assignment will be terminated after:
   a. The injured employee has been released by a licensed physician for regular duty and has a written certification of fitness to return to regular duty by the licensed physician.
   b. It has been determined by the department physician that the employee is permanently disabled and will not be able to return to regular duty.
   c. The one month time limit has expired and no request for extension of temporary light duty is filed. (see IV. A5 a)

G. **Option to End Temporary Light Duty Assignment**
1. The Chief of Police has the option to end temporary light duty assignments at any time. Temporary light duty assignments will be made on a case-by-case basis, with the best interests of the productivity and efficiency of the department, all personnel, the public, and the injured employee taken into account.

6

# REQUEST FOR LIGHT DUTY

*Departmental Directive 4401 requires the following must be completely filled out in order to be considered for relief to light duty:*

Name _____     Date _____

SSN _____     DOB _____

Date of last medical examination _____

Doctor or Medical Practitioner _____

Doctor or Medical Practitioner's specialty _____

Doctor or Medical Practitioner's address & phone _____

_____

_____

*The following is to be filled out by the Doctor or Medical Practitioner:*

Current diagnosis and specific areas of the body under treatment _____

_____

_____

_____

Current physical capabilities of applicant _____

_____

_____

Date of estimated or actual return to full duty status _____

Reason if expected recovery has been delayed _____

_____

_____

List need(s) for rehabilitation _____

_____

_____

Clinical findings to support either delays in recovery or need(s) for rehabilitation

_____

_____

_____

List detailed treatment plan(s) {include results of treatment to date, subjective complaints, objective findings, assessment of claimant's problems and plan(s) of care detailing services, frequency, duration, and expected outcomes} _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

X_____(Medical Practitioner)

X_____(Employee)

WESTLAKE POLICE DEPARTMENT

Title:     *CITIZEN COMPLAINTS*

Date Issued:     November 15, 2001

Revised:

Policy: 5103

Signature: *Richard A. Whiting*

Pages: 1 of 2

### PURPOSE:

To clarify the procedure for handling citizen complaints.

To provide for documentation of specific allegations.

To facilitate the investigation and disposition of citizen complaints.

### POLICY:

It is the policy of the Westlake Police Department to investigate all complaints against Department personnel, regardless of the source of such complaints. Investigations of these complaints through standardized procedures will demonstrate the Department's desire to provide honest, efficient police service and will inspire public confidence in its personnel.

### DEFINITION:

A citizen complaint is defined as that action taken by a citizen to bring to the attention of the Department any police action or inaction that the citizen considers to be contrary to law, proper procedure, good order, or in some other manner prejudicial to the citizen, the police department, or to the community as a whole.

### PROCEDURE:

1.     A citizen complaint will be addressed whenever a citizen brings to the attention of a member of this Department a complaint concerning an action described above. Whenever a citizen requests to file a complaint against a member of this Department an on duty supervisor will discuss the incident with the citizen. If after discussing the incident with the supervisor, the citizen still desires to file a complaint, a Citizen Complaint Form will be provided. A citizen complaint will not be accepted that involves only the citizen's contention that he is innocent of a charge placed against him by the officer.

2.     A citizen complaint may be received from:

citizens who report them to any member of the Department, either orally or in writing, by telephone or correspondence, either signed or anonymous;

through a third person; and,

by referral from some official or unofficial agency.

3.     The citizen will be instructed to document, in their handwriting, as much as possible concerning the incident and will be given whatever assistance is needed to complete the form.

4.     When the citizen is finished the supervisor receiving the form will check it for legibility and sign the form. The original will be retained and the complainant will receive a copy.

5.     The supervisor receiving the form will record, on a separate form, any comments or discussion with the complainant, of any significance, and the complainant's physical and mental condition. Evidence indicating that the complainant is under the influence of an intoxicant or drug, is suffering a mental disorder, or any other evidence of traits or conditions bearing upon his credibility will be noted. The supervisor

Procedure #5103

will also document (in writing, and supplemented by photographs if appropriate) any visible marks or injuries relative to the complaint.

6. Reception of a citizen complaint will be noted on the Daily Log, along with the name and rank of the officer receiving it.

7. The original complaint will be placed in a sealed envelope and forwarded to the Chief of Police without delay.

8. A Department member accepting a complaint by telephone will complete a Citizen Complaint Form with as much information that the complainant will provide. It is essential that the complainant's name, address, and telephone number appear on the form. If the complainant insists on remaining anonymous he will be advised that this will seriously hamper a complete investigation. The complaint form will then be sealed in an envelope and forwarded to the Chief of Police without delay.

9. If a citizen refuses to write the complaint in his own handwriting the complaint will be processed as a telephone complaint.

10. The Chief of Police will assign the complaint for investigation. All investigations are confidential and the investigating officer will discuss the investigation with only those individuals that will be involved in the investigation.

11. The investigating officer will thoroughly document his investigation and all interviews conducted. The results of his investigations and findings will be forwarded, in a sealed envelope, directly to the Chief of Police.

12. After review by the Chief of Police, the complainant will be contacted by the investigating officer with the findings.

13. A record of all sustained citizen complaints will be kept by the office of the Chief of Police for a period determined by the public records retention schedule.

14. ORC Section 2921.15 <u>Filing False Complaint Against Peace Officer states:</u> No person shall knowingly file a complaint against a peace officer that alleges that the peace officer engaged in misconduct in the performance of the officer's duties if the person knows that the allegation is false. Whoever violates this section is guilty of Making a False Allegation of Peace Officer Misconduct, a misdemeanor of the first degree. The Westlake Police Department will file criminal prosecutions against persons violating this section after a review by the prosecutor.

# CITY of WESTLAKE

27300 Hilliard Blvd. Westlake, Oh 871-3311 fax 835-6444

## POLICE DEPARTMENT
### General Orders

| SUBJECT:<br>HARASSMENT IN THE WORKPLACE | | NUMBER<br>5108 | |
|---|---|---|---|
| RULE/REFERENCE:<br>Title VII Civil Rights Act<br>Section 703<br>CALEA STDS: 26.1.2 | EFFECTIVE DATE: April 25, 1997<br><br>REVIEW DATE: Annual | | |
| DISTRIBUTION CODE:<br><br>A,B,C,D,E,F,G | APPROVED: *Richard A. Walling*<br>Chief Richard A. Walling | | NO. of PAGES<br><br>1 of 4 |

## I. POLICY

In accordance with Title VII of the Civil Rights Act of 1964 (Section 703), it is the policy of the City of Westlake and the Westlake Police Department that all employees shall be allowed to work in an environment free from all forms of harassment. The culture of the Westlake Police Department does not condone, and will not tolerate sexual harassment or any other forms of harassment by our officers, employees, and non-employees. Therefore, this agency shall take direct and immediate action to prevent such behavior and to remedy all reported instances of harassment, sexual or otherwise.

## II. PURPOSE

The purpose of this policy is to maintain a healthy work environment and to provide procedures for reporting, investigating and resolving complaints of harassment, sexual or otherwise. The Westlake Police Department strongly opposes harassment in any form.

## III. DEFINITIONS

A. Sexual Harassment is behavior of a sexual nature which is not welcome by the intended recipient, is personally offensive, erodes morale, or interferes with the work performance or effectiveness of personnel.

B. Sexual harassment is any action or comment that has a sexual meaning, or could be interpreted to have a sexual meaning, including, but not limited to, physical actions such as touching and looking, verbal actions such as jokes, innuendoes, or sexual comments, covert actions such as placement of objects or cartoons or other pranks, and/or subtle pressure for sexual activity.

(1)  5108

C. Sexual Harassment is defined by EEOC guidelines as any unwelcome sexual advance, request for sexual favors, or other verbal or physical conduct of a sexual nature when:

1. Submission to such conduct is made either explicitly or implicitly a term or condition of employment; or
2. Submission to or rejection of such conduct by an employee is used as the basis for employment decisions affecting the employee; or
3. Such conduct has the purpose of effect of unreasonable interfering with an employee's work performance or creating an intimidating, hostile or offensive working environment.

D. Employee is defined as any sworn officer, full time employee, part time employee, auxiliary police officer, volunteer, or seasonal employee of the City of Westlake.

## IV. EMPLOYEE RESPONSIBILITIES

A. Each **supervisor** shall be responsible for preventing acts of harassment. This responsibility includes:

1. Monitoring the work environment on a daily basis for signs that harassment may be occurring;
2. Counseling all employees on the types of behavior prohibited, and the agency procedures for reporting and resolving complaints of harassment;
3. Stopping any observed acts that may be considered harassment and taking appropriate steps to intervene, whether or not the involved employees are within their line of supervision.

B. Each **supervisor** has the responsibility to assist any employee of this agency who comes to that supervisor with a complaint of harassment in documenting and filing a complaint with the Chief of Police.

C. Each employee of this agency is responsible for assisting in the prevention of harassment through the following acts:

1. Refraining from participation in, or encouragement of, actions that could be perceived as harassment.
2. Reporting acts of harassment to a supervisor.
3. Assisting any employee who confides that he or she is being harassed by encouraging him or her to report the conduct to their supervisor.

D. Failure to take action to stop known harassment shall be grounds for discipline.

(2)   5108

## V. PROHIBITED ACTIVITY

A. No employee shall either explicitly or implicitly ridicule, mock, deride or belittle any person.

B. Employees shall not make offensive or derogatory comments based on race, gender, religion or national origin either directly or indirectly to another person. Such harassment is a prohibited form of discrimination under state and federal employment laws and is also considered misconduct subject to disciplinary action by this agency.

C. Sexual or so called "dirty" jokes will not be permitted which might embarrass or ridicule an employee because or his/her gender.

D. If comments or conduct of a sexual nature are unwelcome by a person, they may constitute harassment. Excuses for such objectionable behavior such as the offender was "only joking" or that "I didn't think the other employee would object", are not acceptable.

E. Such conduct as grabbing, hugging, kissing, cornering, unnecessary touching, unwanted advances, sexual compliments, jokes, remarks, and innuendos are prohibited.

F. Employees are prohibited from displaying on Police Department property any sexually oriented or provacative posters, pictures, cartoons or drawings that show nudity, partial nudity, suggestive or explicit sexual activity. Magazines or books which feature such material shall not be openly on display on Police Department property.

G. No employee is to be treated differently than any other employee because of his/her race, gender, religious beliefs, or national origin.

## VI. COMPLAINT PROCEDURES

A. Employees encountering harassment should tell the person that their actions are unwelcome and offensive. The employee shall document all incidents of harassment in order to provide the fullest basis for investigation.

B. Any employee who witnesses or believes that he or she is being harassed should report the incident(s) to their supervisor as soon as possible so that steps may be taken to protect the employee from further harassment, and appropriate investigative and disciplinary measures may be initiated. Where this is not practical, the employee may instead file a complaint with another supervisor, the Internal Affairs Unit, or the Chief of Police.
   1. If the accused is the Chief of Police, harassment complaints should be reported directly to the Mayor. See attached City Hall Sexual Harassment Policy for procedures the Mayor would follow in this case.

(3) 5108

C. The supervisor or other person to whom a complaint is given shall meet with the employee and document the incidents complained of, the person(s) doing or participating in the harassment, witnesses, and the dates on which they occurred.

D. The agency member taking the complaint shall expeditiously deliver the complaint to the Chief of Police or in the absence of the Chief, the Acting Chief of Police or the Mayor if VI (B1) applies. The complaint shall not be discussed with whom it does not concern.

E. The Chief of Police will immediately advise the Mayor and will assign the Internal Affairs Unit to fully investigate any complaint alleging harassment.

   1. The Internal Affairs Unit shall immediately notify the Chief of Police and the Prosecutor if the complaint contains evidence of criminal activity.
   2. The investigator shall include a determination whether other employees are being harassed by the person, and whether other agency members participated in or encouraged harassment.
   3. A complaint of harassment shall be investigated thoroughly, swiftly, impartially, and without discussing it with those whom it does not concern.
   4. The Internal Affairs Unit shall inform the parties involved of the outcome of the investigation.

F. The Chief of Police shall file a written report of the findings to the Mayor and shall maintain a file of harassment complaints in a secure location.

G. There shall be no retaliation against any employee for filing a harassment complaint in good faith, or assisting, testifying or participating in the investigation of such a complaint.

H. Complainants or employees accused of harassment may file a grievance in accordance with agency procedures when they disagree with the investigation or disposition of a harassment claim.

I. This policy does not preclude any employee from filing a complaint or grievance with an appropriate outside agency. However, the employee shall notify the Chief of Police that such a complaint has been filed.

J. Disciplinary action shall be taken against any employee found guilty of harassment as determined by the Chief of Police or the Mayor and will be administered as is appropriate under the totality of the facts and circumstances and may range from a verbal reprimand to termination.

(4)  5108

# WESTLAKE POLICE DEPARTMENT

| | | | |
|---|---|---|---|
| Title: | *STALKING POLICY* | Policy: | 6036 |

Date Issued: December 12, 2000

Revised: Annual

Pages: 1 of 8

Signature: *Richard A. Welling*

**Chief of Police**

*Purpose:*

The Stalking Law provides protection from stalking behavior by ensuring that harassing and/or threatening behavior is identified and prosecuted. This protocol directs how a Westlake Police Department officer will investigate stalking-type situations and provides guidance in making arrest decisions, in accordance with reasonable grounds standards. The purpose of this policy is to establish uniform guidelines for handling stalking calls.

*Policy:*

Stalking cases are unique, in that they involve ongoing behavior by a suspect which can occur over long periods of time, even years. Stalking cases present a continuing threat to the victim, the seriousness of which is unpredictable. Due to the difficult and dangerous nature of this conduct, it will be the policy of this department to investigate all harassment, repeated threats and stalking calls in a manner that will facilitate the arrest of the stalker and the protection of the victim. Emphasis shall be on determining if reasonable grounds exist for an arrest and then taking the appropriate action. Police officers will convey sensitivity to victims, and an attitude that stalking is criminal behavior and will not be tolerated. The officer will treat all acts of stalking as criminal conduct. The officer will make efforts to ensure that victims are informed of services available to victims of crime.

*Definitions:*

Menacing By Stalking (ORC 2903.211)
Menacing by stalking occurs when a person engages in a patter of conduct that knowingly causes another to believe that the offender will cause physical harm to the other person or causes mental distress to the other person.

Pattern of Conduct (ORC 2903.211) means two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents.

Mental Distress (ORC 2903.211) means any mental illness or condition that involves some temporary substantial incapacity or mental illness or condition that would normally require psychiatric treatment.

Violation of a Protection Order (ORC 2919.27)
A violation of a protection order exists when a person recklessly violates the terms of a protection order issued by any court in this state under ORC 2919.26 (temporary protection order) or 3113.31 (civil protection order); a protection order issued by any court in this state under ORC 2903.213 (anti-stalking protection order) or 2903.214 (civil anti-stalking protection order); or a protection order issued by a court of another state. NOTE; the Full Faith and Credit section of the Federal Violence Against Women Act requires that such orders issued by either Tribal Courts or courts in US Territories be enforced as well.

Reasonable Grounds (ORC 2935.03B2a)
Reasonable Grounds (for stalking-type offenses) are a written statement by a person alleging that an alleged offender has committed the offense of menacing by stalking or aggravated trespass; for Violating a TPO, a person executes a written statement alleging the suspect in question committed the offense of Violating a TPO (TPO issued to protect either statement writer or his/her child). Also, reasonable grounds are satisfied when the officer reasonably concludes that a TPO Violation offense took place, based on his/her own knowledge and observations concerning the allegation of Violating a TPO, or based on any information (including but not limited to) any reasonably trustworthy information given by a victim of or witness to a TPO violation offense.

*Recognizing a Stalking Case:*

· Any time a victim reports any type of harassing or menacing behavior, the responding officer should be thinking about the possibility of stalking. Additional inquiry must be made to determine whether this is an isolated incident or repeated conduct. (NOTE: it is not uncommon for a victim to put up with harassing behavior for some time before finally calling the police. Therefore, whenever an incident is reported, the officer should be inquiring about prior similar behavior.)

When inquiring about prior behavior, officers should determine whether any prior police reports have been made and in which jurisdiction. Ask whether any friends or members of the victim's family have filed reports. Any time the suspect has engaged in more than one incident of some type of harassment, the case should be evaluated as a potential stalking case.

*PROCEDURE:*

Dispatch:

Dispatchers must evaluate an in-progress stalking call for factors which may make it a priority assignment.

1. During the initial call for assistance, the dispatcher will obtain at least the following information:

   a. The specific location of the emergency; address, apartment, etc.

   b. A call back telephone number should you be disconnected.

   c. The caller's name.

   d. Whether the caller is the victim or a witness.

   e. The nature of the incident.

   f. Whether there are injuries and the extent or description of the injuries (if an ambulance is needed dispatch immediately).

   g. Is the suspect present (if not, a description of the suspect, his/her expected whereabouts, and a description of any vehicle involved)

   h. Are weapons involved or present (if yes, what kind).

   i. Are any of the parties under the influence of alcohol or drugs?

   j. Are children present (are they all right)

   k. Does anyone have a current protection order?

2. *Dispatch priority:*

   a. Two officers will be dispatched to an in-progress call. (Additional information may be gathered while the unit is en route and passed onto the officers).

   b. A supervisor must be alerted to the incident.

   c. Dispatchers should inform the caller of the intended response. If distance or officer availability becomes a factor, some plan for the victim's safety should be devised.

   d. In volatile situations, the dispatcher will keep the caller on the line (if it is safe to do so) until a officer arrives at the location; if the scene is unsafe and the victim can leave, arrange a safe location for the officers and victim to meet.

3. Check for previously reported incidents and protection orders:

a.  When a call is received that could be stalking, the dispatcher will review the departments records containing prior reports, CPOS, TPOS and bond orders to determine whether there is any record of the parties having been involved previously in a stalking incident, other related offense, or having a protection order in effect. Any relevant information is radioed to the responding officers and supervisor.

*Investigation of the Stalking Case:*

Assessing the Stalker:

It is vital that the investigating officer learn as much as possible about the stalker and his/her method of operation. The investigator must assess the potential threat posed by a suspect. Information that should be documented includes:

1. Any prior threats made.
2. Any actual pursuit or following of the victim.
3. Any history of violence against the victim or others.
4. Any information regarding the suspect's tendency towards emotional outburst or rage.
5. Prior history of mental illness.
6. Substance abuse problems.
7. Possession, knowledge of, or fascination with weapons.
8. Any history of Protection Order violations.
9. Suspect's prior criminal history and/or prior contacts with law enforcement.
10. Any contacts (in-person, via telecommunications, email, US Mail, notes, etc.) w/victim

In addition, every stalking investigation should include a thorough research of the suspect's prior criminal history and/or prior contacts with law enforcement.

*Gathering Evidence:*

1. Interviewing the victim: Stalking is different because often nothing physical has happened to the victim yet; wearing the victim down mentally is the suspect's M.O. For the stalking victim, however, the fear that something will happen is overwhelming. Acknowledging the legitimacy of the victim's fear and recognizing that stalking behavior can indeed be the precursor of significant violence is a critical first step in interviewing the victim. The initial interview should attempt to establish the elements of the crime and should include the following:
   a. What incidents of harassment, threats or other have happened?
   b. When did these incidents happen?
   c. Where did these incidents happen? (Any trespass involved?)
   d. Who did them?
   e. What, if any, relationship is/was there between the victim and suspect?
   f. Is the victim a minor?
   g. What has been the effect on the victim?
   h. Any prior acts of violence toward the victim or anyone else?
   i. Was a deadly weapon involved?
   j. Was there a protection order in existence at the time of the incident?
   k. Did the suspect ever do any serious physical harm to the property of the victim?
   l. Any prior threats toward the victim?
   m. Any fear of physical harm or mental distress?
   n. Does the victim know of any previous convictions for stalking or aggravated trespass by the suspect?

   It is important to encourage the victim to not initiate any contact with the suspect and to respond to the suspect's unwanted contacts by clearly stating "I want no contact with you".

3

2. Evidence of victim's state of mind: The crime of stalking often requires that the victim suffer mental distress because of the stalker's conduct. Investigators must document any evidence of the victim's response to the harassment. For example, has the victim:

    a. Changed route to/from work, school, etc.
    b. Alerted friends, family, co-workers to the situation.
    c. Avoided going out alone.
    d. Changed residence/job/etc.
    e. Changed the telephone number.
    f. Asked security from work/school/shopping centers, etc. for assistance, escorts, etc.
    g. Installed an alarm, changed locks, added locks, etc.
    h. Changed work schedule, requested a transfer.
    i. Moved to a shelter, stayed with a friend, had a friend stay with him/her.
    j. Changed behavior, places where he/she goes, events attended, where shops or socializes.
    k. Taken a self-defense course, purchased a gun, carries pepper spray.
    l. Any other changes the victim has made.

3. Items from the victim: Seize any tangible items of evidence from the victim that substantiates the stalking behavior such as:

    a. Any taped telephone messages.
    b. Any letters or notes written by the suspect to the victim.
    c. Any e-mail sent by the suspect to the victim.
    d. Any objects sent to or left for the victim.
    e. Any "Caller ID" telephone records.

4. Obtaining corroboration: Corroborative evidence is crucial for a successful prosecution for stalking. Investigators should:

    a. Photograph any items vandalized, damaged, written on, etc.
    b. Check for fingerprints on vandalized items or other objects sent to or left for the victim.
    c. Advise the victim to save any telephone messages, items, and report all incidents immediately.
    d. Obtain telephone records from the victim and suspect's residence.
    e. Determine if any witnesses were ever present and obtain witness statements.

5. Suspect Interview: Suspect interviews can be extremely important in assessing the dangerousness of the suspect and in obtaining information that will ultimately help prove a stalking case. If appropriate, Miranda warnings are applicable as in any other interrogation. Consider:

    a. Video taping the interview whenever possible. Body language, gestures, voice tone, eye contact, etc. are important aspects in evaluating the stalker.
    b. Record any admissions, partial admissions.
    c. Research suspect's background before the interview, if possible.
    d. Gather as much information as possible about the suspect's thinking, behavior patterns, and activities regarding the victim.
    e. Gather information about the defendant's whereabouts at the time of the incidents and follow up on verifying the alibis.
    f. CAVEAT: Be aware that in some cases, interviewing the suspect may serve to intensify their interest in the victim. Precautions must be taken whenever a suspect interview takes place.

6. Search Warrants: Items to look for when serving warrants include:

    a. Photographs of the victim.
    b. Photos, diagrams, or drawings of the victim's home or workplace.
    c. Writings, logs, diaries (hard copy or computer copy) kept by the suspect which describe his/her stalking activities or thoughts/fantasies about the victim or other victims.

d. Personal items belonging to the victim.
e. Video or audio tapes that might have information concerning the stalking, such as surveillance footage.
f. Books describing stalking techniques or having subject matter dealing with stalking, harassment or violence.
g. Any equipment that appears to have been used to "stalk" the victim, such as cameras, binoculars, video recorders, etc.

7. BE AWARE: Stalking suspects can be very intelligent, manipulative and cunning. They come in all shapes and sizes and from all occupations. They often are very good liars. They will commonly attempt to deny or rationalize their behavior or try to outsmart the investigator.

## ARREST and CHARGING

The purpose of the investigation is to determine if there is reasonable grounds to believe that the crime of menacing by stalking, aggravated trespass, or violation of a protection order has occurred, and that an individual or individuals committed the offense.

1. Officers may arrest and detain a person, until a warrant can be obtained, when:
   a. there are reasonable grounds to believe that the offender committed a crime of menacing by stalking or aggravated trespass;
   b. there are reasonable grounds to believe that the offender violated an anti-stalking protection order.
2. Reasonable grounds may be obtained by a written statement from a person alleging that an alleged offender has committed menacing by stalking or aggravated trespass. NOTE: the reasonable grounds standard for Violating a TPO offense (any type of TPO) does NOT require a written statement-see definitions above.
3. Menacing by stalking is a first-degree misdemeanor unless one of the

following factors is present. It is a fourth degree felony if:
a. The offender has a prior conviction for stalking or criminal trespass;
b. The offender threatened physical harm;
c. The offender trespassed upon the victim's residence, place of employment or school;
d. The victim is a minor;
e. The offender has a history of violence or violent acts;
f. The offender had a deadly weapon on or about his/her person;
g. The offender was subject to an anti-stalking protection order;
h. The offender caused serious physical harm to the property of the victim;
i. Prior to the offense, suspect was determined to be a substantial risk of physical harm to others, as manifested by 1) evidence of then-recent homicidal or other violent behavior OR 2) evidence of then-recent threats which placed another in reasonable fear of violent behavior and serious physical harm OR 3) other evidence of then-present dangerousness

4. Inquire as to whether a civil or criminal protection order is in effect presently and, if so, ask for a copy of the order. If the victim cannot produce a copy of the order, obtain information about the court that granted the order and call dispatch to attempt to verify the existence and effective period of the order.
5. Upon reviewing a protection order, note carefully the restrictions imposed by the order to determine whether there is reasonable ground to believe that the order has been violated. It is the preferred course of action that an officer shall, through arrest, enforce an anti-stalking, temporary, or a civil protection order issued by any court in the state or any other state, in accordance with the provisions of the order, regardless of the reason the suspect gives for being at the premises.
6. If children are present, officers will do all of the following:

5

a. Children should be separated from the parties, if possible. Children should be interviewed about the stalking in a careful, gentle manner appropriate to the child's age and emotional state. Be on the alert for excited utterances from children while interviewing adult parties and witnesses.

7. Officers investigating a menacing by stalking or aggravated trespass will do all of the following:

a. Advise the victim of the availability of criminal and civil anti-stalking protection orders.

b. If the stalking victim will not sign a TPO request, the arresting officer will do so (same procedure as w/uncooperative DV victims)

c. Give the victim in writing the officer's name, badge number, the report number for the incident if a report number is available, and a telephone number that the victim can call for information about the case.

d. Give out a copy of the Department Sexual Assault/Stalking Information Sheet; complete and fax in the WPD Stalking Screening Questionnaire to RRMC probation.

e. Assist (as much as reasonably possible) any victim with transportation and location of lodging with family, friends, shelter, or public accommodation.

8. When an officer determines there are reasonable grounds to arrest and the suspect has left the scene, the officer should promptly seek a warrant for the arrest of that person.

9. If the offender is a juvenile and reasonable grounds exist, take the juvenile into custody and:

a. Contact Juvenile Court Detention Center by telephone to obtain a verbal authorization of admission.

b. Take two copies of the incident report, two copies of the booking information cards and a completed copy of the Juvenile Fact Sheet to the Detention Center at the time of transporting the juvenile to the Center.

c. Juvenile Court Detention Center staff will conduct a risk assessment and determine the level of detention.

d. The officer must sign the Menacing by Stalking complaint with the Juvenile Court Intake Unit within 72 hours of the youth's admission to the Detention Center.

e. It should be noted that the Juvenile Court generally does not issue TPOs against juveniles arrested for DV or stalking when the victim is also a family or household member. A TPO may be issued if the suspect juvenile lives outside of the victim's home.

*Reporting and Filing Procedures:*

1. Officers shall make a written report for any repeated incidents of harassment, threats, stalking or for any other offense arising out of a call to a scene involving an event or incident that may be a pattern of conduct, whether or not an arrest has been made. For a TPO Violation, a single instance constitutes an infraction and a report shall be generated. In the case of an arrest or when seeking a warrant, the officer shall document the facts and circumstances which are the basis for establishing reasonable grounds.

2. When an arrest is made for menacing by stalking or aggravated trespass, the officer shall inform the victim of the right to request a protection order and assist the victim in filing the motion for the order. (If the victim is a family or household member, the officer shall inform the victim of the right to request a temporary protection order under ORC 2919.26).

3. Officers will also advise a victim of the availability of a civil protection order pursuant to ORC 2903.214, or if the victim is a family or household member a civil protection order under ORC 3113.31, whether or not an arrest has been made. The officer shall give the victim the number for Templum's Justice System Advocacy Program

6

(216) 651-8484 for information and assistance in obtaining such an order.

4. When a protection order is requested, the officer shall inform the victim of the necessity to appear in court within 24 hours for a hearing on the motion.

5. The officer shall also inform the victim of the availability of a victim advocate to be present in court with the victim and/or to provide assistance with safety planning and additional services. In addition to providing the victim with the required information indicated in section 7 above, the officer will call Templum's Family Violence Hotline at (216) 631-2275. The officer will provide the victim's name, address, telephone number, defendant's name, the time and date for arraignment or hearing on a motion for a protection order to the advocate answering the telephone, unless requested by the victim not to disclose this information.

6. When an immediate arrest is not possible and a warrant has been issued, the officer shall make the victim aware of the warrant and of steps to take should the victim know of the offender's whereabouts.

*Qualified Immunity:*

Ohio Revised Code 2744.03 provides peace officers with the affirmative defense of qualified immunity against civil liability, including alleged violations of federal civil rights laws i.e. false arrest, malicious prosecution, etc. The affirmative defense is available to government officials, including law enforcement, who perform discretionary functions and whose conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known i.e., the "good faith" defense.

7

WESTLAKE POLICE DEPARTMENT 27300 Hilliard Blvd., Westlake, OH. 44145
Ph. (440) 871-3311 Fax (440) 835-6444 *Emergencies only dial 911*

## Sexual Assault/Stalking Information Sheet

You have reported one of the above offenses and need certain information for either your own reference or for future court proceedings.

Patrol Officer's name/badge number _____

Date of Offense and CAD number _____

Is the offense a Felony or misdemeanor, or uncertain at this time?     (circle one)

Is a TPO (Temp. Protection Order) in effect?   Y   N

Detective assigned (may not always_____
occur, depending on circumstances)

You may call the above number for information about your case, such as whether an arrest has been made, a suspect released on bond, etc. Many times in felony cases, this agency does not have any information as to where a case is in the court system. If needed as a witness, you will receive a subpoena at the same time the officer does. In misdemeanor cases, the officer usually will have more information.

City of Westlake Prosecutor is _____. This is a part time position, and it is best to call the above number and obtain the Prosecutor's private practice office phone #. In felony cases, the City Prosecutor handles only the arraignment (sometimes) and any pre-trial or preliminary hearings, not the actual trial. For misdemeanor cases, the City Prosecutor also conducts the trial. In cases where there is no arrest made at the time of the incident, the City Prosecutor may be asked to rule on what charges, if any, should be filed. Possible rulings are a criminal charge, no prosecution (victim may pursue civil lawsuit at own expense), or present case to the Grand Jury (felonies only). The City Prosecutor prosecutes cases in the Rocky River Municipal Court. It usually takes at least a month for a case to come to trial. The Court's phone number is (440) 333-0066.

The Cuyahoga County Prosecutor's Office handles felony cases at the Common Pleas Court in Cleveland. These cases move slowly. If a suspect is not in jail, it may be several months or longer before the case is brought to trial. The County Prosecutor represents the people and State of Ohio, and so a victim's wishes as to prosecution (or dropping charges) are only a consideration, not a controlling factor. The County Prosecutor's phone number is (216) 443-7800.

Useful phone numbers: Rape Crisis Center 24hrs Hotline (216) 619-6192
DV Hotline (216) 391-4357   Family Violence Hotline (216) 631-2275
County Witness-Victim Services (216) 443-7345
Templum Justice System Advocate (216) 651-8484
Stalking Victim Support Group (Rocky River Ct. Probation Dept.) (440) 356-5670
Ohio Attorney General Crime Victim Assistance 1 800 582 CVSS (can help pay for expenses related to interpersonal crime)

8

## WESTLAKE POLICE DEPARTMENT

Title: School Violence, Weapons, Drugs, and Contraband

Policy: 6150

Date Issued: December 12, 2000

Revised: Annual

Pages: 1 of 3

Signature: *Richard A. Walling*

Chief of Police

### I. Purpose

It is the purpose of this policy to establish procedures to coordinate the reporting of, response to, and follow-up on threats, violence, weapons, drugs, and contraband in the Westlake Schools.

### II. Policy

It is the policy of the Westlake Police Department, in cooperation with school authorities, to appropriately respond to and investigate incidents of threats, violence, weapons, drugs, and contraband in our schools. No report of, or rumor of threats, violence, narcotics, contraband, or weapons in any schools in Westlake shall be ignored.

### III. Procedures

### 1. Responsibility of School Officials

A. School officials will be responsible for initially assessing situations involving threats, weapons, or pending violence to determine the level of seriousness.

1. No threat, report of weapons, or rumor of pending violence shall be ignored, whether made to a student or faculty member.

B. The level of seriousness will be defined by the three categories listed below:

1. *Emergency*- situation where a weapon has been seen, used, or is being displayed in a threatening manner.

a. School officials will immediately contact the Westlake Police via 9-1-1 and then the School Resource Officer (SRO) if available.

b. It is recommended that school staff do not make contact with a student who actually has a firearm. If safe to do so, keep visual contact only.

2. *Serious Threat*- situations where verbal threats are made about bringing a weapon to school, reports from staff or students that someone may have a weapon in school, or serious verbal threats of violence are made unrelated to weapons (Agg. Menacing and Menacing).

a. The Westlake Police Department will be contacted at 871-3311 and an officer requested to respond. The School Resource Officer (SRO) will also be contacted if available.

b. The subject, accompanied by the School Resource Officer or a police officer will be taken to the Office and a parent/guardian will be requested to respond to the school.

3. *Non-Emergency-* situations where non-weapon-related verbal threats are made, and it has been determined there is no reason to believe the party making the threats has intention to act on them.

a. Westlake Police may be contacted if needed. Otherwise, school officials will make appropriate disposition and follow-up with parents and counselors.

b. When in doubt, call the Westlake Police Department for a response by an officer.

## 2. Responsibility of Police Dispatchers and Call Takers

A. The Police Dispatcher or call taker at the Westlake Police Department is responsible for obtaining the following information:

1. Obtain the name of the reporting person.

2. Gather information on the subject/suspect, including location in the building.

3. Obtain from the reporting person which door to the school is unlocked for officer entry or the safest entry location.

4. Advise the reporting person to attempt to keep the subject in school until the police arrive, if no firearm is believed to be involved.

5. <u>Dispatch via the police radio immediately when an *Emergency* or *Serious Threat* is being reported.</u>

6. Update responding officers if level of seriousness changes.

## 3. Responsibility of Responding Officer(s)

A. The responding officer(s) are responsible for the following tasks:

1. Receive the details via radio, MDT, or land line phone.

2. Respond with information provided in a safe fashion using the proper response code.

3. On arrival, gather pertinent information from school officials and the subject to make a determination if a criminal offense has been committed.

4. Interview parent/guardian to determine if the subject has access to weapons. Where access to weapons exists, officers should use all legal means to confiscate them or seek voluntary surrender from the parent/guardian prior to releasing the child into their custody.

a. If necessary, a search warrant should be obtained with the assistance of the Westlake Police Department Detective Bureau and.or the Cuyahoga County Prosecutor's Office.

5. If an arrest is made, depending upon the seriousness of the offense, officers may release the subject into the custody of a parent/guardian after obtaining the necessary information for booking. Children under eight years of age should not be physically arrested unless exigent circumstances dictate otherwise.

6. If an arrest is made, and the situation is determined to be a serious crime, or the parent/guardian is unavailable, the subject will be transported to the police department

2

where a Detective or Juvenile Officer (if available) will follow-up.

a. In cases involving weapons, drugs, actual violence or serious verbal threats of violence, or any felony, attempt to have the suspect admitted to the DH.

7. Appropriate filings and charges shall be made.

8. A report will be generated in each situation, regardless of whether an arrest is made, with a copy to the Juvenile Officer.

9. School officials shall be advised of the result of the investigation.

a. The Juvenile Officer or Field Operations Captain are the designated contacts for school officials.

10. If an incident occurs in a private school, the subject's home police department shall be notified of the situation and circumstances.

**4. Drugs and Contraband**

A. Students found to be possessing, or suspected of possessing, either illegal drugs or drug paraphernalia should be taken to the office by school staff to prevent the destruction or distribution of such items.

B. School staff shall notify the Westlake Police Department of such event as soon as possible after discovery and securing of the contraband.

C. School staff and responding police officers should attempt to discover whether any other person has received or ingested any illegal drug, in addition to the student in question.

1. Appropriate medical care shall be provided in cases where drugs have been ingested.

D. Upon request of the school administrator, the Westlake Police Department's K-9 can be provided to sniff buildings and their furnishings, vehicles, bookbags, and other packages.

E. Students arrested for felony drug law violations shall be returned to the police station for processing.

1. After processing, they should be transported to the Juvenile Detention Home, if the Home will accept them.

F. If, in the opinion of the Officer In Charge (OIC), it would be beneficial to process a misdemeanor drug law violator, such juvenile should also be returned to the station.

1. Examples of such offenders would be repeat offenders, juveniles suspected of involvement in other offenses, etc.

2. Minor Misdemeanor offenders should not ordinarily be returned to the police station, unless no parent or other responsible adult can take charge of the juvenile subject.

G. Adult offenders are treated the same as a non-student arrested for the same offense.

H. Upon request of a school administrator, officers will assist in identifying suspected illicit drugs or drug paraphernalia.

1. Such assistance is conditioned upon the full identity particulars of the student(s) possessing such items being provided to the police department for investigation.

3



# City of Westlake

27216 Hilliard Boulevard, Westlake, Ohio 44145 • (216) 871-3300

# POLICE DEPARTMENT
## general orders

| SUBJECT: AGENCY JURISDICTION and MUTUAL AID | NUMBER 7000 |
|---|---|
| RULE/REFERENCE: ORD & MUTUAL AID AGREEMENTS | EFFECTIVE DATE: December 23, 1987 <br> REVIEW DATE: |
| DISTRIBUTION CODE: A,B,C,D,E | APPROVED: Chief David G. Bly | No of PAGES 1 of 7 |

I. PURPOSE

To delineate the specific geographical boundaries of the City of Westlake, identify cooperative agreements with area law enforcement agencies, and provide agency personnel with the necessary information for effective implementation of mutual aid and/or utilization of regional services.

II. OBJECTIVES

Affording additional police assistance and protection to themselves and their inhabitants, there shall be an inter-change of services of the Police Departments of the six (6) West Shore Communities of Bay Village, Fairview Park, Lakewood, North Olmsted, Rocky River and Westlake, Ohio.

III. JURISDICTION

A detailed official map which delineates the specific geographical boundaries of the Department's jurisdiction is located within the WPD Communications Center.

IV. AGENCY RESPONSIBILITY

It is the intent of this directive to identify basic shared responsibilities as they relate to police service in concurrent jurisdictions. It is incumbent upon the WPD to coordinate it's efforts with other agencies in the area of radio communications, primary and back-up response to service requests, reporting procedures and police functions in the non-emergency role.

V.    INTERAGENCY JURISDICTION

A.    Areas of Joint Jurisdiction

Within certain park districts and state highway jurisdictions the WPD coordinates it's efforts in servicing complaints dispatched via our radio. The purpose is to provide or assist in providing the best possible service to the community we serve. Generally speaking, the first agency upon the scene having jurisdiction, has the responsibility of being in charge. The WPD recognizes this responsibility and either assumes jurisdiction on that basis or provides assistance to other agencies as needed.

The WPD does not however, routinely investigate citizen complaints which fall within the jurisdiction of the Cleveland Metropolitan Park District - Bradley Woods Reservation. Requests from citizens to investigate routine complaints in the Metro Park shall be forwarded to the Park Rangers Headquarters. If a citizen is unable to have a problem resolved at that level, he/she may request assistance from the WPD. All requests of this nature must have administrative approval.

1.    Any investigative matter discovered within the Metro Parks Bradley Woods Reservation will cause appropriate notification to be made to that agency as soon as possible.

2.    A report of any enforcement action taken by personnel of the WPD within the jurisdiction of the Metro Parks Bradley Woods Reservation shall be forwarded to that agency.

B.    Felony Investigation - Joint Jurisdiction

In certain areas of possible joint jurisdiction, the WPD will assist with the investigation of all felony offenses, if requested, where the primary responsibility for the investigation does not rest with this Department. Any such request for assistance shall be logged.

C.    Liquor Control Enforcement

For the purpose of liquor control enforcement, WPD officers are considered agents/representatives of the Ohio Department of Liquor Control.

Liquor control violations fall into two categories:

TITLE 43: LIQUOR CONTROL LAW, or LIQUOR CONTROL REGULATION.

WPD officers may arrest and/or cite for violations of certain sections of TITLE 43 ORC committed in the officer's presence. However, officers may not arrest or cite for violations of the LIQUOR CONTROL REGULATIONS.

1.  Officers must submit a liquor control regulation violation report to the Liquor Control Commission requesting that the "Commission" cite reported offenders.

2.  Arrests and/or citations for violations of the LIQUOR CONTROL LAWS may be heard in both the Municipal Court of original jurisdiction and the Liquor Control Commission.

    a.  When possible, the complaint should be filed with the local court prior to filing such with the Liquor Control Commission. A conviction in the Municipal Court can be used as evidence before the Liquor Control Commission.

3.  Permit holder checks are an important accepted practice of the WPD. Officers are encouraged to make periodic permit holder checks as a routine practice. However, officers should limit the amount of time spent inside such facilities. The officer(s) shall advise the dispatcher of their intent prior to initiating a permit holder premises check. A log entry shall be made to that effect, indicating the start and completion times and the officer's finding.

    a.  Where an arrest is made for a violation of the LIQUOR CONTROL LAW, or other violations which reflect upon the permit holder, an offense report will be submitted. A copy of this report will be forwarded to the Chief's Office

    b.  All reports shall contain, at a minimum, the following: name, address, and permit number of the facility; type of permit (D-1, D-5, C-1, C-2); name and phone number of the person on premises; and, a description of the incident.

          c.    The Criminal Investigations Section shall complete all necessary report forms and the records unit shall then submit a copy of such reports and forms to the attention of the State Liquor Department, Enforcement Division, 3615 Superior Ave., Cleveland, Ohio 44114.

## VI.    MUTUAL AID AGREEMENTS

Pursuant to Section 737.04 ORC, on April 10, 1980, the City of Westlake entered into written agreement with the afore-mentioned neighboring law enforcement agencies to provide mutual aid in emergency situations. Copies of that agree-ment are on file with each of the political subdivisions.

## VII.    AVAILABILITY OF RESOURCES

The availability of resources is dependent upon the nature and location of the incident. Patrol units may be dispatch-ed on an "as-needed" basis with regard to a mutual aid request.

A.    WPD patrol units are generally authorized to respond to a request for mutual aid assistance in adjoining municipalities, provided that at least three (3) patrol units remain available within the City of Westlake during this time.

B.    Extenuating circumstances may justify a reduction in the minimum authorized number of patrol units required to remain in the city, provided the call for assist-ance is in close proximity to the city and the circum-stances warrant an immediate response for a short duration of time.

C.    The Watch Commander shall monitor all requests for mutual aid assistance and determine the extent to which WPD personnel will respond.

## VIII.    MUTUAL AID PROCEDURE

The West Shore mutual aid agreement states that in the event of an emergency and upon the request of another police department by the highest ranking officer of that department on duty at the time of the emergency, each political subdivision which is a party to the agreement will furnish police manpower and equipment if the highest ranking officer on duty, of the requested police depart-ment, is of the opinion that such police manpower and equipment is available. If the responding agency agrees to provide mutual aid, the personnel of the responding agency shall report to, and shall work under the direction and

supervision of the senior officer of the requesting agency on duty at the time that the mutual aid request is made. Such police manpower and equipment may be recalled at the sole discretion of the highest ranking officer on duty of the police department furnishing such police manpower and equipment.

As used herein, the term "emergency" shall mean an actual or potential condition that poses an immediate threat to life or property, and exceeds the capability of a local agency to counteract successfully.

Notwithstanding the above, if mutual aid is provided, it will only be provided pursuant to the particular policy of the responding department.

In situations where mutual aid is utilized, radio communications should be established if possible, through the use of either LEERN or the area wide channel #4 network.

A. On request for assistance and aid from an effected jurisdiction the extent of such response shall be determined by the OIC, who shall at all times, retain sufficient personnel and equipment within the City of Westlake to afford proper and adequate protection for the citizens of the City of Westlake.

  1. At no time will police personnel and equipment of the City of Westlake respond to an outside agency so as to leave the City of Westlake without proper and adequate protection.

  2. The senior officer or officer-in-charge of the police department of the effected community shall have full charge and authority over such assisting personnel and equipment of the responding Municipal Corporation.

B. The following procedures shall apply in situations where mutual aid and assistance is requested or required:

  1. No member of the Police Department of the City of Westlake shall assist any effected or neighboring jurisdiction in a request for aid <u>unless and until he is assigned</u> by the senior officer or officer-in-charge of his platoon.

2. In the event an effected neighboring jurisdiction requests aid or assistance, said jurisdiction shall request aid through the OIC of the platoon which is on duty at the time of the request. At that time, the OIC may grant permission for assigned Westlake Police personnel and equipment to leave the city and respond to the request for aid.

3. All mutual aid requests shall be logged on the daily log indicating the time of such request, the identity of units assigned, and the time all units assigned were freed and back in service.

4. Under no circumstances shall a patrol unit from an effected or neighboring jurisdiction request and receive aid or assistance from a WPD unit without first obtaining permission from the OIC of the Westlake Police Department, with the following exception;

   a. Aid and assistance may be administered to a neighboring jurisdiction, absent approval of a higher authority, in those instances of extreme emergency whereby an immediate decision or determination must be made by the officer on the scene to assist a requesting or neighboring jurisdiction, in order to protect life and property from a substantial risk of physical or serious physical harm.

IX. REQUESTING FEDERAL LAW ENFORCEMENT ASSISTANCE

A. Upon identification of a need for specialized or additional assistance at the scene of a crime, the responding officer shall notify his supervisor, who shall be responsible for coordinating all requests for federal assistance through the Investigations Section of the WPD.

B. Requests for federal law enforcement assistance in emergency situations shall be made through the Chief or his designated representative. The following federal agencies will provide assistance upon request:

   - Federal Bureau of Investigation (Kidnapping, extortion, etc.)

   - U.S. Marshal Service (Prisoner Transport)

   - Secret Service (Special Investigations & support)

X.   OHIO NATIONAL GUARD - EMERGENCY ASSISTANCE

The Ohio National Guard can be requested to assist in the
following general problem areas:

A.   Natural or Man-made Disasters.

- Floods
- Snow Emergencies
- Evacuations
- Water Emergencies (hauling drinking water)

B.   Civil Disturbances

In general, before the Ohio National Guard can be
requested, all available local resources must be
committed to resolving the problem situation.

Procedures for requesting the National Guard shall be
contained within the Emergency Procedures Manual on
file in the Communications Center.

XI.   STATEWIDE LAW ENFORCEMENT RADIO SYSTEM

The WPD intends to access and utilize the Statewide Law
Enforcement Radio System provided and operated by the Ohio
Attorney General. This system is divided into two separate
statewide radio networks, the Law Enforcement Emergency
Radio Network (LEERN) and an inter-city radio network.

1.   The LEERN system is designed to allow patrol units
from separate departments to communicate (car-to-car)
with one another throughout the state.

2.   The inter-city radio network is designed for station-
to-station communication between the various law
enforcement departments within the state.

XII.   STATEWIDE FINGERPRINT RECORDING SYSTEM

The state operated Bureau of Criminal Identification and
Investigation, under the office of the Attorney General,
serves as a cooperative tool for law enforcement at all
levels. One of the primary objectives of BCI&I is to
provide for law enforcement agencies a centralized state-
wide fingerprint records system which serves as the data
base for the Computerized Criminal History (CCH) files.

The WPD participates in this function by supplying data to
the agency and utilizing the vast fingerprint information
provided therein.

# Evaluation Report

**Patrol Officer:** Ryan Jasinsky     **Sergeant:** John A. Mauer     **Rating Quarter:** 3rd   2021

## Evaluation Measures

1. **Measure:** The patrol officer manages his/her radio communications in compliance with policy and training absent any negative disciplinary action during the evaluation period.
   Below Standard_____☐_____     Meets Standard__☒_____

2. **Measure:** The patrol officer operates his/her vehicle in compliance with policy, training and law, absent any at-fault injury MVAs or negative disciplinary action during the evaluation period.
   Below Standard_____☐_____     Meets Standard__☒_____

3. **Measure:** The patrol officer handles equipment in compliance with law, policy, and training absent any negative disciplinary action during the evaluation period.
   Below Standard_____☐_____     Meets Standard__☒_____

4. **Measure:** The patrol officer correctly identifies that a crime requiring an arrest or investigative action has or has not occurred on each call for service, or consults with his/her immediate supervisor prior to clearing the call, during the evaluation period.
   Below Standard_____☐_____     Meets Standard___☒_____

5. **Measure:** The patrol officer completes a thorough preliminary investigation, including the arrest of a suspect as necessary, in compliance with law and policy, absent negative disciplinary action during the evaluation period.
   Below Standard_____☐_____     Meets Standard__☒_____

6. **Measure:** The patrol officer makes arrests supported by probable cause during the evaluation period.
   Below Standard_____☐_____     Meets Standard__☒_____

7. **Measure:** The patrol officer conducts searches of persons and property in compliance with law, training, and policy, absent any negative disciplinary action, during the evaluation period.
   Below Standard_____☐_____     Meets Standard__☒_____

8. **Measure:** The patrol officer completes criminal complaints in compliance with law, absent any negative disciplinary action, during the evaluation period.
   Below Standard_____☐_____     Meets Standard__☒_____

9. **Measure:** The patrol officer, upon receipt of a subpoena, verifies his/her role in the case, the resources needed (additional witnesses and/or evidence, training records), and reports to court on time for all required appearances.
   Below Standard_____☐_____     Meets Standard__☒_____

**10. Measure:**  The patrol officer correctly determines the need for an incident report to be generated at all calls for service, absent any negative disciplinary action, during the evaluation period.
　　　　Below Standard_____☐_____　　　Meets Standard____☒_____

**11. Measure:**  The patrol officer provides sufficient information to the Communications Center to complete the log entry for the call for service, absent any negative disciplinary action, during the evaluation period.
　　　　Below Standard_____☐_____　　　Meets Standard____☒_____

**12. Measure:**  The patrol officer completes all required written reports in compliance with policy, absent any negative disciplinary action, during the evaluation period.
　　　　Below Standard_____☐_____　　　Meets Standard____☒_____

**13. Measure:**  The patrol officer enters all items of evidence or property into the appropriate management system in compliance with law and policy, absent any negative disciplinary action, during the evaluation period.
　　　　Below Standard_____☐_____　　　Meets Standard____☒_____

**14. Measure:**  When not assigned a call for service or providing back-up, the patrol officer provides patrol services in his/her assigned zone, absent any additional supervisory direction, during the evaluation period.
　　　　Below Standard_____☐_____　　　Meets Standard____☒_____

**15. Measure:**  The patrol officer reports to duty and is in rollcall (or reviewing logs if early car) dressed for patrol at the start of the hour, absent any additional supervisory direction, during the evaluation period.
　　　　Below Standard_____☐_____　　　Meets Standard____☒_____

**16. Measure:**  During self-initiated activity, the patrol officer correctly develops that a crime requiring an arrest (or SLW) supported by probable cause has occurred and takes action based upon such crime, absent any negative disciplinary action, during the evaluation period.
　　　　Below Standard_____☐_____　　　Meets Standard____☒_____
　　　　N/A (no self-initiated arrests)____☐_____
*Meets Standard with Distinction, as evidenced by 10 or more self-initiated (NT) arrests during the evaluation period*_X_____

**17. Measure:**  When assigned to conduct a traffic detail, the patrol officer documents all citizen contacts via a Field Interview, Traffic Citation, Non-Traffic arrest, or Equipment Repair Order, and provides the detail disposition to dispatch, absent any additional supervisory direction, during the evaluation period.
　　　　Below Standard_____☐_____　　　Meets Standard____☒_____

**18. Measure:**  The patrol officer completes assigned follow-up cases in compliance with policy, absent negative disciplinary action, during the evaluation period.
　　　　Below Standard_____☐_____　　　Meets Standard____☒_____

19. **Measure:**  The patrol officer achieves timely attendance or excused absence from all WPD required training during the evaluation period.
    Below Standard_____☐_____        Meets Standard_____☒_____

20. **Measure:**  The patrol officer attends training with all required equipment during the evaluation period.
    Below Standard_____☐_____        Meets Standard_____☒_____

21. **Measure:**  The patrol officer successfully completes Lexipol DTBs within five working days of release, absent any negative disciplinary action, during the evaluation period.
    Below Standard_____☐_____        Meets Standard_____☒_____

22. **Measure:**  The patrol officer acknowledges all Lexipol Policy releases within five working days of release, absent any negative disciplinary action, during the evaluation period.
    Below Standard_____☐_____        Meets Standard_____☒_____

23. **Measure:**  The patrol officer complies with applicable uniform appearance and equipment policy during the evaluation period.
    Below Standard_____☐_____        Meets Standard_____☒_____

24. **Measure:**  The patrol officer does not have a sustained Personnel Complaint regarding his or her conduct interacting with or observable by members of the Community during the evaluation period.
    Below Standard_____☐_____        Meets Standard_____☒_____
    *Meets Standard with Distinction, as evidenced by receipt of a formal commendation or recognition/appreciation from a supervisor, member of the public, or another government agency during the evaluation period* X_____

25. **Measure:**  When assigned, the patrol officer engages in a preventive education effort with a member of the community, absent any disciplinary action.

    Below Standard_____☐_____        Meets Standard_____☒_____
    *Meets Standard with Distinction, as evidenced by two self-initiated or voluntary preventive education efforts completed during the evaluation period*_____

 Ryan comes in ready to work every he is here. Great enthusiasm. Reinforce we can't help anyone if we don't get there.  Did get 2 compliments (2116364 & 2122137)  Also from the Chief regarding traffic stop

I have met personally with the employee to review this Evaluation Report in compliance with Policy 1001.

Platoon Sergeant's Electronic Signature: T. Doerr, S8     Date: 9/17/2021

I have reviewed this Evaluation Report in compliance with Policy 1001.

Shift Lieutenant's Electronic Signature: Lt. M.A. Morales, L5   Date: 9/29/21

Upon completion, the Shift Lieutenant will forward a copy of this Evaluation Report to the Admistrative Assistant, who will place the Evaluation Report into the employee's Personnel File Evaluation folder on the WPD network.

EXHIBIT H

# Controversial police training course being held in Westlake this week

**Ideastream Public Media | By Matthew Richmond**
Published April 26, 2022 at 7:12 AM EDT

   



► LISTEN • 4:41



EXHIBIT I

# The City of **W**estlake Ohio



DENNIS M. CLOUGH, MAYOR

www.cityofwestlake.org

**POLICE DEPARTMENT**

27300 Hilliard Blvd.        Phone 440.871.3311
Westlake, OH 44145        Fax    440.835.6444

## NOTICE OF DISCIPLINE

To: Patrolman JP Toth
Date: **December 8th, 2020**

Article 31 of the Collective Bargaining Agreement between the City of Westlake and The Ohio Patrolmen's Benevolent Association (OPBA) provides for the disciplinary procedure to be followed with non-probationary employees of the Police Department. Pursuant to said Article, you are hereby on notice that discipline is being imposed against you for a violation of the following: Westlake Police Department's Policy 300 Use of Force and Policy 310 Canines. This conduct occurred on December 3rd, 2020, On December 6th, 2020, you waived your right to have a representative present and participated in an informal meeting with Lt. Dancy in a good faith effort to settle this matter. An unpaid suspension was proposed as settlement of this matter. You agreed to this proposal. On December 8th, 2020, you waived your right to have a representative present and participated in an informal meeting with Capt. Schanz and me to finalize terms of the proposed settlement of this matter. The following discipline will be imposed against you for the above-described conduct:

> One days of unpaid suspension. One days of suspension will be held in abeyance, conditioned upon the following:

> No further sustained violation of Westlake Police Department Policy 300 and Policy 310 within two years of date of this settlement.

**Further failure to follow the Polices, General Orders and/or Rules and Regulations of the City of Westlake Police Department will subject you to further disciplinary action which may include your termination from employment.**

The below signed parties agree hereby agree to this imposition of discipline as settlement of this issue.

_____                    _____
Patrolman JP Toth                                    Kevin Bielozer
                                                              Chief of Police

**THIS FORMAL NOTICE OF DISCIPLINE WAS SENT VIA REGISTERED MAIL, RETURN RECEIPT REQUESTED OR PERSONALLY SERVED ON THE EMPLOYEE.**

EXHIBIT J

| ID | First | Last | Manual | No. | Policy | Date 1 | Date 2 |
|---|---|---|---|---|---|---|---|
| oh072-jross | Jeaneen | Ross | Westlake Police Department Policy Manual | 304 | Conducted Energy Device | 1/1/2020 | 1/2/2020 |
| oh072-jross | Jeaneen | Ross | Westlake Police Department Policy Manual | 304 | Conducted Energy Device | 1/1/2021 | 1/4/2021 |
| oh072-jross | Jeaneen | Ross | Westlake Police Department Policy Manual | 304 | Conducted Energy Device | 6/4/2021 | 6/7/2021 |
| oh072-jross | Jeaneen | Ross | Westlake Police Department Policy Manual | 319 | Hate or Prejudice Crimes | 7/13/2020 | 7/20/2020 |
| oh072-jross | Jeaneen | Ross | Westlake Police Department Policy Manual | 501 | Traffic Collision Response And Reporting | 3/16/2018 | 3/20/2018 |
| oh072-jross | Jeaneen | Ross | Westlake Police Department Policy Manual | 302 | Handcuffing and Restraints | 10/1/2020 | 10/3/2020 |
| oh072-jross | Jeaneen | Ross | Westlake Police Department Policy Manual | 302 | Handcuffing and Restraints | 4/7/2021 | 4/12/2021 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 103 | Policy Manual | 10/13/2022 | 10/15/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 100 | Law Enforcement Authority | 12/1/2022 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 355 | De-Escalation | 7/18/2022 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 302 | Handcuffing and Restraints | 6/14/2021 | 8/11/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 302 | Handcuffing and Restraints | 12/6/2022 | 12/16/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 304 | Conducted Energy Device | 3/1/2022 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 605 | Brady Material Disclosure | 12/9/2020 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 303 | Control Devices and Techniques | 3/1/2022 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 901 | Custodial Searches | 2/16/2022 | 8/5/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 204 | Training Policy | 7/18/2022 | 8/5/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 1000 | Recruitment and Selection | 8/9/2021 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 103 | Policy Manual | 8/9/2021 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 1008 | Communicable Diseases | 3/13/2020 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 320 | Standards of Conduct | 8/9/2021 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 1003 | Grievance Procedures | 7/13/2020 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 1009 | Smoking and Tobacco Use | 8/26/2016 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 1016 | Fitness for Duty | 1/11/2021 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 1020 | Overtime Compensation Requests | 3/1/2021 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 347 | Transporting Persons | 4/7/2017 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 1033 | Vacations, Days Off and Other Time Off | 3/24/2021 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 206 | Administrative Correspondence | 3/15/2019 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 345 | Department Use of Social Media | 6/9/2020 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 209 | Job Descriptions | 1/3/2021 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 209 | Job Descriptions | 11/1/2022 | 12/2/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 812 | LEADS Management Policies | 9/25/2022 | 10/2/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 902 | JAIL MAN DOWN ALARM (JMDA) | 9/24/2018 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 611 | Online Undercover Operations | 10/1/2018 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 612 | Digital Forensics Examinations | 11/13/2018 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 306 | Firearms | 1/9/2022 | 8/5/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 346 | Crime Scenes and Physical Evidence Recovery | 4/7/2017 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 1030 | Employee Speech, Expression and Social Networking | 5/13/2019 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 1022 | Illness/Injury Reporting and Light Duty | 5/1/2018 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 1028 | Temporary Light Duty Assignments | 5/1/2018 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 1028 | Temporary Light Duty Assignments | 10/13/2022 | 10/15/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 1028 | Temporary Light Duty Assignments | 12/6/2022 | 12/16/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 812 | LEADS Management Policies | 8/24/2018 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 333 | Communications with Persons with Disabilities | 12/6/2022 | 12/16/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 807 | Protected Information | 1/28/2018 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 310 | Canines | 11/26/2019 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 312 | Temporary Custody of Juveniles | 8/9/2021 | 8/5/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 323 | Media Relations | 10/1/2020 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 422 | Mobile Audio Video | 12/9/2015 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 504 | Impaired Driving | 6/1/2022 | 8/11/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 208 | Retiree Concealed Firearms | 5/13/2019 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 502 | Vehicle Impound, Inventory, Towing and Release Policy | 11/19/2018 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 200 | Organizational Structure and Responsibility | 7/22/2021 | 9/18/2022 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 923 | Visitation (Reference Jail Standard 5120: 1-10-07) | 5/4/2021 | 5/25/2021 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 924 | Medical Services - Emergency Care (Reference Jail Standard 5120: 1-10-09) | 5/4/2021 | 5/25/2021 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 924 | Medical Services - Emergency Care (Reference Jail Standard 5120: 1-10-09) | 3/17/2022 | 5/23/2022 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 202 | General Orders | 7/23/2021 | 8/4/2021 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 202 | General Orders | 2/16/2022 | 2/16/2022 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 202 | General Orders | 12/15/2022 | 12/18/2022 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 1033 | Vacations, Days Off and Other Time Off | 3/12/2019 | 8/7/2020 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 918 | JAIL RIOTS | 5/4/2021 | 5/25/2021 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 919 | HOSTAGE SITUATIONS | 5/4/2021 | 5/25/2021 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 309 | Domestic Violence | 2/16/2022 | 2/16/2022 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 309 | Domestic Violence | 5/20/2022 | 5/23/2022 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 201 | Lawful Orders | 2/6/2019 | 8/16/2020 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 201 | Lawful Orders | 1/1/2021 | 1/24/2021 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 705 | BAC Datamaster Weekly Checks | 2/6/2019 | 8/7/2020 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 202 | General Orders | 2/3/2020 | 3/21/2020 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 430 | Crisis Intervention Incidents | 7/18/2022 | 11/29/2022 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 434 | Crisis Intervention Team (CIT) | 9/16/2016 | 8/7/2020 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 505 | Traffic Citations | 5/13/2019 | 8/7/2020 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 809 | Ohio Law Enforcement Gateway OHLEG | 12/23/2019 | 8/7/2020 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 309 | Domestic Violence | 7/13/2020 | 7/19/2020 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 309 | Domestic Violence | 3/1/2021 | 3/5/2021 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 703 | Vehicle Use | 9/13/2016 | 8/7/2020 |

232

| ID | First | Last | Manual | Policy # | Policy Name | Date 1 | Date 2 |
|---|---|---|---|---|---|---|---|
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 1023 | Personal Appearance Standards | 7/13/2020 | 7/19/2020 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 1023 | Personal Appearance Standards | 8/9/2021 | 8/31/2021 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 410 | Citation Releases | 9/16/2016 | 8/7/2020 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 430 | Crisis Intervention Incidents | 9/16/2016 | 8/7/2020 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 430 | Crisis Intervention Incidents | 3/1/2021 | 3/5/2021 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 416 | Field Training Officer Program | 4/1/2020 | 8/7/2020 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 614 | Juvenile Diversion Commission | 4/1/2020 | 8/7/2020 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 614 | Juvenile Diversion Commission | 1/20/2022 | 2/16/2022 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 335 | Biological Samples | 5/1/2020 | 6/25/2020 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 607 | Warrant Service | 5/1/2020 | 6/25/2020 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 608 | Operations Planning and Deconfliction | 5/1/2020 | 5/1/2020 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 900 | Temporary Custody of Adults | 4/7/2021 | 4/9/2021 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 910 | Security (Reference Jail Standard 5120: 1-10-03) | 5/4/2021 | 5/25/2021 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 917 | Staffing (Reference Jail Standard 5120: 1-10-17) | 5/4/2021 | 5/25/2021 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 1034 | Line-of-Duty Deaths | 8/20/2019 | 8/7/2020 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 1034 | Line-of-Duty Deaths | 2/16/2022 | 2/16/2022 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 603 | Confidential Informants | 8/20/2019 | 8/7/2020 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 911 | Jail Recreation and Programing (Reference Jail Standard 5120: 1-10-11A) | 2/19/2021 | 3/5/2021 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 421 | Watch Commanders | 4/18/2019 | 8/7/2020 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 400 | Patrol Function | 2/6/2020 | 8/7/2020 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 615 | Ad Hoc Operations | 3/5/2021 | 3/5/2021 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 615 | Ad Hoc Operations | 3/1/2022 | 3/1/2022 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 606 | Unmanned Aerial System (UAS) Operations (DRONES) | 3/24/2021 | 4/9/2021 |
| oh072-rjasinsky | Ryan | Jasinsky | Westlake Police Department Policy Manual | 415 | Emergency Utility Service | 4/7/2021 | 4/9/2021 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 809 | Ohio Law Enforcement Gateway OHLEG | 12/23/2019 | 12/24/2019 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 400 | Patrol Function | 2/6/2020 | 2/9/2020 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 615 | Ad Hoc Operations | 3/5/2021 | 3/6/2021 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 615 | Ad Hoc Operations | 3/1/2022 | 3/12/2022 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 606 | Unmanned Aerial System (UAS) Operations (DRONES) | 3/24/2021 | 3/24/2021 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 900 | Temporary Custody of Adults | 4/7/2021 | 4/13/2021 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 910 | Security (Reference Jail Standard 5120: 1-10-03) | 5/4/2021 | 5/17/2021 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 323 | Media Relations | 10/1/2020 | 10/6/2020 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 425 | Public Recording of Law Enforcement Activity | 6/9/2020 | 6/12/2020 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 427 | Foot Pursuits | 11/19/2018 | 11/19/2018 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 427 | Foot Pursuits | 11/1/2022 | 11/13/2022 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 421 | Watch Commanders | 4/18/2019 | 4/19/2019 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 400 | Patrol Function | 9/24/2018 | 9/25/2018 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 311 | Search and Seizure | 1/1/2021 | 1/2/2021 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 311 | Search and Seizure | 1/9/2022 | 1/13/2022 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 316 | Missing Persons | 8/24/2018 | 8/26/2018 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 316 | Missing Persons | 11/19/2018 | 11/19/2018 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 316 | Missing Persons | 3/1/2021 | 3/8/2021 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 323 | Media Relations | 4/1/2020 | 4/9/2020 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 355 | De-Escalation | 2/16/2022 | 2/19/2022 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 355 | De-Escalation | 7/18/2022 | 7/29/2022 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 424 | Portable Audio/Video Recorders | 3/8/2022 | 3/8/2022 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 304 | Conducted Energy Device | 3/1/2022 | 3/12/2022 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 311 | Search and Seizure | 1/23/2018 | 1/25/2018 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 311 | Search and Seizure | 2/6/2020 | 2/10/2020 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 303 | Control Devices and Techniques | 3/1/2022 | 3/12/2022 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 314 | Discriminatory Harassment | 8/24/2018 | 8/26/2018 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 314 | Discriminatory Harassment | 7/13/2020 | 7/17/2020 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 314 | Discriminatory Harassment | 8/9/2021 | 8/10/2021 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 314 | Discriminatory Harassment | 12/6/2022 | 12/23/2022 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 100 | Law Enforcement Authority | 12/1/2020 | 12/15/2020 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 320 | Standards of Conduct | 5/13/2019 | 5/17/2019 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 320 | Standards of Conduct | 2/6/2020 | 2/9/2020 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 320 | Standards of Conduct | 8/1/2020 | 8/8/2020 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 320 | Standards of Conduct | 8/9/2021 | 8/10/2021 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 303 | Control Devices and Techniques | 1/1/2020 | 1/3/2020 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 303 | Control Devices and Techniques | 1/1/2021 | 1/1/2021 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 1018 | Lactation Breaks | 12/6/2022 | 12/23/2022 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 306 | Firearms | 2/28/2018 | 3/2/2018 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 306 | Firearms | 11/26/2019 | 12/1/2019 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 306 | Firearms | 1/1/2021 | 1/3/2021 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 306 | Firearms | 1/9/2022 | 1/13/2022 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 200 | Organizational Structure and Responsibility | 7/22/2021 | 7/25/2021 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 305 | Officer-Involved Shootings and Deaths | 6/1/2018 | 6/2/2018 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 305 | Officer-Involved Shootings and Deaths | 6/1/2019 | 6/1/2019 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 305 | Officer-Involved Shootings and Deaths | 9/2/2020 | 9/2/2020 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 305 | Officer-Involved Shootings and Deaths | 2/16/2022 | 2/19/2022 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 305 | Officer-Involved Shootings and Deaths | 7/18/2022 | 8/21/2022 |
| oh072-rdudas | Richard | Dudas | Westlake Police Department Policy Manual | 305 | Officer-Involved Shootings and Deaths | 7/18/2022 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 333 | Communications with Persons with Disabilities | 11/7/2021 | 9/18/2022 |
| oh072-sbarnie | Stephen | Barnie | Westlake Police Department Policy Manual | 431 | First Amendment Assemblies | 6/9/2020 | 9/18/2022 |

233

EXHIBIT K

# Use of Force

City of Westlake Police Department Policy Manual

---

**300.1 PURPOSE AND SCOPE**

This policy provides guidelines on the reasonable use of force. While there is no way to specify the exact amount or type of reasonable force to be applied in any situation, every member of this department is expected to use these guidelines to make such decisions in a professional, impartial, and reasonable manner.

In addition to those methods, techniques, and tools set forth below, the guidelines for the reasonable application of force contained in this policy shall apply to all policies addressing the potential use of force, including but not limited to the Control Devices and Techniques and Conducted Energy Device policies.

300.1.1 DEFINITIONS
Definitions related to this policy include:

**Deadly force** - Force reasonably anticipated and intended to create a substantial likelihood of causing death or very serious injury.

**Feasible** - Reasonably capable of being done or carried out under the circumstances to successfully achieve the arrest or lawful objective without increasing risk to the officer or another person.

**Force** - The application of physical techniques or tactics, chemical agents, or weapons to another person. It is not a use of force when a person allows him/herself to be searched, escorted, handcuffed, or restrained.

**Imminent** - Ready to take place; impending. Note that imminent does not mean immediate or instantaneous.

**Totality of the circumstances** - All facts and circumstances known to the officer at the time, taken as a whole, including the conduct of the officer and the subject leading up to the use of force.

**300.2 POLICY**

The use of force by law enforcement personnel is a matter of critical concern, both to the public and to the law enforcement community. Officers are involved on a daily basis in numerous and varied interactions and, when warranted, may use reasonable force in carrying out their duties.

Officers must have an understanding of, and true appreciation for, their authority and limitations. This is especially true with respect to overcoming resistance while engaged in the performance of law enforcement duties.

The Department recognizes and respects the value of all human life and dignity without prejudice to anyone. Vesting officers with the authority to use reasonable force and to protect the public welfare requires monitoring, evaluation and a careful balancing of all interests.

---

Copyright Lexipol, LLC 2022/12/15, All Rights Reserved. Published with permission by City of Westlake Police Department

Use of Force - 53

## City of Westlake Police Department Policy Manual

### 300.2.1 DUTY TO INTERCEDE AND REPORT
Any officer present and observing another law enforcement officer or a member using force that is clearly beyond that which is objectively reasonable under the circumstances shall, when in a position to do so, intercede to prevent the use of unreasonable force.

Any officer who observes another law enforcement officer or a member use force that is potentially beyond that which is objectively reasonable under the circumstances should report these observations to a supervisor.

### 300.2.2 PERSPECTIVE
When observing or reporting force used by a law enforcement officer, each officer should take into account the totality of the circumstances and the possibility that other law enforcement officers may have additional information regarding the threat posed by the subject.

### 300.3 USE OF FORCE

Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.

The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.

Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.

It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to

rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.

While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.

300.3.1 USE OF FORCE TO EFFECT AN ARREST
Any officer who has reasonable cause to believe that the person to be arrested has committed a crime or public offense may use reasonable force to effect the arrest, to prevent escape or to overcome resistance. An officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested, nor shall an officer be deemed the aggressor or lose his/her right to

*Use of Force*

---

Copyright Lexipol, LLC 2022/12/15, All Rights Reserved. Published with permission by City of Westlake Police Department

Use of Force - 54

# City of Westlake Police Department Policy Manual

self-defense by the use of reasonable force to effect the arrest, prevent escape or to overcome resistance.

300.3.2 FACTORS USED TO DETERMINE THE REASONABLENESS OF FORCE
When determining whether to apply force and evaluating whether an officer has used reasonable force, a number of factors should be taken into consideration, as time and circumstances permit. These factors include but are not limited to:

1. (a)  Immediacy and severity of the threat to officers or others.
2. (b)  The conduct of the individual being confronted, as reasonably perceived by the officer at the time.
3. (c)  Officer/subject factors (e.g.,age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of officers available vs. subjects).
4. (d)  The effects of suspected drug or alcohol use.
5. (e)  The individual's mental state or capacity.
6. (f)  The individual's ability to understand and comply with officer commands.
7. (g)  Proximity of weapons or dangerous improvised devices.
8. (h)  The degree to which the individual has been effectively restrained and his/her ability to resist despite being restrained.
9. (i)  The availability of other reasonable and feasible options and their possible effectiveness.
10. (j)  Seriousness of the suspected offense or reason for contact with the individual.
11. (k)  Training and experience of the officer.

12. (l)  Potential for injury to officers, suspects, and others.
13. (m)  Whether the individual appears to be resisting, attempting to evade arrest by flight, or is attacking the officer.
14. (n)  The risk and reasonably foreseeable consequences of escape.
15. (o)  The apparent need for immediate control of the individual or a prompt resolution of the situation.
16. (p)  Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others.
17. (q)  Prior contacts with the individual or awareness of any propensity for violence.
18. (r)  Any other exigent circumstances.

### 300.3.3 PAIN COMPLIANCE TECHNIQUES

Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers may only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:

*Use of Force*

Copyright Lexipol, LLC 2022/12/15, All Rights Reserved. Published with permission by City of Westlake Police Department

## City of Westlake Police Department Policy Manual

1. (a)  The degree to which the application of the technique may be controlled given the level of resistance.
2. (b)  Whether the Individual can comply with the direction or orders of the officer.
3. (c)  Whether the Individual has been given sufficient opportunity to comply.

The application of any pain compliance technique shall be discontinued once the officer determines that compliance has been achieved.

### 300.3.4 CAROTID CONTROL HOLD

A carotid control hold is a technique designed to control an individual by temporarily restricting blood flow through the application of pressure to the side of the neck and, unlike a chokehold, does not restrict the airway. The proper application of the carotid control hold may be effective in restraining a violent or combative individual. However, due to the potential for injury, the use of the carotid control hold is limited to those circumstances where deadly force is authorized and is subject to the following:

1. (a)  At all times during the application of the carotid control hold, the response of the individual should be monitored. The carotid control hold should be discontinued when circumstances indicate that the application no longer reasonably appears necessary.

2.  (b) Any individual who has had the carotid control hold applied, regardless of whether he/ she was rendered unconscious, shall be promptly examined by paramedics or other qualified medical personnel and should be monitored until such examination occurs.
3.  (c) The officer shall inform any person receiving custody, or any person placed in a position of providing care, that the individual has been subjected to the carotid control hold and whether the individual lost consciousness as a result.
4.  (d) Any officer attempting or applying the carotid control hold shall promptly notify a supervisor of the use or attempted use of such hold.
5.  (e) The use or attempted use of the carotid control hold shall be thoroughly documented by the officer in any related reports.

300.3.5 USE OF FORCE TO SEIZE EVIDENCE
In general, officers may use reasonable force to lawfully seize evidence and to prevent the destruction of evidence. However, officers are discouraged from using force solely to prevent a person from swallowing evidence or contraband. In the instance when force is used, officers should not intentionally use any technique that restricts blood flow to the head, restricts respiration or which creates a reasonable likelihood that blood flow to the head or respiration would be restricted. Officers are encouraged to use techniques and methods taught by the City of Westlake Police Department for this specific purpose.

300.3.6 ALTERNATIVE TACTICS - DE-ESCALATION
When circumstances reasonably permit, officers should use non-violent strategies and techniques to decrease the intensity of a situation, improve decision-making, improve communication, reduce

*Use of Force*

---

Copyright Lexipol, LLC 2022/12/15, All Rights Reserved. Published with permission by City of Westlake Police Department

# City of Westlake Police Department Policy Manual

the need for force, and increase voluntary compliance (e.g., summoning additional resources, formulating a plan, attempting verbal persuasion).

300.3.7 RESPIRATORY RESTRAINTS
The use of a respiratory restraint, also known as a chokehold, is limited to circumstances where deadly force is authorized and if applied, is subject to the same guidelines and requirements as a carotid control hold.

**300.4 DEADLY FORCE APPLICATIONS**

When reasonable, the officer shall, prior to the use of deadly force, make efforts to identify him/ herself as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts.

Use of deadly force is justified in the following circumstances involving imminent threat or imminent risk:

1.  (a)  An officer may use deadly force to protect him/herself or others from what he/she reasonably believes is an imminent threat of death or serious bodily injury.
2.  (b)  An officer may use deadly force to stop a fleeing subject when the officer has probable cause to believe that the individual has committed, or intends to commit, a felony involving the infliction or threatened infliction of serious bodily injury or death, and the officer reasonably believes that there is an imminent risk of serious bodily injury or death to any other person if the individual is not immediately apprehended. Under such circumstances, a verbal warning should precede the use of deadly force, where feasible.

Imminent does not mean immediate or instantaneous. An imminent danger may exist even if the suspect is not at that very moment pointing a weapon at someone. For example, an imminent danger may exist if an officer reasonably believes that the individual has a weapon or is attempting to access one and intends to use it against the officer or another person. An imminent danger may also exist if the individual is capable of causing serious bodily injury or death without a weapon, and the officer believes the individual intends to do so.

300.4.1 MOVING VEHICLES
Shots fired at or from a moving vehicle involve additional considerations and risks, and are rarely effective.

When feasible, officers should take reasonable steps to move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants.

An officer should only discharge a firearm at a moving vehicle or its occupants when the officer reasonably believes there are no other reasonable means available to avert the imminent threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others.

Officers should not shoot at any part of a vehicle in an attempt to disable the vehicle.

*Use of Force*

---

Copyright Lexipol, LLC 2022/12/15, All Rights Reserved. Published with permission by City of Westlake Police Department

# City of Westlake Police Department Policy Manual

## 300.5 REPORTING THE USE OF FORCE

Any use of force by a member of this department shall be documented promptly, completely, and accurately in an appropriate report, depending on the nature of the incident. The officer should articulate the factors perceived and why he/she believed the use of force was reasonable under the circumstances.

To collect data for purposes of training, resource allocation, analysis, and related purposes, the Department may require the completion of additional report forms, as specified in department policy, procedure, or law. See the Report Preparation Policy for additional circumstances that may require documentation.

300.5.1 NOTIFICATIONS TO SUPERVISORS
Supervisory notification shall be made as soon as practicable following the application of force in any of the following circumstances:

*Use of Force*

---

**300.6**

1.  (a)  The application caused a visible injury.
2.  (b)  The application would lead a reasonable officer to conclude that the individual may have experienced more than momentary discomfort.
3.  (c)  The individual subjected to the force complained of injury or continuing pain.
4.  (d)  The individual indicates intent to pursue litigation.
5.  (e)  Any application of the TASER device or control device.
6.  (f)  Any application of a restraint device other than handcuffs, shackles, or belly chains.
7.  (g)  The individual subjected to the force was rendered unconscious.
8.  (h)  An individual was struck or kicked.
9.  (i)  An individual alleges unreasonable force was used or that any of the above has occurred.

**MEDICAL CONSIDERATIONS**

Once it is reasonably safe to do so, medical assistance shall be obtained for any person who exhibits signs of physical distress, has sustained visible injury, expresses a complaint of injury or continuing pain, or was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until the individual can be medically assessed. Individuals should not be placed on their stomachs for an extended period, as this could impair their ability to breathe.

Based upon the officer's initial assessment of the nature and extent of the individual's injuries, medical assistance may consist of examination by an emergency medical services provider or medical personnel, at a hospital or jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.

---

Copyright Lexipol, LLC 2022/12/15, All Rights Reserved. Published with permission by City of Westlake Police Department

# City of Westlake Police Department <small>Policy Manual</small>

The on-scene supervisor or, if the on-scene supervisor is not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).

Individuals who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics, and imperviousness to pain, or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away.

See the Medical Aid and Response Policy for additional guidelines.

## 300.7 SUPERVISOR RESPONSIBILITIES

A supervisor should respond to a reported application of force resulting in visible injury, if reasonably available. When a supervisor is able to respond to an incident in which there has been a reported application of force, the supervisor is expected to:

1. (a)  Obtain the basic facts from the involved officers. Absent an allegation of misconduct or excessive force, this will be considered a routine contact in the normal course of duties.
2. (b)  Ensure that any injured parties are examined and treated.
3. (c)  When possible, separately obtain a recorded interview with the individual upon whom force was applied. If this interview is conducted without the individual having voluntarily waived his/her *Miranda* rights, the following shall apply:
    1. The content of the interview should not be summarized or included in any related criminal charges.
    2. The fact that a recorded interview was conducted should be documented in a property or other report.
    3. The recording of the interview should be distinctly marked for retention until all potential for civil litigation has expired.
4. (d)  Once any initial medical assessment has been completed or first aid has been rendered, ensure that photographs have been taken of any areas involving visible injury or complaint of pain, as well as overall photographs of uninjured areas.

1. These photographs should be retained until all potential for civil litigation has expired.

5. (e)  Identify any witnesses not already included in related reports.
6. (f)  Review and approve all related reports.
7. (g)  Determine if there is any indication that the individual may pursue civil litigation.

*Use of Force*

Copyright Lexipol, LLC 2022/12/15, All Rights Reserved. Published with permission by City of Westlake Police Department

Use of Force - 59

## City of Westlake Police Department Policy Manual

1. If there is an indication of potential civil litigation, the supervisor should complete and route a notification of a potential claim through the appropriate channels.

(h) Evaluate the circumstances surrounding the incident and initiate an administrative investigation if there is a question of policy noncompliance or if for any reason further investigation may be appropriate.

In the event that a supervisor is unable to respond to the scene of an incident involving the reported application of force, the supervisor is still expected to complete as many of the above items as circumstances permit. The supervisor conducting the initial administrative review of a use of force incident shall document the findings in the Case Notes section under the Case Manage tab of the incident report.

300.7.1 WATCH COMMANDER RESPONSIBILITY
The Watch Commander shall review each use of force by any personnel within his/her command to ensure compliance with this policy and to address any training issues.

### 300.8 TRAINING

Officers will receive periodic training on this policy and demonstrate their knowledge and understanding, at least annually, including use of deadly force, use of force and use of deadly force reporting, and use of force and use of deadly force reviews/investigations.

Subject to available resources, officers should receive periodic training on:

1. (a)  Guidelines regarding vulnerable populations, including but not limited to children, elderly, pregnant persons, and individuals with physical, mental, or intellectual disabilities.
2. (b)  De-escalation tactics, including alternatives to force.

### 300.9 USE OF FORCE ANALYSIS

At least annually, the Special Operations Lieutenant should prepare an analysis report on use of force incidents. The report should be submitted to the Chief of Police. The report should not

*Use of Force*

contain the (a)

(b) (c) (d)

names of officers, suspects or case numbers, and should include: The identification of any trends in the use of force by members. Training needs recommendations. Equipment needs recommendations.

Policy revision recommendations.

---

Copyright Lexipol, LLC 2022/12/15, All Rights Reserved. Published with permission by City of Westlake Police Department

EXHIBIT L



# FORCE SCIENCE®
## INSTITUTE

# CERTIFICATE

## OF COMPLETION



### THIS CERTIFICATION IS PROUDLY PRESENTED TO

# *Richard Lea*

## FORCE SCIENCE ANALYST

This document confirms the above named individual is certified to apply the principles and concepts of Force Science in the analysis of use of force incidents after successfully completing all course and practical application requirements of the Force Science Certification Course.



**Dr. William Lewinski**
Executive Director



**May 3, 2022**
**Date Issued**

EXHIBIT M



123046501

# IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

THE STATE OF OHIO
   Plaintiff

WILLIAM MCKISSACK
   Defendant

Case No: CR-21-664465-A

Judge: WANDA C JONES

INDICT: 2923.12  CARRYING CONCEALED WEAPONS
        /FORS
        2923.16  IMPROPERLY HANDLING FIREARMS IN A
        MOTOR VEHICLE /FORS
        2921.31  OBSTRUCTING OFFICIAL BUSINESS

## JOURNAL ENTRY

DEFENDANT IN COURT.  COUNSEL JAMES S JONES PRESENT.
PROSECUTOR(S) ALEXANDRIA SERDARU PRESENT.
COURT REPORTER  PRESENT.
TRIAL CONTINUED TO 06/29/2022 AT 09:00 AM
AT THE REQUEST OF STATE.
DEFENDANT'S MOTION MOTION TO SUPRESS IS GRANTED.


04/25/2022
CPBWL 04/26/2022 14:36:58

_____
   Judge Signature              04/27/2022

HEAR
04/25/2022